1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| SETH WALLACK and SAN DIEGO VETERINARY IMAGING, INC., | CASE NO. 11cv2996-GPC(KSC) |

11

Plaintiffs,

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

12

vs.

13
14

IDEXX LABORATORIES, INC.; IDEXX REFERENCE

[Dkt. Nos. 37, 39.]

15

LABORATORIES, INC.; MATTHEW WRIGHT; an individual; and

16

STEPHEN WALTERS, an individual

17

Defendants.

18
19
20

        Presently before the Court are two Motions to Dismiss filed by Defendants Matthew Wright ("Wright") and Stephen Walters ("Walters"), (ECF No. 37); and Idexx Laboratories, Inc. ("Idexx") and Idexx Reference Laboratories, Inc. ("Idexx RL"), (ECF No. 39).  Plaintiffs Seth Wallack ("Plaintiff") and San Diego Veterinary Imaging, Inc. ("SD Imaging") opposed the motions, (ECF Nos. 41, 43), and Defendants replied, (ECF Nos. 46, 47).  Having considered the parties' submissions and the applicable law, the Court GRANTS in part and DENIES in part both Defendants' motions to dismiss.

21
22
23
24
25

**Background**[1]

26
27

        Plaintiff, a licensed veterinarian, established SD Imaging in 2002.  Plaintiff was

28

_____

        [1]All factual allegations in this section are taken from the First Amended Complaint.  (ECF No. 34.)

one of the first veterinary radiologists to promote "tele-radiology" – a digital imaging technology allowing veterinarians to use the Internet to send x-rays to radiologists for an immediate consultation. Plaintiff recognized tele-radiology practices would require a software platform to store, analyze, and manipulate imagery, as well as a platform to provide consultations online. With this in mind, Plaintiff began developing a software platform to service this need in 2004. SD Imaging hired Defendant Walters, a professional software developer, and offered him 20% of SD Imaging's stock. Using the name "DVMinsight," Plaintiff named the software, established a website, created a trademark, and conducted his tele-radiology practice. Plaintiff filed a trademark application in April 2005, and received a trademark registration for DVMinsight ("the Trademark") with SD Imaging as the owner on August 7, 2007. Plaintiff began working on an operation called the Veterinary Imaging Center of San Diego, Inc. ("the Center") which formally launched in December 2005. Eventually, Walters ceased to offer services to SD Imaging and worked solely at the Center. Also, late in 2005, Defendant Wright, a veterinary radiologist, joined Plaintiff and Walters at the Center. Plaintiff and Wright became close colleagues and interacted constantly with Walters to develop the software program.

In 2006, Plaintiff, Wright and Walters established DVMinsight, Inc. ("DVM") of which Plaintiff and Wright each owned 40%, and Walters 20%. Plaintiff claims the three owners understood that SD Imaging retained ownership of the Trademark but permitted DVM to operate under the trade name. By 2008, DVM largely succeeded in developing the software program and by 2009, DVM's software program was functional, popular, and successful.

In April 2009, Wright traveled to Defendant Idexx's headquarters in Maine and met with officers and employees to discuss the possibility of selling DVM to Idexx. Upon his return, Wright reported that Idexx had expressed a "passing interest" in DVM and "would not pay more than $1 million for the entire DVM operation." Wright said the discussions with Idexx had been unsuccessful, inconclusive, and they only offered

$1 million for DVM.  Wright mentioned that he spoke with a Fred Farber, an officer of Idexx but provided no other names.  Wright and Plaintiff agreed that the purchase price of $1 million was well below what they believed the value of DVM at the time.  When Plaintiff inquired whether Wright would pursue further negotiations or discussion swith Idexx, Wright emphatically responded that any discussions with Idexx were over and there would be no further discussions.  However, Plaintiff later discovered that Wright was in communication with Idexx in an email dated July 26, 2009 from Wright to Wallack titled "IDEXX" which reflects that there was contact between Wright and an officer of Idexx.

Plaintiff claims that from mid-2009 onward, Wright became "inexorably unfair" towards Plaintiff and managed to "win over" Walters who would side with Wright during the near-daily quarrels.  Plaintiff also claims Wright convinced key administrative assistants they would be better off if they sided with Wright and Walters.  Wright allegedly indicated that if Plaintiff did not leave DVM, Wright was prepared to manipulate corporate structures to justify improperly diverting DVM revenues to the private companies of Wright and Walters, and would conduct a series of transactions which would saddle Plaintiff with debt while depriving him of revenues.

In August 2009, Plaintiff had an email exchange with Wright requesting a general update on DVM's profitability in the prior months and requested a meeting of the board of directors of DVM to discuss the current and prior months' financial records.  In the email exchange, Wright represented that DVM is "not really all that profitable at this point."  At the meeting of the board of directors in August, Plaintiff was not presented with standard corporate financial records but was presented with an Income and Expense Graph separated by month.  Plaintiff claims that the bar graph showed approximate net income for the first seven months of 2009 between $25,000 and $30,000; however, Wright falsely stated that DVM was "not really profitable at this point."

In October 2009, Wright and Walters, without notice or consent, terminated Plaintiff as an administrator of the software program.  In December 2009, they also unilaterally changed ownership of DVM's domain name and transferred it to a new host which denied Plaintiff access.  Plaintiff no longer had administrative access to DVM's platform and was frozen out of the financial matters of DVM by Wright. Wright and Walters also gave themselves pay raises and bonuses without offering Plaintiff the same, and engaged in ongoing discussions with DVM's accountant without explaining the nature of these discussions to Plaintiff.

