# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SETH WALLACK and SAN DIEGO VETERINARY IMAGING, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> IDEXX LABORATORIES, INC.; IDEXX REFERENCE LABORATORIES, INC.; MATTHEW WRIGHT; an individual; and STEPHEN WALTERS, an individual <br><br> Defendants. | CASE NO. 11cv2996-GPC(KSC) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** <br><br> [Dkt. Nos. 52, 54.] |

Presently before the Court are Motions to Dismiss filed by Defendants Matthew Wright ("Wright") and Stephen Walters ("Walters"), (ECF No. 52); and Idexx Laboratories, Inc. ("Idexx") and Idexx Reference Laboratories, Inc. ("Idexx RL")[1], (ECF No. 53). Plaintiffs Seth Wallack ("Plaintiff") and San Diego Veterinary Imaging, Inc. ("SD Imaging") opposed the motions, (ECF Nos. 65, 67), and Defendants replied, (ECF Nos. 60, 61). Having considered the parties' submissions and the applicable law, the Court GRANTS in part and DENIES in part both Defendants' motions to dismiss.

---

[1] Idexx RL is a subsidiary corporation that is wholly owned and controlled by Idexx. (ECF No. 50, SAC ¶ 4.)

# Background[2]

Plaintiff, a licensed veterinarian, established SD Imaging in 2002. Plaintiff was one of the first veterinary radiologists to promote "tele-radiology" – a digital imaging technology allowing veterinarians to use the Internet to send x-rays to radiologists for an immediate consultation. Plaintiff recognized tele-radiology practices would require a software platform to store, analyze, and manipulate imagery, as well as a platform to provide consultations online. With this in mind, Plaintiff began developing a software platform to service this need in 2004. SD Imaging hired Defendant Walters, a professional software developer, and offered him 20% of SD Imaging's stock. Using the name "DVMinsight," Plaintiff named the software, established a website, created a trademark, and conducted his tele-radiology practice. He also decided to conduct his tele-radiology practice under the name, "DVMinsight."

Plaintiff also registered a trademark for the name DVMinsight ("the Trademark") with SD Imaging as the owner. In 2004, Plaintiff began working on an operation called the Veterinary Imaging Center of San Diego, Inc. ("the Center") which formally launched in December 2005. The Center replaced SD Imaging for most but not all of Wallack's work. Eventually, Walters ceased to offer services to SD Imaging and worked solely at the Center.

In late 2005, Defendant Wright, a veterinary radiologist, joined Plaintiff and Walters at the Center. Wright was invited to assist Plaintiff in developing the software platform and in time became the manager and resident radiologist of the Center so that Wallack could devote time to raise funds. Plaintiff and Wright became close colleagues and interacted constantly with Walters to develop the software program.

In 2006, Plaintiff, Wright, and Walters established a new company, DVMinsight, Inc. ("DVM") of which Plaintiff and Wright each owned 40%, and Walters 20%. All three were named officers and directors of DVM. Plaintiff claims

---

[2] All factual allegations in this section are taken from the Second Amended Complaint. (ECF No. 50.)

the three owners understood that SD Imaging retained ownership of the Trademark but permitted DVM to conduct all operations under the trade name "DVMinsight" and use the name "DVMinsight" for the software. DVM was to complete the development of the software. DVM would provide a website and its own software that allows treating veterinarians to upload, store, organize and review imagery and allow them to obtain immediate diagnoses and consultations from online veterinary radiologist whom DVM had previously screened. DVM enrolled its veterinary radiologists in a program called "Sighthounds Radiology". Wright, who handled this matter, had his own company rather than DVM to register the name "Sighthounds Radiology" as a fictitious business name. By 2008, DVM largely succeeded in developing the software program and by 2009, DVM's software program was functional, popular, and successful.

In April 2009, Wright traveled to Defendant Idexx's headquarters in Maine and met with officers and employees to discuss the possibility of selling DVM to Idexx. Upon his return, Wright reported that Idexx had "expressed only a passing interest in purchasing DVM or the Software Program" and "it would not pay more than $1 million for the entire DVM operation." Wright said the discussions with Idexx had been unsuccessful, inconclusive, and they only offered $1 million for DVM. Wright mentioned that he spoke with a Fred Farber, an officer of Idexx, but provided no other names. Wright and Plaintiff agreed that the purchase price of $1 million was well below what they believed the value of DVM at the time. When Wallack inquired whether Wright would pursue further negotiations or discussions with Idexx, Wright emphatically responded that any discussions with Idexx were over and there would be no further discussions. However, Plaintiff later discovered inconsistencies in Wright's representation that there would be no further discussions with Idexx. An email dated July 26, 2009 from Wright to Wallack titled "IDEXX" shows that there was contact between Wright and RJ Dupree, an executive at Idexx.

