1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| SETH WALLACK and SAN DIEGO VETERINARY IMAGING, INC., | CASE NO. 11cv2996-GPC(KSC) |
|---|---|
| Plaintiffs, | **ORDER GRANTING DEFENDANTS WRIGHT AND WALTERS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| IDEXX LABORATORIES, INC.; IDEXX REFERENCE LABORATORIES, INC.; MATTHEW WRIGHT; an individual; and STEPHEN WALTERS, an individual | [Dkt. No. 87.] |
| Defendants. | |

18

19    Presently before the Court is Defendants Matthew Wright ("Wright") and

20  Stephen Walters' ("Walters") (collectively "Defendants") motion for summary

21  judgment. (Dkt. No. 87.)   Plaintiff Seth Wallack ("Plaintiff") opposed the motion.

22  (Dkt. No. 93.) Defendants filed a reply. (Dkt. No. 9.)  Having considered the parties'

23  submissions, supporting documentation, and the applicable law, the Court GRANTS

24  Defendants' motion for summary judgment.

**Procedural Background**

25

26    Plaintiff and San Diego Veterinary Imaging, Inc. ("SDVI") filed a complaint

27  against Defendants Idexx Laboratories, Inc. and Idexx Reference Laboratories, Inc. on

28  December 22, 2011 alleging numerous causes of action for federal and state securities

fraud, fraud related causes of action and trademark infringement. (Dkt. No. 1.)  On April 11, 2013, the Court granted in part and denied in part Defendants' motions to dismiss with leave to amend. (Dkt. No. 33.)  A first amended complaint was filed on May 2, 2013. (Dkt. No. 34.)  On September 12, 2013, the Court granted in part and denied in part Defendants' motions to dismiss with leave to amend. (Dkt. No. 49.)  The operative second amended complaint was filed on September 26, 2013 and asserts four causes of action: (1) trademark infringement by Plaintiff SDVI against Idexx and Idexx RL; (2) breach of fiduciary duty by Plaintiff Wallack against Wright and Walters; (3) civil conspiracy by Plaintiffs against all Defendants; and (4) request for declaratory relief by Plaintiffs against Idexx and Idexx RL. (Dkt. No. 50.)  Defendants Wright and Walters moved to dismiss the second cause of action for breach of fiduciary duty, and third cause of action for civil conspiracy. (Dkt. No. 52.)  On April 14, 2014, the Court denied Defendants Wright and Walters' motion to dismiss the breach of fiduciary duty claim; and granted Defendants' motion to dismiss the civil conspiracy claim with prejudice. (Dkt. No. 68.)  Therefore, the remaining cause of action alleged against Defendants Wright and Walters is breach of fiduciary duty which is subject to the instant motion for summary judgment.

## Factual Background

Plaintiff is a licensed veterinary radiologist and established San Diego Veterinary Imaging, Inc. ("SDVI"), in 2002, to conduct his veterinary radiology practice. (Dkt. No. 93-5, Wallack Decl. ¶¶ 2, 8.)  In the early 2000s, Plaintiff recognized the need and benefit of digital imagery to view x-rays over the internet instead of "making the rounds" and visiting veterinary offices, clinics and hospitals to conduct his practice. (Id. ¶¶ 2, 3, 4.)  In early 2004, Plaintiff contemplated and began work to develop a software program to serve as a "platform" for veterinary radiologists where they could keep, organize, retrieve and use all of their imagery. (Id. ¶ 7.)

At that time, Plaintiff hired Defendant Stephen Walters, a computer programmer, to assist in the programming and coding of the computer platform/website. (Id. ¶ 9.)

They worked together for months to develop the program and they agreed that Walters would eventually become a 20% ownership in any future company. (Id.) Walters also retained ownership of the portions of the source code/programmed information he developed related to the platform/website. (Id.)

In early 2004, Plaintiff named the software "DVMInsight" and decided to conduct his tele-radiology practice under the name "DVMInsight." (Id. ¶ 10.) In 2005, SDVI established, through GoDaddy.com a domain name and website called "DVMInsight.com" and SDVI registered the trademark "DVMInsight". (Id.)

In July 2005, Plaintiff created and incorporated a new business called Veterinary Imaging Center of San Diego, Inc. ("VICSD"). (Id. ¶ 13.) VICSD replaced SDVI for some but not all of his work. (Id.) After VICSD opened, Plaintiff performed conventional veterinary radiology and tele-radiology under its auspices. (Id.)

At the end of November 2005, Defendant Wright, a veterinary radiologist, joined Plaintiff to work at VICSD to work on the DVMInsight platform and set up a new corporation called DVMInsight. Inc. (Id. ¶ 14.) In 2005/2006, Wright became the manager and resident radiologist at VICSD so Plaintiff could generate funds by "making the rounds" to veterinary hospitals. (Id.)

Wright, through his company Animal Insides, Inc., provided online commentary on veterinary radiology and on the increasing importance of digital imaging in veterinary radiology. (Id. ¶ 15.) Plaintiff appreciated Wright's talent for writing and Wright expressed his appreciation for Plaintiff's talent for undertaking and organizing the DVMInsight/VICSD initiatives. (Id.) All three worked to complete the development of the software program. (Id.)

In September 2006, Plaintiff, Wright and Walters incorporated DVMInsight, Inc. ("DVMI"). (Dkt. No. 95-2, Ds' Concordance of Separate Statement of Undisputed Material Facts ("CSSUF") No. 1.) At the time of incorporation, the purpose of DVMInsight was threefold: 1) development of a software platform ("DVM platform") that could be used by veterinarians for teleradiology purposes; 2) operation of a

website where clients and providers could use the software; and 3) the generation of teleradiology work for Plaintiff and Wright. (Id.) At the time of incorporation, Plaintiff and Wright each owned 40% of DVMI's outstanding stock, and Walters owned the remaining 20%. (Id., CSSUF No. 2.) Plaintiff, Wright and Walters were named officers and directors of DVMI. (Id.) Plaintiff was the President, Director and Shareholder. (Id., CSSUF No. 4.) Plaintiff was never an employee of DVMI but he occasionally read cases for DVMI. (Id.)