Also, in an email dated December 7, 2009, Wright indicated that there was going to be an excess of $120,000 to $150,000 of profit disbursement for 2009.  This email was sent to Plaintiff without any financial data to support the financial findings. Plaintiff asserts there is an inconsistency between Wright's comment in August 12, 2009 that DVM was not really profitable and an email dated December 7, 2009 indicating that there was going to be an excess of $120,000 of profit disbursement for 2009.  Plaintiff does not understand how the financial fortunes of DVM could have drastically improved during those four months.

Due to the hostile work environment and financial manipulations, in December 2009, Plaintiff agreed to negotiate with Wright and Walters for the sale of his 40% interest in DVM and proposed they hire a business valuation specialist to assess a fair price for Plaintiff.  Plaintiff claims Wright "angrily refused" and insisted that if the purchase did not take place immediately, he would find other means of excluding Plaintiff from its operations.  Upon an initial offer of $100,000, Plaintiff called Fred Farber, an Idexx officer, regarding Wright's negotiations with Idexx.  Farber responded that Idexx had "floated a sales price 'in the neighborhood of $1 million' that Idexx might be willing to pay for DVM . . . and indicated that he had given no further thought to this matter and expected that Idexx would not pursue the matter any further." Thereafter, Wright, Walters, and Plaintiff agreed to value DVM at $686,250, offering

[11cv2996-GPC(KSC)]

1   Plaintiff $274,500 for his 40% share[2] ("the Purchase Agreement") signed December

2   31, 2009.

3          The Purchase Agreement also included a non-solicitation clause forbidding

4   Plaintiff from soliciting any listed customer of DVM.  Plaintiff claims he realized only

5   after signing the Purchase Agreement that the list was over-inclusive and included even

6   potential clients of DVM.  Late in the day on December 31st, the day the Purchase

7   Agreement was signed, Plaintiff was presented with the customer list that was to list

8   all of DVM's current customers.  Wright indicated that if the list was over-inclusive,

9   he would not strictly enforce it against Plaintiff.  Plaintiff claims Wright refused to

10  remove the names of non-customers, even though prior to signing the Purchase

11  Agreement he indicated he would do so.

12         In September 2011, Defendant Idexx RL, a subsidiary corporation owned and

13  controlled by Idexx, acquired DVM and Animal Insides (a company owned by Wright)

14  for a total of 3.2 million dollars, $3 million of which Plaintiff attributes to DVM.  This

15  was 4.3 times higher than the value of $686,250 that they used to buy Plaintiff out and

16  3.2 times more than the alleged $1 million valuation that Idexx had asserted in

17  December 2009.  During the 21 month period from Plaintiff's sale of his stock in DVM

18  to Wright and Walters, Plaintiff claims DVM did not acquire or develop any new asset

19  or line of business of substantial value, did not improve its services or transform itself

20  so as to increase its value, and the market conditions did not materially improve; in

21  fact, the market conditions deteriorated during this time.  Upon purchasing DVM,

22

23          [2]In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a Court may consider
     exhibits attached to the complaint, matters subject to judicial notice, or documents
24  necessarily relied on by the complaint whose authenticity no party questions.  See
     Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007); Lee v. City of Los Angeles,
25  250 F.3d 668, 688–689 (9th Cir. 2001); United States v. Ritchie, 342 F.3d 903, 908
     (9th Cir. 2003) ("A court may, however, consider certain materials-documents attached
26  to the complaint, documents incorporated by reference in the complaint, or matters of
     judicial notice-without converting the motion to dismiss into a motion for summary
27  judgment.") Plaintiff submitted an Appendix of Exhibits attached to his First Amended
     Complaint containing documents which are referred to in the Complaint and integral
28  to the Plaintiff's claims.  (ECF No. 34.)  Defendants do not object to these documents.
     Accordingly, the Court may consider these exhibits on Defendants' motions to dismiss.

1  Idexx began using the Trademark without permission from Plaintiff.

2      During the years in questions, in 2010, DVM worked on about 131,207 cases,
3  an increase of about 26,000 cases from 2009 or a 24% increase.  In 2011, before the
4  sale of DVM to Idexx in September, DVM performed about 123,088 cases to that
5  point.  Plaintiff alleges that an increase of about 25,000 cases per year would not justify
6  a purchase price of 3.2 million in September 2011 based on a $1million value Idexx
7  had asserted in April 2009.

8      Plaintiff further complains that a reasonable inference can be made that Wright
9  reached an understanding with Fred Farber and/or TJ Dupree whereby Idexx would
10 purchase DVM for about $3million at some future time.  Around August 2009, Idexx
11 bought another veterinary company, VDIC for about $6.7 million.  Plaintiff asserts that
12 Idexx and Wright agreed to delay the purchase of DVM because Idexx was in the
13 process of negotiating the purchase of VDIC and it took time for Idexx to integrate and
14 use VDIC's software based tele-radiology platform/services.  Theoretically, DVM
15 could have been sold to Idexx at an earlier time, such as January 2010 after Wallack
16 sold his stock to Wright/Walters.

17     Plaintiff claims that contrary to statements made by Idexx and Wright,
18 Defendants made an agreement in 2009 for the purchase of DVM for approximately $3
19 million dollars, an agreement to conceal the purchase price and to delay the purchase
20 until after Plaintiff's departure.

21     The First Amended Complaint asserts seven causes of action:  (1) securities fraud
22 in violation of Section 10(b) and Rule 10(b)-5 of the Securities Exchange Act of 1934;
23 (2) securities fraud in violation of California Corporations Code sections 25401, 25501,
24 and 25504.1; (3) intentional misrepresentation and fraudulent concealment; (4) breach
25 of fiduciary duty; (5) trademark infringement; (6) civil conspiracy; and (7) request for
26 declaratory relief to resolve whether Idexx RL is the alter ego of Idexx and whether
27 Idexx or Idexx RL may continue to use the trademark at issue.  (ECF No. 34.)