Plaintiff claims that from mid-2009 onward, Wright became "inexorably unfair" towards Plaintiff, on the telephone, in emails, and in the open workplace. Initially, it

started with mocking Wallack's alleged lack of social skills and inability to take full advantage of DVM's commercial value. Walters began to openly side with Wright during the near-daily quarrels. Plaintiff also claims Wright convinced key administrative assistants they would be better off if they sided with Wright and Walters. Wright had seized control of the books, records and accounting for DVM and worked solely on DVM business ceasing work on all other related veterinary radiology business work. By summer of 2009, Wright and Walters began goading Wallack that they would pay Wallack to "just to go away." Wright allegedly indicated that if Plaintiff did not leave DVM, Wright was prepared to manipulate corporate structures to justify improperly diverting DVM revenues to the private companies of Wright (Animal Insides, Inc.) and Walters (Computer Bugs).

In August 2009, Plaintiff had an email exchange with Wright requesting a general update on DVM's profitability in the prior months and requested a meeting of the board of directors of DVM to discuss the current and prior months' financial records. In the email exchange, Wright represented that DVM is "not really all that profitable at this point." At the meeting of the board of directors in August, Plaintiff was not presented with standard corporate financial records but was presented with an Income and Expense Graph separated by months. Plaintiff claims that the bar graph showed approximate net income for the first seven months of 2009 between $25,000 and $30,000; however, Wright falsely stated that DVM was "not really profitable at this point."

In October 2009, Wright and Walters, without notice or consent, terminated Plaintiff as an administrator of the software program. In December 2009, they also unilaterally changed ownership of DVM's domain name and transferred it to a new host which denied Plaintiff access. Plaintiff no longer had administrative access to DVM's platform and was frozen out of the financial matters of DVM by Wright. Since the August 2009 meeting, no further financial documents regarding DVM were provided to Wallack by Wright. Wright and Walters also gave themselves pay raises

and bonuses without offering Plaintiff the same, and engaged in ongoing discussions with DVM's accountant without explaining the nature of these discussions to Plaintiff.

Also, in an email dated December 7, 2009, Wright indicated that there was going to be an excess of $120,000 to $150,000 of profit disbursement for 2009. This email was sent to Plaintiff without any financial data to support the financial findings. Plaintiff asserts there is an inconsistency between Wright's comment in August 12, 2009 that DVM was not really profitable and an email dated December 7, 2009 indicating that there was going to be an excess of $120,000 of profit disbursement for 2009. Plaintiff does not understand how the financial fortunes of DVM could have drastically improved during those four months.

Due to the hostile work environment and financial manipulations, in December 2009, Plaintiff agreed to negotiate with Wright and Walters for the sale of his 40% interest in DVM and proposed they hire a business valuation specialist to assess a fair price for Plaintiff. Plaintiff claims Wright "angrily refused" and insisted that if the purchase did not take place immediately, he would find other means of excluding Plaintiff from DVM. Upon an initial offer of $100,000, Plaintiff called Fred Farber, an Idexx officer, regarding Wright's negotiations with Idexx. Farber responded that Idexx had "floated a sales price 'in the neighborhood of $1 million' that Idexx might be willing to pay for DVM . . . and indicated that he had given no further thought to this matter and expected that Idexx would not pursue the matter any further." Thereafter, Wright, Walters, and Plaintiff agreed to value DVM at $686,250, offering Plaintiff $274,500 for his 40% share.[3] The Stock Purchase Agreement ("the Purchase

---

[3] In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a Court may consider exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint whose authenticity no party questions. See Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007); Lee v. City of Los Angeles, 250 F.3d 668, 688–689 (9th Cir. 2001); United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may, however, consider certain materials-documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice-without converting the motion to dismiss into a motion for summary judgment.") Plaintiff submitted an Appendix of Exhibits attached to his Second Amended Complaint containing the Stock Repurchase Agreement which is referred to

Agreement") was signed on December 31, 2009.