Plaintiff's role was to grow VICSD while Wright's role was to grow DVMI. (Dkt. No. 87-16, Ds' NOL, Ex. I, Wallack Depo. at 88:6-11; 90:19-91:5.) Over time, Plaintiff stepped away from being administratively involved at DVMI and allowed Wright to take over and grow the business. (Dkt. No. 87-16, Ds' NOL, Ex. I, Wallack Depo. at 71:5-16; 73:18-74:8.) Eventually, he was no longer involved in the day to day operations of DVMI as he had a lot of other things going on. (Id.) There was a clear separation of responsibilities. (Dkt. No. 87-16, Ds' NOL, Ex. I, Wallack Depo. at 90:19-91:5.) His role was to grow the VICSD business and he left Wright and Walters in charge of the DVMI business. (Id.)

From the beginning of DVMI, Walters was employed and responsible for information technology for the DVMI. (Dkt. No. 95-2, CSSUF No. 8.) In particular, Walters was responsible for programming, keeping the servers up and running, and providing high level technical support. (Id.) Wright also became an employee of DVMI after he left employment at VICSD in June/July 2009. (Id., CSSUF No. 6.) DVMI grew steadily. (Id., CSSUF No. 9.)

Around the spring 2009, Defendant Idexx Laboratories, Inc. ("Idexx") was searching for partners for its teleradiology/storage needs and issued a Request for Proposal ("RFP") to companies, including DVMI, to fulfill that need. (Id., CSSUF No. 10.) Wright made Plaintiff aware of the RFP and Defendants worked to prepare a response on behalf of DVMI to offer its ImageBank services. (Id.) Because Plaintiff devoted his full attention to VICSD, he did not have time to review the RFP or to

contribute, in a substantial way, to the RFP response.  (Id.)

Wright nonetheless provided Plaintiff with the RFP response, kept him apprised of the status of the response, and informed Plaintiff that in the late spring of 2009, he would be traveling to Maine, where Idexx was headquartered, to present the response and to explore any interest that Idexx had in purchasing DVMI.  (Id., CSSUF No. 11.) While Plaintiff now professes to have had a desire to attend the Idexx meeting, he acknowledges that Wright did not stop him from accompanying Wright to the meeting in Maine and that Plaintiff simply had other commitments outside of DVMI that prevented him from attending.  (Id.)

Wright testified that he and Farber discussed an offer where Idexx would pay a multiple of 1.1-1.2 of DVMI's gross revenues to purchase DVMI's assets.  (Dkt. No. 87-15, Ds' NOL, Ex. H, Wright Depo. at 134:22-135:6.)  Wright calculated the amount based on DVMI's $900,000 gross revenues for 2008/09 and came up with a purchase price of $1 million.  (Id.)  When Wright returned, he informed Walters and Plaintiff about the offer of $1 million and they collectively agreed it was not acceptable.  (Id. at 145:22-146:4; Dkt. No. 93-5, Wallack Decl. ¶ 22.)

While it is disputed as to who initially raised the idea of DVMI buying out Plaintiff's shares, in August 2009, the parties exchanged emails about the possibility of buying Plaintiff out.  (Dkt. No. 87-18, Ds' NOL, Ex. I at 16-18[1].)  Plaintiff acknowledged that since Wright and Walters grew the company, they should reap the rewards.  (Id. at 16.)  Plaintiff raised concern about distribution at the time for shareholder distributions since he was not involved in DVMI.  (Id.)  DVMI's attorney, Michael Christian ("Christian"), responded that Plaintiff should hold onto his 40% ownership and go along for the ride.  (Id. at 17.)  However, Plaintiff responded that he did not agree because he did not think it would be fair and could result in a "train wreck when it is time for shareholder distributions."  (Id.)  Plaintiff was open to a buyout.  (Id.)  Later, in another email, Plaintiff wrote that he did not need to get out and

---

[1]The page numbers are based on the CM/ECF pagination.

was fine "staying in for the ride." (Id. at 18.)  At that time, discussions regarding a buyout ended.  As a result, Wright proposed a shareholder meeting to discuss the issue of shareholder distribution.  (Dkt. No. 93-3, P's NOL, Ex. S at 274; 277-78.)  A shareholder meeting was held in August 2009.  (Dkt. No. 87-17, Ds' NOL, Ex. I, Wallack Depo. at 146:2-3.)

On December 7, 2009, Plaintiff emailed Christian, DVMI's attorney, about having DVMI repurchase his shares and asked for advice.  (Dkt. No. 87-20, Ds' NOL, Ex. J, Christian Depo. at 51:1-9; Dkt. No. 87-20, Ds' NOL at 18.)  Plaintiff wrote,

> I am forwarding an email I received today from Matt.  It is good to see the company is doing well however, the context of the message concerns me with respect to fiduciary responsibilities and bonuses intended to drive the year end profits to a level that would require retention of earnings.  I don't want to get into a legal battle so rather than call for an accounting evaluation I think it is better if the other shareholders buy me out.  I am steadfast on this decision and believe that a complete company valuation is required to determine a fair market value.

(Dkt. No. 87-20, Ds' NOL at 18.) Christian informed Plaintiff that since he represented DVMI, he could not represent Plaintiff, a shareholder, against the interests of the company. (Dkt. No. 87-20, Ds' NOL, Ex. J, Christian Depo. at 63:3-8; Dkt. No. 87-20, Ds' NOL at 18.)