28     Defendants Wright and Walters move to dismiss the first cause of action for

[11cv2996-GPC(KSC)]

federal securities fraud; second cause of action for state securities fraud; third cause of action for intentional misrepresentation and fraudulent concealment; fourth cause of action for breach of fiduciary duty; and sixth cause of action for civil conspiracy.

Defendants Idexx and Idexx RL move to dismiss the first cause of action for federal securities fraud; second cause of action for state securities fraud; third cause of action for intentional misrepresentation and fraudulent concealment; and sixth cause of action for civil conspiracy.  Defendants Idexx and Idexx RL do not move to dismiss the trademark infringement and declaratory relief claims.

## I.    Legal Standard on Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990).  Under Federal Rule of Civil Procedure 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir.

2009) (quotations omitted).  In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff.  al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)).  In other words, where leave to amend would be futile, the Court may deny leave to amend.  See Desoto, 957 F.2d at 658; Schreiber, 806 F.2d at 1401.

## II.   Federal Securities Fraud - Violation of Section 10(b) and Rule 10b-5 as to all Defendants

Defendants Wright and Walters assert that Plaintiff has not pled any facts to demonstrate the existence of an alleged 2009 agreement or that any statements made by Wright or Wallack prior to the execution of the Agreement were false.  Idexx contends that Plaintiff has failed to allege an actionable misrepresentation by failing to allege any facts that Farber's statement in December 2009 that Idexx had "floated" a price of about $1million but that he did not expect Idexx to pursue the matter further was false.

Section 10(b) of the Securities Exchange Act ("Act") makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or . . . for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, . . . ." 17 C.F.R. § 240.10b–5(b).  Rule 10b-5 also makes it unlawful for

[11cv2996-GPC(KSC)]

1   any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in

2   any act, practice, or course of business which operates or would operate as a fraud or

3   deceit upon any person, in connection with the purchase or sale of any security." 17

4   C.F.R. § 240.10b–5(a), (c).

5       To state a securities fraud claim under 10(b) of the Act and Rule 10b-5, a

6   plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) in

7   connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and

8   (6) loss causation. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). A

9   complaint alleging claims under section 10(b) and Rule 10b-5 must satisfy the pleading

10  requirements of both the PSLRA and Rule 9(b). In re Verifone Holdings, Inc.

11  Securities Litigation, 704 F.3d 694, 701 (9th Cir. 2012).

12      In 1995, Congress enacted the Private Securities Litigation Reform Act

13  ("PSLRA") to curb abuses of securities fraud litigation. Amgen, Inc. v. Conn.

14  Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1200 (2013). These include

15  "nuisance filings, targeting of deep-pocket defendants, vexatious discovery request and

16  manipulation by class action lawyers." Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

17  551 U.S. 308, 320 (2007). In response to these abuses, the PSLRA imposed a

18  heightened pleading requirement under securities fraud actions under § 10(b) and Rule

19  10b-5 requiring that falsity and scienter be plead with particularity. Amgen, Inc., 133

20  S. Ct. at 1200; Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir.

21  2009).

22      Under the PSLRA's heightened pleading instructions, a complaint alleging that

23  the defendant made a false or misleading statement must: "(1) 'specify each statement

24  alleged to have been misleading [and] the reason or reasons why the statement is

25  misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise

26  to a strong inference that the defendant acted with the required state of mind,' §

27  78u–4(b)(2)." Tellabs, Inc., 551 U.S. at 321.

28      To satisfy the requisite state of mind element, "a complaint must 'allege that the

[11cv2996-GPC(KSC)]

defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness.'" Zucco, 552 F.3d at 991 (citation omitted). Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness. In re VerFone Holdings, Inc. Securities Litig., 704 F.3d at 701. To satisfy the Ninth Circuit's interpretation of the PSLRA, Plaintiffs' allegations must give rise to a strong inference of deliberate recklessness, "provid[ing] a list of all relevant circumstances in great detail." Silicon Graphics, 183 F.3d at 974 ( abrogated on other grounds by South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008)). If allegations of false statements are based on information and belief, the complaint must "provide, in great detail, all the relevant facts forming the basis for that belief." In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1017 (S.D. Cal. 2005). The heightened pleading requirements of the PSLRA "are an unusual deviation from the usually lenient requirements of federal rule pleadings." Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001).

Under Federal Rule of Civil Procedure 9(b), the circumstances constituting fraud must be pled with particularity. Fed. R. Civ. P. 9(b). The particularity requirement means "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)). Thus, to satisfy the specificity requirement of 9(b), a plaintiff is required "to plead evidentiary facts" and the court must "consider what inferences these facts will support—despite the pitfalls and inefficiencies of such an analysis at the pleading stage . . . ." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) (emphasis added). To most directly show misrepresentation, the plaintiff may draw on inconsistent contemporaneous statements or conditions which contradict the challenged statements. In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1549 (9th Cir. 1994). Allegations "based on information and belief usually do not satisfy the degree of particularity required

under Rule 9(b)." <u>Zatkin v. Primuth</u>, 551 F. Supp. 39, 42 (S.D. Cal. 1982).

In <u>Fecht</u>, the plaintiffs adequately pled falsity in alleging that the defendants gave falsely positive statements regarding a company expansion program when, in reality, the defendants were aware the program was doing so poorly it would have to be curtailed or abandoned.  <u>Fecht</u>, 70 F.3d at 1083.  To show how the statements were false, plaintiffs cited contemporaneous inconsistent conditions like unsatisfactory sales at the time of the statements.  <u>Id.</u>  The court also found that the shortness of time between positive statements and public disclosure of the failing program, less than three months, was strong circumstantial evidence of misrepresentation. <u>Id.</u> at 1083-84.