The Purchase Agreement also included a non-solicitation clause forbidding Plaintiff from soliciting any listed customer of DVM. Plaintiff claims he realized only after signing the Purchase Agreement that the list was over-inclusive and included even potential clients of DVM. Wright angrily insisted that Plaintiff sign the Purchase Agreement on December 31, 2009. Late in the day on December 31st, Plaintiff was presented with the customer list that was to list all of DVM's current customers. Wright indicated that if the list was over-inclusive, he would not strictly enforce it against Plaintiff. After carefully reviewing the list after the Agreement was signed, Plaintiff claims Wright refused to remove the names of non-customers, even though prior to signing the Purchase Agreement he indicated he would do so.

In September 2011, Defendant Idexx RL, a subsidiary corporation owned and controlled by Idexx, acquired DVM and Animal Insides (a company owned by Wright) for a total of 3.2 million dollars, $3 million of which Plaintiff attributes to DVM. This was 4.3 times higher than the value of $686,250 that they used to buy Plaintiff out and 3.2 times more than the alleged $1 million valuation that Idexx had asserted in December 2009. During the 21 month period from Plaintiff's sale of his stock in DVM to Wright and Walters, Plaintiff claims DVM did not acquire or develop any new asset or line of business of substantial value, did not improve its services or transform itself so as to increase its value, and the market conditions did not materially improve; in fact, the market conditions deteriorated during this time.

During the years in questions, in 2010, DVM worked on about 131,207 cases, an increase of about 26,000 cases from 2009 or a 24% increase. In 2011, before the sale of DVM to Idexx in September, DVM performed about 123,088 cases to that point. Plaintiff alleges that an increase of about 25,000 cases per year would not justify

---

in the Second Amended Complaint and integral to the Plaintiff's claims. (ECF No. 50-2.) Defendants do not object to this document. Accordingly, the Court may consider the Stock Repurchase Agreement on Defendants' motions to dismiss.

a purchase price of $3.2 million in September 2011 based on a $1million value Idexx had asserted in April 2009.

Plaintiff further complains that a reasonable inference can be made that Wright reached an understanding with Fred Farber and/or TJ Dupree whereby Idexx would purchase DVM for about $3 million at some future time. Around August 2009, Idexx bought another veterinary company, VDIC for about $6.7 million. Plaintiff asserts that Idexx and Wright agreed to delay the purchase of DVM because Idexx was in the process of negotiating the purchase of VDIC and it took time for Idexx to integrate and use VDIC's software based on tele-radiology platform/services. Theoretically, DVM could have been sold to Idexx at an earlier time, such as January 2010 after Wallack sold his stock to Wright/Walters.

Plaintiff claims that contrary to statements made by Idexx and Wright, Defendants made an agreement in 2009 for the purchase of DVM for approximately $3 million dollars, an agreement to conceal the purchase price and to delay the purchase until after Plaintiff's departure.

The Second Amended Complaint asserts four causes of action: (1) trademark infringement by SD Imaging against Idexx and Idexx RL; (2) breach of fiduciary duty by Walters against Wright and Walters; (3) civil conspiracy by Plaintiffs against all Defendants; and (4) request for declaratory relief by Plaintiffs against Idexx and Idexx RL. (ECF No. 50.) Defendants Wright and Walters move to dismiss the second cause of action for breach of fiduciary duty; and third cause of action for civil conspiracy. (ECF. No. 52.) Defendants Idexx and Idexx RL move to dismiss the third cause of action for civil conspiracy, and move to strike the allegations relating to a purported $5,000 offer by Idexx to settle any dispute over ownership of the "DVMinsight" trademark. (ECF. No. 54.) They also join in Defendants Wright and Walters' motion to dismiss the third cause of action for civil conspiracy.

**I.     Legal Standard on Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure

to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). Under Federal Rule of Civil Procedure 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff. al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. See Desoto, 957 F.2d at 658; Schreiber, 806 F.2d at 1401.

1 **II.     Breach of Fiduciary Duty as to Defendants Wright and Walters**

Defendants Wright and Walters contend that the Second Amended Complaint does not state a claim for breach of fiduciary duty. Plaintiff argues that he has pled a cause of action for breach of fiduciary duty.