Plaintiff subsequently retained counsel, William Markham ("Markham"), to assist him in selling his shares to DVMI.  (Dkt. No. 95-2, CSSUF No. 20.)  In order to determine the value of DVMI, Plaintiff reached out to Farber at Idexx in December 2009 to confirm the information that Wright had relayed in April 2009 that an offer of a potential purchase price was made in the $1 to $1.1 million range.  (Dkt. No. 95-2, CSSUF No. 21.)

In mid-December 2009, Plaintiff believed he had three options for effectuating the repurchase of his DVMI shares: 1) negotiations between the parties; 2) submission to binding arbitration and selection of a business valuation specialist/accountant whose valuation would be binding on the parties; or 3) litigation among the parties.  (Dkt. No. 95-2, CSSUF No. 22.)

On December 18, 2009, Wallack, through his attorney, threatened to initiate a lawsuit against Defendants. (Dkt. No. 95-2, CSSUF No. 23; Dkt. No. 87-23, Ds' NOL, Ex. L at 24-25.) In an effort to resolve differences among the parties without litigation, Markham and Christian began working together in mid-December 2009 to negotiate a stock repurchase agreement.  (Dkt. No. 95-2, CSSUF No. 36.)   Negotiations continued through the latter part of December 2009 with the parties having vastly different views about the value of DVMI and the provisions to be included in any agreement. (Dkt. No. 95-2, CSSUF No. 37.) After negotiations with counsel and with the assistance of a third party, David Zanders, the parties reached an agreement. (Dkt. No. 95-2, CSSUF No. 37.)  The parties executed a Stock Repurchase Agreement on December 31, 2009.  (Dkt. No. 93-3, P's NOL, Ex. M.)  Plaintiff agreed to sell his DVMI shares for $274,500 and received a payment of $30,000 in exchange for the settlement and mutual release. (Dkt. No. 95-2, CSSUF No. 37; Dkt. No. 93-3, P's NOL, Ex. M.)

On September 9, 2011, DVMI and Idexx entered into an Asset Purchase Agreement where Idexx purchased the assets of DVMI and Animal Insides, Inc. for around $3,200,000. (Dkt. No. 93-3, P's NOL, Ex. N; Dkt. No. 95-2, CSSUF No. 42.) On December 22, 2011, Plaintiff and SDVI filed the instant action.  (Dkt. No. 1.)

### Discussion

**A.      Legal Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

**B.   General Release[2]**

---

[2]Both parties argue that the Court's prior rulings on Defendants' motion to dismiss applies to support their arguments. Defendants argue that the Court previously ruled that any allegations of fraudulent concealment would be barred. Plaintiff argues that the Court previously ruled that he alleged facts of fraud sufficient to render the release voidable, and therefore, the case cannot be dismissed based on the release. However, the Court's ruling on a motion to dismiss is based on a different standard

As a threshold issue, Defendants argue that by signing the Stock Repurchase Agreement, that contained a mutual release, Plaintiff knowingly and voluntarily released the Defendants from any and all claims as of December 31, 2009. Plaintiff argues that the release is voidable because as a fiduciary, Defendants did not fully disclose all the relevant facts. Plaintiff contends that as to all the instances of breaches of fiduciary duty, he either had no idea they were occurring or he did not know the import of why they were occurring.

A "general release can be completely enforceable and act as a complete bar to all claims (known or unknown at the time of the release) despite protestations by one of the parties that he did not intend to release certain types of claims." San Diego Hospice v. County of San Diego, 31 Cal. App. 4th 1048, 1053 (1995) (citing Winet v. Price, 4 Cal. App. 4th 1159, 1173 (1992)). In determining the enforceability of a release, courts consider (1) whether the parties are represented by counsel; (2) whether the releasor was aware of any potential claims, and (3) whether the releasor with this awareness of the second factor, and advice of counsel, the releasor agreed to release unknown claims explicitly waiving the protection of Civil Code section 1542. Id. at 1054 (citing Winet, 4 Cal. App. 4th at 1168).

However, a release may be rescinded or the release can be avoided if (1) there was fraud in the inception - misrepresenting the nature or contents of the document being executed; (2) a release obtained by a fiduciary without full disclosure of the relevant facts; (3) fraud as a ground for not applying a release to an unknown claim because the fraud prevented the releasor from knowing about the claim. Id. at 1055 n. 2.

In this case, the mutual release contained in the Stock Repurchase Agreement, entered on December 31, 2009 provides:

---

than on a motion for summary judgment. Moreover, allegations of fraudulent concealment is a distinct cause of action from breach of fiduciary duty. The Court will not rely on its prior ruling on motions to dismiss in considering the instant motion for summary judgment.

[11cv2996-GPC(KSC)]

Mutual Release. The Company, Matt, and Stephen release Seller and his attorneys, employees, and agents, and Seller releases the Company, Matt, and Stephen and their attorneys, employees, and agents from all claims, liabilities, obligations, promises, agreements, controversies, and damages of any nature and kind, known or unknown, attributable to or otherwise arising from any matter, transaction, occurrence, event or controversy from the beginning of time until the Effective Date. The only possible claim between the two sides that can survive this release will be one for breach of this agreement, and any such claim is specifically preserved from this release. This release specifically includes any and all claims under any federal, state, or local statute, rule, or regulation, as well as any claims for negligent or intentional infliction of emotional distress, breach of contract, fraud or any other unlawful behavior, the existence of which the Company, Matt, Stephen and the Seller deny. This release is not an admission of any wrongful or unlawful acts or of any breach of any agreement. This release will be effective as a full and final accord and satisfaction and general release of and from all of the claims released in this agreement (the "Released Claims"). The parties acknowledge that they are familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

1542. CERTAIN CLAIMS NOT AFFECTED BY A GENERAL RELEASE.

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Each party waives any and all rights he or it has, or may have, under California Civil Code Section 1542 (or any successor statute) with respect to the Released Claims. In connection with this waiver, the parties acknowledge that they are aware that they may discover claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true, with respect to the subject matter of this agreement. Nevertheless, each party reaffirms that by entering into this agreement, and having had the opportunity to seek the advice of its own independently selected counsel, such party intends to release fully, finally, and forever the Released Claims.