In another Ninth Circuit case, the court clarified that the "[Ninth Circuit has] allowed the temporal proximity of an allegedly fraudulent statement or omission and a later disclosure to *bolster* a complaint, [internal citation omitted], but [it has] never allowed the temporal proximity between the two, *without more*, to satisfy the requirements of Rule 9(b)." <u>Yourish v. California Amplifier,</u> 191 F.3d 983, 997 (9th Cir. 1999) (emphasis in original).  "Mere 'temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance,' without more, 'do[es] not create an inference that the earlier statements were fraudulent.'" <u>Id.</u> (citation omitted).  The Court held that the temporal proximity between an earlier statement and a later disclosure alone did not satisfy Rule 9(b)'s pleading requirement.  <u>Id.</u>; <u>see also</u> <u>Ronconi v. Larkin</u>, 253 F.3d 423, 429 (9th Cir. 2001) (holding that "the five week period between the optimistic statements and the below-expectations earning report is not enough to sustain the complaint.").

In the First Amended Complaint, Plaintiff alleges numerous false and/or misleading material statements or omissions made by Defendants between April 2009 to December 31, 2009 concerning the sale of Plaintiff's shares of stock in DVM to Defendants Wright and Walters.  Plaintiff asserts that these assertions were made to fraudulently mislead Plaintiff into believing negotiations between Idexx and Wright were unsuccessful in order to induce Plaintiff to sell his 40% interest at a greatly

devalued price in December 2009.

First, Plaintiff asserts that an email sent on August 12, 2009 from Wright to Wallack that DVM was "not really all that profitable at this point" is false and/or misleading because it is contradicted by other documents which include the Income and Expense Summary Graph he received concerning the month of August 2009 which shows that DVM is purported to be making $20,000 in profit that month, and an Income and Expense Summary Graph received in December 2009 which shows profits of around $15,000 to $25,000 per month throughout the 2009 calendar year.  (ECF No. 34-8 at 2; 34-6 at 2.)  Moreover, during August 2009, Wright and Walters were repeatedly imploring Wallack to sell his stock to them and this email reflects Plaintiff's attempt to determine if his stock was valuable and therefore he was left to consider this statement in determining whether the buyout price was reasonable.

Defendants Wright and Walters argue that the email statement is vague and does not reflect that DVM was not profitable at all but that it was not very profitable as of August 2009.  Moreover, they argue that the statement is merely a subjective opinion as to profitability by Wright.

The email dated August 12, 2009 from Wright to Wallack stated, "[b]ased on FMW for profitability it is going to be the same routine as the center.  Not really all that profitable at this point.  You sure that you want to do this?  FWIW Matt"  This statement is not a calculated assessment on profitability but the subjective comments of Wright as to his opinion on the profitability of the company at that time.  Moreover, Wallack admits that he received the Income and Expense Summary Graph of August 2009 and the year 2009 in December 2009 before he signed the Stock Repurchase Agreement.  Therefore, Plaintiff's allegation that he relied on the August 12, 2009 email as a basis to determine whether the buyout price was reasonable is without merit.  Lastly, the fact that Plaintiff received the email and received the Income and Expense Summary Graph in August and December 2009, refutes Plaintiff's allegation that there was purposeful concealment of facts from Wallack.  Accordingly, Plaintiff's allegation

[11cv2996-GPC(KSC)]

1   that the contents of the August 12, 2009 email were false and which led Plaintiff to sell

2   his stock at a low price does not satisfy the heightened pleading requirements of the

3   PLSRA and Rule 9(b).

4         Second, Plaintiff asserts that Wright misrepresented that he would have no

5   further communications with Idexx after April 2009.  (ECF No. 34, FAC ¶ 84(b).)

6   Plaintiff contends that an email dated July 26, 2009 reveals that Wright was having

7   discussions with Idexx executives, including but not limited to TJ Dupree, Farber's

8   boss.  (Id.)  Moreover, Wright represented to Walters prior to the final value price of

9   DVM that Wright was not going to be selling DVM to Idexx in December 2009.  (Id.)

10        Defendants Wright and Walters argue that this statement does not give rise to a

11   strong inference that Wright, as of July 2009, was engaged in negotiations with Idexx

12   for the purchase of DVM.  Moreover, a conversation with "Brandon" does not give rise

13   to a reasonable inference that Wright, as of July 2009 was engaged in negotiations with

14   Idexx for the purchase of DVM.  Defendant Idexx asserts that an email dated July 26,

15   2009, which was disclosed to Plaintiff, shows that Wright's discussion with Idexx was

16   not being kept secret.  Moreover, the email content is not inconsistent with Farber's

17   alleged representation to Wallack in December 2009 that Idexx had considered

18   purchasing DVM for $1 million earlier in the year but had decided against it.  Plaintiff

19   contends that there was an ongoing business between DVM and Idexx at that time and

20   Wright and Walters failed to disclose those Idexx dealings.

21        The email dated July 26, 2009 from Wright to Wallack states: "Talked with

22   brandon this AM.  TJ Dupree is not happy about the CR leases you are doing.  MWI

23   rep is pissed off or something.  They may be posturing but this may throw the backup

24   bit over the edge.  Seems like TJ is ready to move this forward.  He is Freds boss BTW.