To adequately allege breach of fiduciary duty, "a plaintiff must show the existence of a fiduciary relationship, its breach, and damage caused by the breach." Apollo Capital Fund, 158 Cal. App. 4th at 244. California law clearly recognizes that officers and directors owe a fiduciary duty to stockholders, and controlling stockholders owe a fiduciary duty to minority stockholders. Singhania v. Uttarwar, 136 Cal. App. 4th 416, 426 (2006); see also Southern Pac. Co. v. Bogert, 250 U.S. 483, 488 (1919) (finding that the majority has a "fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors."). "Majority shareholders may not use their power to benefit themselves alone or in a manner detrimental to the minority." Stephenson v. Drever, 16 Cal. 4th 1167, 1178 (1997). A fiduciary's dealings with the corporation "are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." Jones v. H.F. Ahmanson & Co., 1 Cal. 3d 93, 108-09 (1969).

According to the Complaint, Wright and Walters, as controlling shareholders owning 60% of DVM, and as officers owed a fiduciary duty to Plaintiff, a minority shareholder, owning 40% of DVM, and officer of DVM. (ECF No. 50, SAC ¶ 30.) Plaintiff has adequately alleged that Wright and Walters, as majority shareholders and directors, were in a fiduciary relationship with the Plaintiff as co-director and minority shareholder of DVM. See Singhania, 136 Cal. App. at 426 (finding directors owe a fiduciary duty to stockholders); Southern Pac. Co., 205 U.S. at 488 (finding the majority is in a fiduciary relationship with the minority).

The second amended complaint alleges that the fiduciary duty was allegedly

breached based on duties owed to Plaintiff which included the failure to disclose and conceal the following matters from Plaintiff:

> (1) If and to what extent Wright had held or was holding negotiations with Idexx, whether he and/or IDEXX were actively pursuing having Idexx purchase DVM and/or any other matters he was discussing with IDEXX regarding DVM;
> (2) Whether and in what amount Idexx had discussed and/or was prepared to pay to purchase DVM, whether it was $1 million or a price approximating $3 million;
> (3) that Wright wanted to exclude Wallack from DVM before selling it to Idexx;
> (4) what DVM's true financial condition was during 2009, including its monthly profit and loss figures, especially for the months of May through December after Wright had effectively taken control of the books and accounting of DVM upon his return from his visit at IDEXX, as well as the results of any communications and/or work product received in Wrights communications with the corporate accountant;
> (5) to not hold 16 secret meetings, or otherwise discuss important corporate business, without a properly noticed meeting of the board of directors. This includes decisions related to access as an administrator of the DVM website, the ownership of the DVM's domain name, decisions as to corporate officer/director compensation increases and/or disbursement of bonuses to officers/directors/shareholders/staff;
> (6) that where applicable, the provisions in the bylaws and/or other corporate records must be followed, including in the assessment of valuation of authorized and issued shares of stock;
> (7) that when a financial report is requested, and indeed a meeting is scheduled amongst the members of the board, that reliable financial documents, i.e. profit and loss statements, balance sheet, financial statement, or some other compilation of the corporations finances be provided;
> (8) that when the person is handling the accounting duties is queried on the final condition of the corporation, either generally or specifically, that such responses are truthful and based on reliable information;
> (9) when any monthly or similar financial records, financial statements, profit and loss statements/summaries and so forth are revised to reflect information that is inconsistent with prior published financial documents the corporation; and
> (10) that there is, or is intended to be, transfers of corporate assets/funds to other companies or to anyone else, including the members of the board, officers and/or shareholders so that such matters are appropriately documented.

(ECF No. 50, SAC ¶ 84.) The Court previously held that these allegations sufficiently stated a claim for breach of fiduciary duty. (ECF No. 49.)

Defendants first allege that Plaintiffs' breach of fiduciary duty claim is predicated on the same allegations of fraud that the Court already deemed insufficient

1  and dismissed.  Because the Court dismissed all the fraud causes of action, and since
2  the breach of fiduciary duty claims is also based on fraud, the Court should grant
3  Defendants' motion to dismiss.  They cite to paragraph 85[4] of the SAC which alleges
4  that Defendants fraudulently concealed of the ten matters listed in the SAC.