(Dkt. No. 87-9, Ds' NOL, Ex. C at 5.)  This is a broad release that covers any known and unknown claims and also waives the rights under California Civil Code section 1542.

As to enforceability, Defendants argue that Plaintiff was represented by an

[11cv2996-GPC(KSC)]

1  experienced and competent counsel, William Markham.[3]  Defendants also maintain that

2  Plaintiff was aware of all the facts he currently alleges as breaches of fiduciary duty

3  prior to signing the Stock Repurchase Agreement, and he voluntarily and knowingly

4  released known and unknown claims, and explicitly waived the protections under Civil

5  Code section 1542.   Plaintiff does not dispute Defendants' argument as to the

6  enforceability of the mutual release, but argues that the mutual release is voidable

7  based on Defendants' role as fiduciaries and their failure to fully disclose all the

8  relevant facts.

9        In his opposition, Plaintiff lists the acts or omission of acts that should void the

10  release.  (Dkt. No. 93 at 19-20.)  These acts are:

11      a.    Withholding/Misrepresenting DVMI's true financial condition
              during 2009 from Wallack;
12      b.    Taking control/seizing the books and accounting of DVMI;
        c.    Moving the DVMI business operations to Wright's home, with
13            little or any notice;
        d.    Holding at least one secret meeting with the company
14            accountant, including discussing that much of the 2009 profits
              (which Wright had in August told Wallack there would likely be
15            none), would be distributed in the form of back paid salary to
              Wright and Walters, and bonuses to Walters, Wright and other
16            DVMI employees, to the exclusion of Wallack.
        e.    Eliminating Wallack's Administrator access to the DVMI
17            website;
        f.    Seizing and transferring ownership of the DVMinsight.com
18            domain name to themselves from Wallack's company (SDVI) by
              having Walters surreptitiously use his prior SDVI access to the
19            GoDaddy.com account to contact GoDaddy.com and have the
              domain name switched to another account and web host, with no
20            access to Wallack or SDVI;
        g.    As part of the Stock Repurchase Agreement, by attempting in
21            bad faith to "steal" SDVI's registered ownership of the
              DVMINSIGHT Trademark, with the intent of selling that
22            Trademark to IDEXX, knowingly without obtaining the
              necessary written assignment under federal law (namely 15 USC
23            1055(a)(3)). In fact, the Trademark was never mentioned in the
              negotiations, there is no written assignment, and its registered
24            owner, SDVI, was not even a party to the Stock Repurchase
              Agreement (see, Christian Depo, **Exhibit "D,"** pages 81-82);
25

26        [3]Plaintiff retained counsel, William Markham to assist him in selling his shares
    in DVMI in late 2009. (Dkt. No. 87-22, Ds' NOL, Ex. L, Markham Depo. at 15:21-
27  16:4.) Markham has been practicing law for about 27 years and has been involved in
    cases concerning shareholder disputes, and drafting settlement agreements and stock
28  repurchase agreements. (Id. at 8:17-19; 13:6-9; 19-14:12; 15:11-20.)

h.    Refusing to allow a fair business valuation of DVMI to establish a purchase price for Wallack's shares of stock; and

i.    Knowingly retaining DVMI's corporate counsel, Michael Christian, as also their personal counsel to represent them in the Stock Repurchase Transaction, including having Christian advocate to not have a business valuation and otherwise dissuade Wallack from receiving the benefits of a fair, reasonable, good faith and honest negotiation he deserved with those who owed him fiduciary duties (but who were fraudulently and clandestinely negotiating the Stock Repurchase so they could reap the rewards of future employment and millions of dollars from an asset purchase- to the tortuous exclusion of Wallack from reaping those benefits.)

j.    Subjecting Wallack to a coordinated effort to make his relationships with co- owners and is (sic) working environment with them and staff hostile ones; and

k.    Threatening to misdirect DVMI's revenues/assets to their own personal companies if Wallack insisted on remaining a shareholder of the company.

(Dkt. No. 93 at 20-21.) Plaintiff alleges either he did not know these acts were occurring or he did not understand the "import of why they were occurring." (Id. at 21.)

Plaintiff explains he did not know the import or significance of these acts at the time of the Stock Repurchase Agreement because he was not aware that Defendants were in continuous communications with Idexx from April 2009 until the Asset Purchase Agreement between Idexx and DVMI was signed in September 2011. Plaintiff claims that the $1 million was the "first offer" which increased over time. Moreover, it was later discovered, and unknown to Plaintiff that at the time of signing the Stock Repurchase Agreement, that Wright, Walters and all employees of DVMI, except Plaintiff, were offered future employment at Idexx, in April/May 2009 when Wright went to visit Idexx, to continue to operate DVMI's business model the same as before. Consequently, in order to achieve their goal of an asset sale and future employment at Idexx, Defendants had to remove Plaintiff from his stock ownership interest in DVMI. From the time Wright returned from Idexx in April 2009, Plaintiff alleges Defendants committed numerous overt acts and concealed key facts from Plaintiff which forced Plaintiff to succumb to Defendants' pressure to sell his interests in DVMI.

[11cv2996-GPC(KSC)]

First, Plaintiff does not provide any legal authority that while he was aware of the many alleged acts of breaches of fiduciary duty prior to the stock repurchase agreement containing the mutual release, he did not understand the significance of all the acts, in totality, until after he discovered that there were continuous discussions of the sale of DVMI to Idexx and the offer of employment to Defendants and DVMI employees at the exclusion of Plaintiff.