25   Will know more this week.  Matt" (ECF No. 34, FAC, Ex. 3 at 2.)

26        The fact that this email was sent to Plaintiff about dealings with Idexx indicates

27   that nothing was concealed from him and the email alerted him to the fact that there

28   was some type of discussion between the two companies and Wallack was part of that

conversation.  Second, there cannot be an inference that because Wright and Idexx had contact with each other, does not mean that they had an agreement in April 2009 to purchase DVM at some time in the future.   The content of the email does not concern any discussions or negotiations over an alleged agreement by Idexx to purchase DVM for $3 million.   The July 2009 email that Wright sent to Wallack referring to a conversation Wright had with a "Brandon" does not give rise to a reasonable inference that Wright, as of July 2009 was engaged in negotiations with Idexx for the purchase of DVM. Thus, Plaintiff has not sufficiently alleged that the statement in the email was false or misleading as to attempts to conceal the financial condition of DVM abd to lowball the buyout price to Plaintiff.

Third, Plaintiff complains that Wright and Walters concealed meetings with corporate accountants.   (ECF No. 34, FAC ¶ 84(c).)   As a result, this concealment misled Wallack in evaluating the true value and marketability of DVM against entering into the buyout.  (Id.)  Plaintiff alleges that in late 2009, he learned that Wright and Walters had been engaged in ongoing discussions with DVM's corporate accountant but did not provide notice to Plaintiff and did not receive any information as to any financial arrangements they were planning for DVM.  (Id., FAC ¶ 61.)  In an email dated December 7, 2009, Wallack learned what Wright and Walters had been talking about with the accountant. (Id.)  Accordingly to Plaintiff, the email stated that Wright and Walters would receive substantial pay increases between $120,000 to $150,000 based on profits for the year 2009.  Thus, this email reveals that the email dated August 12, 2009 where Wright indicates the business was not profitable was false.

Defendants Wright and Walters argue that Wallack learned of the meetings with the accountants in late 2009 before he signed the Agreement and that the substantial pay rate increase did not mislead Wallack in evaluating the true value and marketability of DVM.  Plaintiff contends that this information regarding secret meetings with the accountant was the final straw for Wallack to sell his stock.

As stated above, the email dated August 12, 2009 does not reveal that the

[11cv2996-GPC(KSC)]

statement in the email was false or misleading.  The fact that Plaintiff received a copy of the Income and Expense Graph does not demonstrate that Defendants acted with the requisite state of mind or purposefully concealed the information.  In addition, the email dated December 7, 2009 was received by Plaintiff a few weeks before the Stock Purchase Agreement was signed; therefore Plaintiff's allegation that meetings with accountants were concealed from him which misled him to evaluate the financial condition of DVM does not sufficiently allege a false misrepresentation.

Fourth, Plaintiff maintains that Wright and Walters misrepresented that Fred Farber or TJ Dupree of Idexx offered only $1 million.  (ECF No. 34, FAC ¶ 84(d).) According to Plaintiff, this statement was false and the inferences can be drawn that it was false based on the fact that Idexx subsequently purchased DVM for $3.2 since it was 4.3 times higher than the valuation of $686,250 that they used to set the buyout price for Plaintiff's 40% interest.  He alleges there is no plausible reason that between the 21 month period of time from Wallack's sale of his stock and when Idexx RL purchased DVM that its valued increased over 4.3 times or that DVM's value had increased 3.1 times from $1 million in April 2009 to $3.2 million in September 2011. He also states, on information and belief, that DVM did not acquire or develop any new asset or line of business of substantial value or otherwise improve its services.  On the contrary, the market conditions deteriorated during the time in question.  The First Amended Complaint asserts additional facts concerning the business volume to support an inference of an alleged 2009 agreement to sell DVM for $3 million.  He alleges that DVM's cases increased by 26,000 from 2009, or a 24% increase.  Then , in 2011, DVM had performed about 123,088 cases that year.  Plaintiff alleges an increase of about 25,000 cases per year would not justify a substantial change in the value of DVM such that Idexx would be willing to purchase DVM for $3.2 million in September 2011.

Defendants Wright and Walters argue that Plaintiff's allegation are based on his own speculation and impermissible conclusion that nothing happened between January 2010 and August 2011 to warrant a purchase price of $3.2 million.  In his opposition,

Plaintiff does not address this specific allegation.

The Court concludes that no temporal proximity exists between the statement in April 2009 by Wright that Idexx would purchase DVM for $1 million and the sale of DVM for $3.2 million to Idexx in September 2011.  See Yourish, 191 F.3d at 994. Therefore, no inference can be made that an agreement was made in April 2009 between Wright and Idexx to purchase DVM for $3 million and that such sale would be postponed until Wallack was bought out.    The added factual allegations concerning the number of cases handled does not create an inference that the earlier statement that Idexx would purchase DVM for $1 million in April 2009 is false.

Fifth, Plaintiff maintains that Wright and Walters represented that they would not strictly enforce customer list violations against Wallack if the customer list was overinclusive.  (ECF No. 34, FAC ¶ 84(e).)  This representation was false because on numerous occasion after the purchase agreement was entered into, Wright and Walters have claimed violations by Wallack regarding the customer list.  (Id.)

Defendants Wright and Walters allege that Plaintiff has not alleged how the Defendants have "strictly enforced" the violations.  Plaintiff does not oppose this argument.  The Court concludes that the allegation concerning the customer list is conclusory and does not provide specific facts as to how Wright and Walters have "strictly enforced" the customer list violations.  Therefore, Plaintiff has not sufficiently pled an allegation under the heightened pleading requirement.

Individually, the alleged false statements or misrepresentations do not lead the Court to infer that there was an alleged agreement in April 2009 between Defendants Wright and Walters, and Idexx to sell DVM for $3 million at some future date when Wallack was out of the picture or that Wright and Walters were concealing the true financial condition of DVM in order to buyout Plaintiff's shares at a deflated price. The Court must also look to the totality of allegations to create a strong inference that the individual Defendants acted with deliberate or conscious recklessness.  Tellabs, Inc., 551 U.S. at 322; see No. 84 Employer-Teamster Joint Council Pension Trust Fund

[11cv2996-GPC(KSC)]

v. America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) (holding that the allegations must be considered in their totality in determining whether plaintiffs have met the PSLRA standard).