5  Here, the breach of fiduciary claim is not limited to fraudulent concealment[5] but
6  also based on hostile work conditions and the illegal non-solicitation clause and other
7  non-fraud allegations.  Thus, Defendants' first argument is without merit.

8  Second, Defendants allege that the Court's dismissal with prejudice as to the
9  fraud causes of action resurrects the release contained in the Purchase Agreement.  In
10 the Court's prior order, the Court concluded that the claim of fraudulent inducement
11 rendered the release "voidable" and therefore the release did not apply. (ECF. No. 33.)
12 Since the Court dismissed the fraud causes of action with prejudice, Defendants assert
13 that the breach of fiduciary breach of duty based on fraud allegations is barred by the
14 release.

15 Plaintiffs argue that the release is voidable on the breaches of fiduciary duty
16 because under California law, a release of a liability claim may be rendered void "on
17 the grounds of fraud, misrepresentation or breach of fiduciary duty of loyalty and/or
18 honesty based on fraud as long as the releasor's failure to learn the nature of the terms
19 was not attributable to his own negligence and rescission is sought." (ECF No. 67, Ps'
20 Opp. at 9.)  In reply, Defendants argue that the breach of fiduciary duty is predicated
21 on fraud or concealment of material information that induces the other party to enter
22 into the release.

---

[4] "Defendants breached their fiduciary duties to Plaintiff in numerous respects by failing to disclose or properly handle the above matters. In fact, rather than disclose these matters to Wallack, they fraudulently concealed them from him and made misleading, partial disclosures to him about these very matters, doing so to induce him to agree to a hurried sale of his stock at a greatly depressed price that he would never have accepted if they had disclosed these matters to him." (ECF No. 50, SAC ¶ 85.)

[5] Any allegations of fraudulent concealment would be barred by the Court's prior order dismissing the cause of action for intentional misrepresentation and fraudulent concealment. (ECF No. 49 at 19.)

Here, the breach of fiduciary duty case of action consists of ten different allegations consisting of non-fraud allegations such as failure to disclose financial condition of DVM, failure to hold required meetings, and failure to document transfers. (ECF No. 50, SAC ¶ 84.) Breach of fiduciary duty does not always involve fraud. See SEC v. Zandford, 535 U.S. 813, 825 n.4 (2002). Accordingly, the Court DENIES Defendants Wright and Walters' motion to dismiss the breach of fiduciary cause of action.

**III.     Civil Conspiracy against all Defendants**

As to civil conspiracy, Defendants Wright and Walters and Defendants Idexx contend that Plaintiff cannot state a claim for civil conspiracy because an employee, Wright and Waters, and an employer, Idexx, cannot be liable for conspiracy. While Plaintiffs do not dispute that an employer and employee cannot be liable for civil conspiracy, they argue that the allegations concerning civil conspiracy include facts before Wright and Walters became an employee of Idexx.

While "[c]ivil conspiracy is not a cause of action," it is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-51 (1994). To allege a claim for  civil conspiracy, a plaintiff must allege "(1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting . . . ." Mosier v. S. Cal. Physicians Ins. Exchange, 63 Cal. App. 4th 1022, 1049 (1998). "A conspiracy cannot be alleged as a tort separate from the underlying wrong it is organized to achieve." McMartin v. Children's Inst. Internat'l, 212 Cal. App. 3d 1393, 1406 (1989). "A complaint for civil conspiracy states a cause of action only when it alleges the commission of a civil wrong that causes damage. Though conspiracy may render additional parties liable for the wrong, the conspiracy itself is not actionable without a wrong." Okun v. Superior Court, 29 Cal. 3d 442, 454 (1981). The "wrongful act" must satisfy all the elements of a cause of action for some

other tort or wrong. Gen. Am. Life Ins. Co. v. Rana, 769 F. Supp. 1121, 1125 (N.D. Cal. 1991) (citation omitted).

Under the agent's immunity rule announced in Wise, "agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." Wise v. Southern Pac. Co., 223 Cal. App. 2d 50, 72 (1963) (overruled on other grounds by Applied Equipment Corp., 7 Cal. 4th at 510) (corporate employees not liable for conspiracy to breach corporation's contract where they acted in their official capacities on behalf of the corporation and not for their individual advantage)); see also Doctors' Co. v. Superior Court, 49 Cal. 3d 39, 45 (1989).