Even if the Court considered Plaintiff's argument, he has failed to demonstrate a genuine issue of disputed material fact as to the facts giving rise to Plaintiff's argument that he did not understand the significance of all the acts constituting breach of fiduciary duty. Defendants argue Plaintiff has not demonstrated a genuine issue of disputed material fact that there were continuous discussions between Wright and Walters with Idexx concerning the sale of DVMI to Idexx after Wright returned from Maine in April/May 2009 and that Defendants knew at that time they would be offered employment at Idexx once the sale was complete that specifically excluded Plaintiff.

Defendants present the following facts in support. When Farber, an Idexx representative, suggested a purchase price of not more than $1 million, which was a multiple of 1.1-1.2 of DVMI's gross revenues, Plaintiff and Defendants all agreed that the price was too low and not acceptable. (Dkt. No. 87-15, Ds' NOL, Ex. H, Wright Depo. at 145:22-146:4; Dkt. No. 93-5, Wallack Decl. ¶ 22.) In a brief conversation, Wright told Farber, "no" to the offer. (Dkt. No. 87-15, Ds' NOL, Ex. H, Wright Depo. at 145:22-146:4; 153:3-6; Dkt. No. 87-16, Ds' NOL, Ex. I, Wallack Depo. at 94:11-17.) Wright testified that after he said "no" to Idexx concerning its RFP, there was radio silence. (Dkt. No. 87-15, Ds' NOL, Ex. H, Wright Depo. at 155:8-156:5.) According to DVMI's attorney, negotiations ceased regarding selling anything to Idexx. (Dkt. No. 87-20, Ds' NOL, Ex. J, Christian Depo. at 48:1-25.) Wallack also testified that when he contacted Farber in December 2009 to confirm the potential price offered by Idexx, Farber told him there were no continued business discussions. (Dkt. No. 87-18, Ds' NOL, Ex. I, Wallack Depo. at 313:13-315:3.) According to Schofield, an Idexx

representative, he stated that there was communication with Wright about six to ninth months before the asset purchase sale in September 2011.  (Dkt. No. 93-3, P's NOL, Ex. F, Schofield Depo at 44:5-12.)  He also testified that he did not know why there were no documents as to another nondisclosure agreement ("NDA"), a letter of intent and/or term sheet sent to DVMI for the purchase of its assets.  (Id. at 61:3-18.)  Wright testified that he got a call from Schofield a few months before September 2011 concerning Idexx' interest in purchasing DVMI.  (Dkt. No. 87-15, Ex. H, Wright Depo. at 158:17-160:7.)  In addition, he recalls that Idexx did not contact him more than three months before September 2011 because Christian informed him that Idexx wanted the deal completed within 60 days.  (Id.)  Defendants' facts demonstrate that negotiations between DVMI and Idexx ceased in the Spring of 2009 and did not start up again until 2011.

In response, Plaintiff points to three facts to support his argument that there were continuous negotiations between DVMI and Idexx and an offer of employment to all DVMI employees and Defendants.  First, Plaintiff asserts that a nondisclosure agreement ("NDA") was negotiated in April/May 2009 and that the NDA remained open until the deal closed in September 2011.  According to Plaintiff, this demonstrates there were continued discussion between Defendants and Idexx.  In his declaration, Plaintiff states that he later learned of extensive correspondence between Farber, Wright and DVMI's attorney concerning negotiations on an exclusive Non-Disclosure Agreement ("NDA") with Idexx at the time of Wright's visit to Maine in April/May 2009.  (Dkt. No. 93-5, Wallack Decl. ¶ 23.)  After the NDA was signed, Wright provided DVMI's financials to Idexx.  (Id.)  He states, "I was for the most part unaware of these communications."[4]  (Id.)

---

[4]Defendants object to Plaintiff's declaration based on the sham affidavit rule. A "party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Nelson v. City of Davis, 571 F.3d 924, 927 (9th Cir. 2009).  "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues

[11cv2996-GPC(KSC)]

1    In reply, Defendants argue that Plaintiff knew about the NDA at the time of its

2  negotiation.  A non-disclosure agreement was discussed and negotiated by email

3  between Wright, Farber and Christian, DVMI's attorney, in May 2009. (Dkt. No. 93-3,

4  P's NOL, Ex. P.)  Plaintiff was cc'ed on most of the emails.  (<u>Id.</u>)   Also, Plaintiff

5  testified that he was aware of the negotiations regarding the NDA at the time as he

6  acknowledged he received the emails. (Dkt. No. 95-4, Freeland Decl., Ex. A, Wallack

7  Depo. at 115:5-116:23.)  Plaintiff further testified that while he understood that the

8  NDA was being put in place he did not know the contents of the NDA.  (<u>Id.</u>)  He said

9  he understood the NDA was related to the potential purchase of DVMI by Idexx. (<u>Id.</u>)

10  Financials were sent to Farber.  (Dkt. No. 87-15, Ds' NOL, Ex. H, Wright Depo. at

11  134:9-135:6.)