Here, the Court concludes, that taken as a whole, the allegations in the amended complaint do not raise an inference of securities fraud sufficient to meet the heightened pleading requirements of the PSLRA and Rule 9(b).  Since Plaintiff has been give two opportunities and has failed to allege a § 10(b) and Rule 10b-5 cause of action, the Court concludes that any further amendments would be futile.  Accordingly, the Court GRANTS all Defendants' motion to dismiss the federal securities fraud claim with prejudice.

**II.    State Securities Fraud Cause of Action against All Defendants**

Plaintiff alleges violations of California Corporation Code sections 25401, 25501, 25504.1 as to all Defendants and violation of California Corporation Code section 25504.1 as to Idexx only. (ECF No. 34, FAC ¶¶ 96-110.) Plaintiff alleges the same alleged misleading facts or omissions alleged in the cause of action for federal securities fraud to the state law securities cause of action.

**A.    Violation of Sections 25401 and 25501 as to Wright and Walters**

Wright and Walters argue that Plaintiff has merely stated the elements of a cause of action for state securities fraud without specific factual allegations.   Plaintiff opposes contending that he has alleged sufficient evidentiary and factual allegations.

Section 25401 provides that

> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Cal. Corp. Code § 25401; see also Boam v. Trident Fin. Corp., 6 Cal. App. 4th 738, 742 (1992). While section 25401 is penal in nature, the corresponding section 25501 establishes a private remedy for damages. California Amplifier, Inc. v. RLI Ins. Co.,

94 Cal. App. 4th 102, 113 (2001); Cal. Corp. Code. § 25501.  Sections 25401, 25501 and 25504.1 are modeled after § 12(2) of the Securities Act of 1933.  <u>Viterbi v. Wasserman</u>, 191 Cal. App. 4th 927, 937 (2011).  Therefore federal cases interpreting federal securities law are persuasive authority when interpreting state law.  <u>Id.</u>

The Court has concluded that Plaintiff has failed to allege a cause of action under § 10(b) and Rule 10b-5 based on the failure to plead with requisite particularity factual and evidentiary allegations which would create an inference that Defendants made false statements.  Since this is also a requisite element in a section 25401 claim, the Court also GRANTS Defendants Wright and Walter's motion to dismiss the claim under California Corporations Code §§ 25401 and 25501 with prejudice as any further amendments would be futile.

### B.   Section 25504.1 as to Idexx

Plaintiff alleges that Idexx and Idexx RL materially assisted Wright and Walter's fraud and breaches of fiduciary duty in the sale of Wallack's stock to Wright and Walters through Farber's representation to Wallack in December 2009 that Idexx had only offered $1 million for DVM and he was unlikely to revisit negotiations with DVM.  (ECF No. 34, FAC ¶ 107.)

Under section 25504.1, "a person who materially assists in any violation of section 25401, with intent to deceive or defraud, [is] jointly and severally liable for the violation."  <u>Apollo Capital Fund, LLC v. Roth Capital Partners, LLC</u>, 158 Cal. App. 4th 226, 235 (2007).  As long as primary liability is stated with the requisite privity, secondary liability may also exist under section 25504.1 for those who participated in the violation.  <u>Moss v. Kroner</u>, 197 Cal. App. 4th 860, 875 (2011).

Since Plaintiff has failed to adequate allege the underlying section 25401 claim, his claim as to section 25504.1 also fails as to all Defendants.  Thus, the Court GRANTS all Defendants' motion to dismiss the claim under California Corporations Code § 25501.1 with prejudice.

/ / / /

**III.   Intentional Misrepresentation/ Fraudulent Concealment as to all Defendants**

Defendants Wright and Walters assert that Plaintiff has failed to comply with the requisite pleading requirement for fraud under Rule 9(b).  Defendant Idexx argues that that the amended complaint does not allege with specificity a false representation or concealment that Farber's statement to Wallack was not true at the time it was made

"[W]hile a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule."  Miron v. Herbalife Int'l, Inc., 11 Fed. App'x 927, 930 (9th Cir. 2001) (quoting Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (emphasis in original)).  Intentional misrepresentation and fraudulent concealment are kinds of "fraudulent deceit" where one person willfully deceives another with the intent to induce him to alter his position causing injury."  Cal. Civ. Code § 1709.  Intentional misrepresentation is "the suggestion, as a fact, of that which is not true, by one who does not believe it to be true."  Cal. Civ. Code § 1710(1).  Concealment is "the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."  Cal. Civ. Code § 1710(3).  To recover for intentional fraud, the plaintiff must allege: (1) the defendant misrepresented a past or existing material fact; (2) the defendant knew the fact was false; (3) the defendant intended to induce the plaintiff's reliance; (4) the plaintiff reasonably relied on the misrepresentation; and (5) damages resulted.  Small v. Fritz Companies, Inc., 30 Cal. 4th 167, 173 (2003).

The First Amended Complaint alleges that Defendants fraudulently concealed and intentionally misrepresented facts concerning the sale of Plaintiff's stock to them. (ECF No. 34, FAC ¶ 112.)  Plaintiff's intentional misrepresentation/fraudulent concealment must allege a false statement or omission of fact.  Underlying this cause of action are the same alleged misleading facts alleged in the federal and state

1  securities fraud causes of action. Since Plaintiff has not sufficiently pled a false

2  statement under Rule 9(b) in the federal and state securities fraud causes of action, this

3  claim also fails.  Plaintiff has been give two opportunities and has failed to allege a

4  cause of action for intentional misrepresentation/fraudulent concealment.  Therefore,

5  the Court concludes that any further amendments would be futile.  The Court GRANTS

6  all Defendants' motion to dismiss the intentional misrepresentation/fraudulent

7  concealment cause of action with prejudice.