The Second Amended Complaint alleges that San Diego Imaging registered the DVM trademark in 2004 and Wright and Walters knew that Plaintiff SD Imaging owned the registered DVM trademark. (ECF. No. 50, SAC ¶ 92.) The trademark was never sold, transferred, or assigned to DVM, Wright or Walters at any time from December 31, 2009, when Wallack sold his interest in DVM to Wright and Walters, and September 2011, when Idexx purchased DVM from Wright and Walters. (Id. ¶ 94.) On information and belief, at the time when Idexx bought DVM Insight, both Wright and Walters became employees of Idexx. (Id.)

In October 2011, Idexx filed an application with the federal trademark registrar seeking to trademark the same mark as the DVM trademark owned by SD Imaging. (Id. ¶ 96.) Plaintiffs believe that the application was virtually the same as the application and mark that was registered to SD Imaging. (Id.) They do not believe Idexx' application was approved but it has continued to use the DVM trademark in interstate and possibly worldwide market sales of its products. (Id.) Since the DVM trademark could not be part of the sale to Idexx, "Idexx, Wright and Walters knowingly agreed to enter into a civil conspiracy to commit the tortious conduct of trademark infringement by disavowing San Diego Imaging's rightful ownership of the trademark and/or representing to third parties that no such rights exist." (Id. ¶ 97.) Examples of

overt acts and representations include Idexx with assistance from Wright and Walters filed a false application with federal trademark authorities attempting to register the trademark in Idexx's name and continuing to use the trademark from October 2011 to the present as part of Idexx's market and sales literature. (Id.)

The facts supporting the allegation for civil conspiracy are based on acts after Wright and Walters joined Idexx as employees in September 2011. Although not alleged, it appears that Wright and Walters were acting as employees of Idexx and not as individuals for their individual advantage.

In their opposition, Plaintiffs argue that the allegations in the SAC demonstrate that some acts of civil conspiracy occurred before Wright and Walters became employees of Idexx and cite to paragraphs 76, 77 and 94-97 of the SAC. However, these cited paragraphs do not support Plaintiffs position. These paragraphs discuss the offer to purchase the trademark from Mr. Schoefield, an executive of Idexx in September 2011. These allegations only shows that Idexx made an offer to buy the trademark, not that Wright and Walters were involved in that offer. (See ECF No. 50, SAC ¶¶ 94-97.) Moreover, the SAC clearly states that when the $5,000 offer by Schoefield failed, then at that point, the civil conspiracy was formed. (Id. ¶ 97.) Therefore, as employees of Idexx, Wright, and Walter, and Idexx cannot form a civil conspiracy. See Wise, 223 Cal. App. 2d at 72. Accordingly, the Court GRANTS all Defendants' motion to dismiss the civil conspiracy cause of action with prejudice.[6]

**IV.   Request for Judicial Notice**

In support of their motions to dismiss, Defendant Idexx filed a request for judicial notice. (ECF. Nos. 54-2.) While Plaintiffs do not oppose, the Court DENIES

---

[6] Idexx also moves to strike the allegations in the complaint pursuant to Federal Rule of Evidence 12(f) relating to a purported $5,000 offer by Idexx to settle any dispute over ownership of the "DVMinsight" trademark pursuant to Federal Rule of Evidence 408. In opposition, Plaintiffs argue that the $5000 was an offer to purchase the trademark and not an offer of settlement and should not be struck. Since the Court GRANTS all Defendants' motion to dismiss the cause of action for civil conspiracy, the motion to strike allegations from the SAC concerning the $5,000 offer is moot.

Idexx's request for judicial notice as the Court did not rely on the documents in ruling on the motion.

## Conclusion

Based on the above, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss. Specifically, the Court:

1. DENIES Defendants Wright and Walter's Motion to Dismiss the breach of fiduciary duty claim;
2. GRANTS all Defendants' Motion to Dismiss the civil conspiracy claim with prejudice as Plaintiffs have had ample opportunity to amend the complaint and failed to do so;
3. DENIES Idexx's motion to strike allegations concerning settlement offers as MOOT;
4. Defendants shall file an answer to the second amended complaint pursuant to the Federal Rule of Civil Procedure.
5. The hearing set for April 18, 2014 shall be **vacated**.

IT IS SO ORDERED.

DATED: April 14, 2014

HON. GONZALO P. CURIEL
United States District Judge