12    Based on these facts, Plaintiff has not demonstrated that he was not aware of the

13  NDA at the time it was negotiated.  Plaintiff presents an implication that there were

14  continued  negotiations  of  a  sale  from  April  2009  to  September  2011  because

15

16  of fact."  <u>Kennedy v. Allied Mutual Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991).
    However, the sham affidavit rule must be applied with caution because "it is in tension
17  with the principle that the court is not to make credibility determinations when granting
    or denying summary judgment. <u>Yeager v. Bowlin</u>, 693 F.3d 1076, 1080 (9th Cir. 2012)
18  (citation omitted).  Therefore, in order for the sham affidavit rule to apply, the court
    must make a factual determination that the contradiction was actually a "sham" and the
19  "inconsistency between a party's deposition testimony and subsequent affidavit must
    be clear and unambiguous to justify striking the affidavit." <u>Id.</u> (citation omitted).
20
    Here, Plaintiff deposition was taken on December 12, 2014 and the declaration
21  was executed on March 20, 2015.  His declaration statement "I was for the most part
    unaware of these communications" is an exaggeration, and not a direct contradiction,
22  of his deposition testimony where he testified that he, in fact, received the emails about
    the NDA and was aware one was being negotiated.  Moreover, it does not appear that
23  Plaintiff was aware that DVMI gave Idexx its financial document which support
    Plaintiff's statement that "for the most part [he] was unaware of these communications."
24  <u>See Brown v. Showboat Atlantic City Propco, LLC</u>, No. 08–5145(NLH), 2010 WL
    5237855, * 4 (D.N.J. Dec.16, 2010) ("An inherent requirement of a sham affidavit is
25  that the affiant's statement must contradict deposition testimony. Statements in an
    affidavit that 'merely . . . conflicts to some degree with an earlier deposition' cannot
26  be disregarded as shams . . . .  Courts do not declare these affidavits shams because
    they do not flatly contradict deposition testimony and, therefore, a reasonable jury may
27  find the affidavit credible and conclude that any discrepancy is inadvertent[,]" citing
    <u>Baer v. Chase</u>, 392 F.3d 609, 625 (3d Cir. 2004)).  Therefore, the Court declines to
28  strike the paragraph in Plaintiff's declaration and overrules Defendants' objections.

1   Defendants did not produce another NDA that was negotiated for the Asset Purchase

2   Agreement. Therefore, Plaintiff implies that since the same NDA was most likely used

3   for the Asset Purchase Agreement, there must have been continued negotiations about

4   the sale of DVMI to Idexx.  Plaintiff's assertion is merely an implication and no facts

5   are presented to support that assertion.  The NDA issue does not show there were

6   continuous negotiations of a sale between Defendants and Idexx.

7        Second, Plaintiff contends that an email, dated July 26, 2009 and titled "Idexx",

8   sent to him from Wright indicated that Wright was in communication with a TJ Dupree,

9   an executive and Farber's boss at Idexx, demonstrates continuous negotiations between

10  the two companies. (Dkt. No. 93-5, Wallack Decl. ¶ 23; Dkt. No. 93-3, P's NOL, Ex.

11  Q.)    According to Plaintiff, contrary to Wright's representation that his discussion

12  with Idexx were over and would not be dealing with Idexx on any further matters, he

13  became aware that Wright exchanged emails with a TJ Dupree, at Idexx. (Dkt. No. 93-

14  5, Wallack Decl. ¶ 23.)  At the time, Plaintiff was unaware of any work being done by

15  or with Idexx in July 2009 by DVMI.  (Id.)

16       One email in July 2009, does not demonstrate that Defendants and Idexx were

17  still discussing the sale of DVMI to Idexx.  Morever, even if it did demonstrate

18  continued discussions concerning the sale of DVMI to Idexx, Plaintiff was fully aware

19  of Wright's communications with Idexx in July 2009.[5]  Moreover, Plaintiff testified

20  that prior to 2009, he was not involved in the day-to-day business of DVMI so he was

21  not aware whether DVMI had a business relationship with Idexx. (Dkt. No. 87-16, Ds'

22  NOL, Ex. I, Wallack Depo. at 90:19-91:5.)  Plaintiff has not created a genuine issue of

_____

24       [5]Wright explained that he emailed TJ Dupree and had conversations with
    Brandon French, also an employee of Idexx, about the CR leases Plaintiff was doing.
25  (Id. Ds' NOL, Ex. H, Wright Depo. at 153:9-155:8) While the parties do not explain
    the meaning of "CR leases", Wright testified about CR systems and how they are
26  distinct digital radiology machines and create a conflict of interest if you sell both.
    (Dkt. No. 87-15, Ds' NOL, Ex. H, Wright Depo. at 154:1-23.) At that time, Plaintiff
27  and Idexx were competitors in the sale of digital radiography machines and there was
    a relationship. (Id.) Wright's goal was to encourage digital radiology vendors to keep
28  a level playing field to allow anybody to send images to anybody else. (Id.)  Idexx sent
    images to DVMI even though they had their own teleradiology division. (Id. at 155:3-
    7.)

material fact that the one email in July 2009 to an employee at Idexx demonstrates continued negotiations between Defendants and Idexx concerning the sale of DVMI to Idexx.

Third, Plaintiff states that the alleged agreement in 2009 to sell DVMI to Idexx also included an employment offer to Defendants and DVMI's employees and not Plaintiff. For support, Plaintiff only cites to his declaration which states that "Wright did not mention that any potential sale would also include IDEXX retaining all DVMI management except me." (Dkt. No. 93-5, Wallack Decl. ¶ 23.) Defendants filed objections to Plaintiff's declaration. (Dtk. No. 95-1.) As to this statement, Defendants object because this statement lacks personal knowledge under Federal Rules of Evidence 602 and lacks relevance. (Id.) The Court agrees and sustains Defendants' objection. Plaintiff provides no foundation as to how he learned that Wright knew that any potential sale would include employment with Idexx back in April/May 2009.

Plaintiff's allegations do not show that Defendants had continued negotiations about the sale of DVMI from April/ May 2009 through September 2011 when the Asset Purchase Agreement was executed, and do not demonstrate that Defendants, in April/May 2009, were offered employment by Idexx, if the acquisition occurred.

As discussed above, the underlying bases of Plaintiff claim that he did not understand the import or significance of the eleven acts because Defendants concealed information about the potential later sale of DVMI to Idexx and concealed the offer of employment to Defendants and DVMI employees only is without merit as Plaintiff has failed to demonstrate a genuine issue of material fact. Plaintiff presents many arguments, claims, and conjectures without evidentiary support.