8  **IV.    Breach of Fiduciary Duty as to Defendants Wright and Walters**

9      Defendants Wright and Walters contend that the First Amended Complaint

10  alleges only conclusory allegations and "unwarranted deductions of acts or legal

11  conclusions masquerading as facts" as to the claim for breach of fiduciary duty.

12  Moreover, they argue that Wallack alleged that he did not suffer harm as a result of any

13  of the alleged wrongdoing.  Plaintiff argues that he has pled a cause of action for

14  breach of fiduciary duty and that Defendants seek the Court to dismiss the claim based

15  on the same standard as the securities fraud causes of action.

16      To adequately allege breach of fiduciary duty, "a plaintiff must show the

17  existence of a fiduciary relationship, its breach, and damage caused by the breach."

18  Apollo Capital Fund, 158 Cal. App. 4th at 244.  California law clearly recognizes that

19  officers and directors owe a fiduciary duty to stockholders, and controlling

20  stockholders owe a fiduciary duty to minority stockholders. Singhania v. Uttarwar, 136

21  Cal. App. 4th 416, 426 (2006); see also Southern Pac. Co. v. Bogert, 250 U.S. 483, 488

22  (1919) (finding that the majority has a "fiduciary relation toward the minority, as much

23  so as the corporation itself or its officers and directors.").  "Majority shareholders may

24  not use their power to benefit themselves alone or in a manner detrimental to the

25  minority."  Stephenson v. Drever, 16 Cal. 4th 1167, 1178 (1997).  A fiduciary's

26  dealings with the corporation "are subjected to rigorous scrutiny and where any of their

27  contracts or engagements with the corporation is challenged the burden is on the

28  director or stockholder not only to prove the good faith of the transaction but also to

[11cv2996-GPC(KSC)]

1  show its inherent fairness from the viewpoint of the corporation and those interested

2  therein." <u>Jones v. H.F. Ahmanson & Co.</u>, 1 Cal. 3d 93, 108-09 (1969).

3      According to the Complaint, Wright and Walters, as controlling shareholders

4  owning 60% of DVM, and as officers owed a fiduciary duty to Plaintiff, a minority

5  shareholder, owning 40% of DVM, and officer of DVM.  (ECF No. 34, FAC ¶ 122.)

6  Plaintiff has adequately alleged that Wright and Walters, as majority shareholders and

7  directors, were in a fiduciary relationship with the Plaintiff as co-director and minority

8  shareholder of DVM.  <u>See</u> <u>Singhania</u>, 136 Cal. App. at 426 (finding directors owe a

9  fiduciary duty to stockholders); <u>Southern Pac. Co.</u>, 205 U.S. at 488 (finding the

10  majority is in a fiduciary relationship with the minority).

11      The First Amended Complaint alleges that the fiduciary duty was allegedly

12  breached based on duties owed to Plaintiff which included the failure to disclose and

13  conceal the following matters from Plaintiff:

14      (1) If and to what extent Wright had held or was holding negotiations
with Idexx, whether he and/or IDEXX were actively pursuing having

15  Idexx purchase DVM and/or any other matters he was discussing with
IDEXX regarding DVM;

16      (2) Whether and in what amount Idexx had discussed and/or was
prepared to pay to purchase DVM, whether it was $1 million or a price

17  approximating $3 million;

18      (3) that Wright wanted to exclude Wallack from DVM before selling
it to Idexx;

19      (4) what DVM's true financial condition was during 2009, including
its monthly profit and loss figures, especially for the months of May
through December after Wright had effectively taken control of the

20  books and accounting of  DVM upon his return from his visit at
IDEXX, as well as the results of any communications and/or work

21  product received in Wrights communications with the corporate
accountant;

22      (5) to not hold 16 secret meetings, or otherwise discuss important
corporate business, without a properly noticed meeting of the board of

23  directors. This includes decisions related to access as an administrator
of the DVM website, the ownership of the DVM's domain name,

24  decisions as to corporate officer/director compensation increases
and/or disbursement of bonuses to officers/directors/shareholders/staff;

25      (6) that where applicable, the provisions in the bylaws and/or other
corporate records must be followed, including in the assessment of

26  valuation of authorized and issued shares of stock;

27      (7) that when a financial report is requested, and indeed a meeting is
scheduled amongst the members of the board, that reliable financial
documents, i.e. profit and loss statements, balance sheet, financial

28  statement, or some other compilation of the corporations finances be
provided;

(8) that when the person is handling the accounting duties is queried on the final condition of the corporation, either generally or specifically, that such responses are truthful and based on reliable information;

(9) when any monthly or similar financial records, financial statements, profit and loss statements/summaries and so forth are revised to reflect information that is inconsistent with prior published financial documents the corporation; and

(10) that there is, or is intended to be, transfers of corporate assets/funds to other companies or to anyone else, including the members of the board, officers and/or shareholders so that such matters are appropriately documented.

(ECF No. 34, FAC ¶ 122.)