Furthermore, as to the eleven acts of breaches of fiduciary duty, Defendants argue that Plaintiff knew about the claims he alleges in this case and cannot void the mutual release. In an email dated December 18, 2009, Plaintiff, through Markham, threatened to initiate a lawsuit against Defendants alleging, among other things, breach of fiduciary duty. (Dkt. No. 87-23, Ds' NOL, Ex. L at 24.) In the email, Markham

stated the law on the fiduciary duties owed by Defendants, the majority shareholders, to Plaintiff, the minority shareholder. (Id.) Markham addressed the following issues in his email:  Wright and Waters' refusal to agree to a valuation of the company; the additional pay bonuses to be paid out to Defendants; Defendants' removal of the software from the company; Defendants' restriction of Plaintiff's ability to monitor the company's activities; and an indication that Defendants intended to transfer the value of the business to other entities to avoid paying an honest purchase price.  (Id. at 24-25.) Plaintiff provided notice that unless an agreement is worked out, he will bring suit in Superior Court on January 5, 2010 seeking a judicial accounting, an involuntary dissolution and damages for breach of contract, mismanagement, breach of fiduciary duty and related wrongs.  (Id. at 25.)

At his deposition, Markham confirmed that in December 2009, he sent an email threatening to bring a lawsuit in state court. (Dkt. No. 87-22, Ex. L, Markham Depo. at 118:1-122:5.)  He testified that the breaches of fiduciary duties he was referencing in the December 2009 email were Defendants diverting the assets and/or revenues to Wright and Water's companies so DVMI would have no value; meeting privately with DVMI's accountant to make tax planning and payment arrangements that benefit the controlling shareholders but to the detriment of the minority shareholder; not disclosing to the minority shareholder the status of their arrangements to sell the company for what they think the company is worth if they were able to sell it; trying to suppress what the minority shareholder knew about the value of the company or the revenues it was receiving, excluding the minority shareholder from information that the shareholder requires in order form a fair assessment of the value of the company; refusing in bad faith to any sort of valuation process when negotiating the purchase of the minority shareholders' interest in the company; and insisting that the company had negligible or no value during these negotiations.  (Id. at 120:7-121:9.)

Markham's email and testimony reveal that Plaintiff knew about alleged acts or omissions a, b, d, e, f, h, and k prior to the signing of the mutual release. (Cf., Dkt. No.

93 at 19-20.)  Therefore, these cannot be a basis to for void the mutual release.  The Court next addresses items c, g, i, and j to determine if Plaintiff knew about these issues prior to signing the Stock Repurchase Agreement.

As to item c concerning Wright relocating DVMI's business operations to his home  and changing the mailing address to a post office box only he had access to, the Court concludes that Defendants have not provided appropriate citation to facts in the record to support their position.  In their CSSUF, Defendants assert that Plaintiff testified that moving DVMI to Wright's home was financially beneficial because DVMI would no longer have to pay rent to VICSD.  However, the citations to Plaintiff's deposition and to Walters and Christian's deposition pages do not support this claim.  (See Dkt. No. 95-2, CSSUF Nos. 3, 12, 34.)[6]  Plaintiff asserts in his declaration that Wright relocated business operations to his home and changed the mailing address to a post office box that only Wright had access to raising the implication that the move was done to shut Plaintiff out of the business operations of DVMI.  (Dkt. No. 93-5, Wallack Decl. ¶ 25.)

Coincidentally, as the Court was reviewing the record, it came across an email in early August 2009 where Plaintiff writes, "I also agree that there is no reason for DVMinsight to spend the money on rent but if you want to continue getting mail at the center that is fine you don't have to rent a PO Box."  (Dkt. No. 93-3, P's NOL, Ex. S at 274.)  Therefore, Plaintiff not only was notified and aware of the move of operations of DVMI to Wright's home but actually condoned it.  This cannot be a basis to void the mutual release.

As to item g, concerning Plaintiff's allegation that Defendants breached a fiduciary duty by attempting to "steal" SDVI's registered ownership of the DVMInsight trademark as it was a listed asset in the Asset Purchase Agreement with

---

[6]The Court notes many pages are missing from the record that are cited by the both parties in the CSSUF.  For example, pages 79-83; 130-34 and142-43 of Plaintiff's deposition are not in Defendants' supporting documents or even in Plaintiff's documents.  Therefore, the Court only considered the pages that were in the record.

[11cv2996-GPC(KSC)]

1   Idexx without obtaining a written assignment under trademark law.  Plaintiff did not
2   learn of this fact until after the execution of the Asset Purchase Agreement.

3        The Asset Purchase Agreement in schedule 1.1 states that the trademark was an
4   asset owned by DVMI and was being sold to Idexx.  The trademark was filed in April
5   2005 in SDVI's name and no assignment was ever made.  In November 2011, Idexx
6   attempted to have the trademark registered in its name. (Dkt. No. 93-3, P's NOL, Ex.
7   W.)

8        In order to demonstrate that Defendants breached their fiduciary duty, Plaintiff
9   has to show that prior to the 2009 Stock Repurchase Agreement, Defendants intended
10  to "steal" the trademark as part of DVMI's asset sale to Idexx later in September 2011.
11  As discussed above, Plaintiff has not created a genuine issue of material fact that there
12  were continued negotiations between Defendants and Idexx from April/May 2009 to
13  September 2011.  It follows that Defendants could not have intended to "steal" the
14  trademark as part of the sale to Idexx prior to December 2009.