Defendants Wright and Walters argue, without legal authority, that Plaintiff has failed to allege breach of a fiduciary duty concerning allegations which the Court already determined, in the prior motion to dismiss, stated a cause of action. Specifically, the Court held that the allegations that Defendants provided Plaintiff with an "eleventh hour" all-encompassing list of customers subject to an illegal non-solicitation clause, and that Defendants subjected Plaintiff to a coordinated effort to make him feel unwelcome at DVM as well as used financial manipulation and professional exclusion so he would agree to a hurried sale of his interest, (ECF No. 34, FAC at ¶¶ 124-125), was sufficient to state a claim.   (ECF No. 33 at 17-19.) Defendants do not address and it does not appear that Defendants move to dismiss on the remaining allegations that Defendants breached their fiduciary duty by failing to disclose certain matters to Plaintiff. (See ECF No. 34, FAC ¶ 122.) Accordingly, the Court DENIES Defendants Wright and Walter's motion to dismiss the breach of fiduciary claim.

## V.    Civil Conspiracy against all Defendants

As to civil conspiracy, Defendants Wright and Walters contend that Plaintiff's allegations are based on information and belief, and the conspiracy allegations concerning defrauding Plaintiff are insufficient to state a cause of action.  Defendant Idexx argues that the first two allegations of conspiracy rest on a fraud theory which is not sufficiently pled and the third allegation fails to assert the existence of a

1  wrongful act.  Plaintiff opposes.

2      To allege a claim for  civil conspiracy, a plaintiff must allege  "(1) the formation

3  and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and

4  (3) the damage resulting . . . ."  Mosier v. S. Cal. Physicians Ins. Exchange, 63 Cal.

5  App. 4th 1022, 1049 (1998).  "A conspiracy cannot be alleged as a tort separate from

6  the underlying wrong it is organized to achieve."  McMartin v. Children's Inst.

7  Internat'l, 212 Cal. App. 3d 1393, 1406 (1989).  "A complaint for civil conspiracy

8  states a cause of action only when it alleges the commission of a civil wrong that

9  causes damage. Though conspiracy may render additional parties liable for the wrong,

10  the conspiracy itself is not actionable without a wrong."  Okun v. Superior Court, 29

11  Cal. 3d 442, 454 (1981).  The "wrongful act" must satisfy all the elements of a cause

12  of action for some other tort or wrong.  Gen. Am. Life Ins. Co. v. Rana, 769 F. Supp.

13  1121, 1125 (N.D. Cal. 1991) (citation omitted).  Where there is an allegation of

14  conspiracy to commit fraud, Rule 9(b) applies and a plaintiff must allege with sufficient

15  particularity that defendants reached some explicit or tacit understanding or agreement.

16  Brooks v. Gomez, No. C10-1873SBA, 2013 WL 496339, at *8 (N.D. Cal. Feb. 7,

17  2013).

18      The First Amended Complaint alleges, on information and belief, that

19  Defendants "conspired with and amongst themselves to conceal from the Plaintiffs,

20  Defendants' true nature and intentions which were to (a) to defraud Wallack to sell his

21  40% ownership interest in DVM at far below the true value of such shares, and so that

22  Wright/Walters could realize substantial profits upon the sale of DVM to Idexx; (b) to

23  facilitate the removal or buyout of Wallack as an officer, director and shareholder of

24  DVM to facilitate the sale of DVM to Idexx; (c) to attempt to obtain a ruling whereby

25  Idexx is found to be the holder/owner of the subject trademark claimed to be owned by

26  San Diego Imaging, and to avoid an award of damages, restitution and/or injunctive

27  relief to Idexx and/or Idexx RL for infringing on Plaintiffs trademark."  (ECF No. 34,

28  FAC ¶ 145.)  Plaintiff further asserts that the "aforementioned conduct of Defendants

constitutes malice, fraud and/or oppression and was committed with the intention on the part of Defendants to deprive Plaintiffs of their property and/or to otherwise cause Plaintiffs injury, and was wilful and/or despicable conduct that subjected Plaintiffs to a cruel and unjust hardship and conscious disregard of Plaintiffs' rights." (Id. ¶ 147.)

The first two allegations are based on fraud and similar to the allegations brought forth in the federal and state securities fraud causes of action.   The Court has held that Plaintiff failed to sufficiently satisfy the Rule 9(b) heightened pleading standard as to these fraud allegations.   Accordingly, these allegations may not be a basis for Plaintiff's civil conspiracy claim and must be dismissed.   Plaintiff concedes that the third allegation is also based on fraud. (ECF No. 41 at 30.)  The allegation concerning the trademark is conclusory and Plaintiff has not sufficiently alleged the who, what, when, where and how of the claim.  Moreover, Plaintiff has not alleged an underlying tort or wrong.  This allegation must also be dismissed.  Because it is not clear to the Court that amendment would be futile, the Court GRANTS all Defendants' motion to dismiss without prejudice.

### Conclusion

Based on the above, the Court GRANTS in part and DENIES in part all Defendants' motions to dismiss.  Specifically, the Court

1.   GRANTS all Defendants' Motion to Dismiss the Section 10(b) and Rule 10(b)-5 federal securities fraud claim WITH PREJUDICE;

2.   GRANTS Defendants Wright and Walter's Motion to Dismiss California Corporations Code sections 25401 and 25501 state securities fraud claims WITH PREJUDICE;

3.   GRANTS Defendants Idexx and Idexx RL's Motion to Dismiss California Corporations Code section 25504.1  state securities fraud claim WITH PREJUDICE;

4.   GRANTS all Defendants' Motion to Dismiss the intentional misrepresentation/fraudulent concealment claims WITH PREJUDICE;

5.   DENIES Defendants Wright and Walter's Motion to Dismiss the breach of

fiduciary duty claim.

6.      GRANTS all Defendants' Motion to Dismiss the civil conspiracy claim without prejudice.

Plaintiffs shall be granted leave to file a Second Amended Complaint within fourteen (14) days from the date this Order is filed.

IT IS SO ORDERED.

DATED:  September 12, 2013

HON. GONZALO P. CURIEL
United States District Judge

[11cv2996-GPC(KSC)]