15       Defendants argues that they were permitted to use the trademark after the Stock
16  Repurchase Agreement in December 2009. Wallack testified that there was an oral
17  license between SDVI and DVMI concerning the use of its trademark. (Dkt. No. 95-4,
18  Freeland Decl., Ex. A, Wallack Depo. at 243:16-244:10; 245:3-12.)  When Wright
19  came on board in 2004, they agreed that with the creation of the new entity, SDVI,
20  everything would remain the status quo so that the assets, such as the trademark,
21  remained part of the original company, SDVI, and would be used by the new entity,
22  DVMI.  (Id.)  He testified that the parties never discussed termination of the license.
23   (Id. at 245:13-23.)  Plaintiff does not raise an issue of trademark violation after the
24  Stock Repurchase Agreement in December 2009 as to Defendants or DVMI but only
25  alleges it as to Idexx as part of the Asset Purchase Agreement and later conduct by
26  Idexx.

27       Defendants also contend that Plaintiff has no standing to raise this issue because
28  SDVI is the owner of the trademark and SDVI did not file an opposition to Defendants'

motion for summary judgment.  Furthermore, Defendants argue that there was no longer a fiduciary relationship between the Defendants and Wallack after December 31, 2009.  They assert that Idexx' attempt to register the DVMinsight trademark is not relevant to Plaintiff's claim for breach of fiduciary duty against Defendants.  The Court agrees.

Plaintiff has not shown that Defendants intended to sell the trademark to Idexx at the time they entered into the Stock Repurchase Agreement in December 2009.  Therefore, this issue cannot void the mutual release.

As to item i, Plaintiff alleges that Defendants knowingly retained DVMI's corporate counsel Michael Christian, as their personal counsel to represent them in the Stock Repurchase transaction, including having Christian advocate to not have a business valuation and otherwise dissuade Plaintiff from receiving the benefits of a fair, reasonable, good faith and honest negotiation owed to him by Defendants' fiduciary obligations to him.

Defendants argue that Plaintiff asserts a legal conclusion which has no support.  According to Plaintiff, Christian's response to Plaintiff's email of December 7, 2009 demonstrates that Defendants violated their fiduciary duties by knowingly retaining corporate counsel, Christian, to represent them as individual parties as well as DVMI as to the Stock Repurchase Agreement without obtaining a waiver of conflict letter.  Christian's response only stated that he could not represent the interests of the shareholders since he represented the corporation.  (Dkt. No. 87-20, Ds' NOL, Ex. J at 18.)  There is no indication that Christian was representing Defendants in the Stock Repurchase Agreement.  Plaintiff's speculative argument concerning item i is without merit.

Finally, Plaintiff relies on item j which alleges in a conclusory fashion that Defendants subjected Plaintiff to a coordinated effort to make his relationships with co-owners and his working environment a hostile one.  This allegation is essentially an amalgamation of items a-j which have been shown to be meritless individually and are

[11cv2996-GPC(KSC)]

no more meritorious combined.

In sum, Plaintiff has not created a genuine issues of fact that he was unaware of the allegations of breaches of fiduciary duty prior to the Stock Repurchase Agreement such that the mutual release can be voided.

Based on the evidence, it is clear that by December 2009 the relationship between Plaintiff and Wright/Walters had deteriorated. Plaintiff was motivated to sell his shares in the company. In order to avoid prolonged litigation, he was willing to accept a significant discount on the valuation in order to get something reasonable and to sever his ties with Wright and Walters. (Dkt. No. 95-6, Freeland Decl., Ex. C, Markham Depo at 69:9-12.) Plaintiff contacted Farber at Idexx concerning Idexx' offer in April/May 2009 and Markham conducted his own valuation of the company. (Id., Markham Depo. at 111:21-25.) Plaintiff was fully aware of the issues he alleged concerning Defendants' breach of their fiduciary duty; however, he acknowledged that he wanted to avoid litigation and voluntarily gave up his rights as to these claims when he signed and agreed to the mutual release. Plaintiff made a choice to settle his claims rather than pursue litigation. He also acknowledged that he would be receiving less than what he believed DVMI was worth. On December 27, 2009, Markham wrote to Christian, Wright and Walters to accept a settlement offer. (Dkt. No. 87-23, Ds' NOL., Ex. L at 35-36.) In that email, he discussed his disagreement with the valuation procedures and cited to caselaw and disputed opposing counsel's supporting article. (Id. at 36.) In the end, Markham wrote, "[t]hese points, however, no longer matter, as Seth accepts Matt's offer, which he understands to be the following . . . " (Id. at 36.)

Moreover, Plaintiff admits that he read the Agreement, did not have any concerns about the mutual release, and had an opportunity to speak to his lawyer about the Agreement before signing it. (Dkt. No. 87-18, Ds' NOL, Ex. I, Wallack Depo. at 329:19-331:21; 334:4-13; Dkt. No. 87-22, Ex. L, Markahm Depo. at 143:9-144:5.) After reading the Agreement, Plaintiff understood the terms and signed it on December 31, 2009 and received all the consideration provided under the Agreement. (Id.)

[11cv2996-GPC(KSC)]

Therefore, based on the evidence presented, Plaintiff has not demonstrated a genuine issue of material fact that the mutual release is voidable based on Defendants', as fiduciaries, failure to fully disclose the relevant facts.  Since the mutual release bars Plaintiff from asserting any claims for breach of fiduciary duty, the Court GRANTS Defendants Wright and Walters' motion for summary judgment on the cause of action for breach of fiduciary duty.

## C.    Evidentiary Objections

Defendants filed evidentiary objections to Plaintiff's declaration. (Dkt. No. 95-1.)  The Court notes their objections.  To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence.  To the extent that the evidence is not proper, the Court did not consider it.

## Conclusion

Based on the above the Court GRANTS Defendants Wright and Walters' motion for summary judgment on the breach of fiduciary duty cause of action.  The hearing set for April 17, 2015 shall be **vacated**.

IT IS SO ORDERED.

DATED:  April 15, 2015

HON. GONZALO P. CURIEL
United States District Judge