1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12

SETH WALLACK and SAN DIEGO
VETERINARY IMAGING, INC.,

                                    Plaintiffs,

        vs.

13
14
15
16
17

IDEXX LABORATORIES, INC.;
IDEXX REFERENCE
LABORATORIES, INC.; MATTHEW
WRIGHT; an individual; and
STEPHEN WALTERS, an individual

                                    Defendants.

CASE NO. 11cv2996-GPC(KSC)

**ORDER DENYING IDEXX
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

[Dkt. No. 103.]

18
19
20
21
22
23
24
25

        Presently before the Court is Defendants IDEXX Laboratories, Inc. ("Idexx")
and IDEXX Reference Laboratories, Inc.'s ("Idexx RL") motion for summary
judgment.  (Dkt. No. 103.)  Plaintiffs Seth Wallack ("Wallack") and San Diego
Veterinary Imaging, Inc. ("SDVI") opposed the motion.  (Dkt. No. 133[1].)  Defendants
filed a reply.  (Dkt. No. 124.)  Having considered the parties' briefs, supporting
documentation, and the applicable law, the Court DENIES Defendants' motion for
summary judgment.

/ / / /

26
27
28

[1]Plaintiffs filed a timely opposition on September 4, 2015; however, the
opposition was stricken based on non-compliance with the local rules. (Dkt. No. 131.)
Plaintiffs corrected the errors and refiled the opposition on October 4, 2015. (Dkt. No.
133.)

**Procedural Background**

On December 22, 2011, Plaintiffs Wallack and SDVI filed a complaint against Defendants Idexx, Idexx RL, (collectively "Idexx Defendants" or "Defendants"), Matthew Wright ("Wright") and Stephen Walters ("Walters") alleging numerous causes of action. (Dkt. No. 1.) After two rounds of motions to dismiss, the operative second amended complaint, filed on September 26, 2013, asserts causes of action for: (1) trademark infringement by Plaintiff SDVI against Idexx and Idexx RL; (2) breach of fiduciary duty by Plaintiff Wallack against Wright and Walters; (3) civil conspiracy by both Plaintiffs against all Defendants; and (4) request for declaratory relief by both Plaintiffs against Idexx and Idexx RL. (Dkt. No. 50.) On April 14, 2014, the Court denied Defendants Wright and Walters' motion to dismiss the breach of fiduciary duty claim; and granted Defendants' motion to dismiss the civil conspiracy claim with prejudice. (Dkt. No. 68.) On April 15, 2015, the Court granted Defendants Wright and Walters' motion for summary judgment on breach of fiduciary duty. (Dkt. No. 99.)

The remaining causes of action in the operative second amended complaint are the first cause of action by SDVI against Idexx Defendants for trademark infringement, and fourth cause of action by SDVI and Wallack against Idexx Defendants for declaratory relief relating to the trademark.[2]

**Factual Background**

Seth Wallack has been a licensed veterinary radiologist for over ten years. (Dkt. No. 133-2, Wallack Decl. ¶ 2.) He has been the sole shareholder, and President and CEO of San Diego Veterinary Imaging, Inc. ("SDVI") since its formation in 2002. (Dkt. No. 124-2, Concordance of UMF, No. 1.) Wallack conducted his veterinary radiology practice under SDVI. (Dkt. No. 133-2, Wallack Decl. ¶ 8.) In the early 2000's, he became one of the first veterinary radiologist in the San Diego area to

---

[2]On May 12, 2014, Idexx Defendants filed a counterclaim against Plaintiffs for Declaratory Judgment under the Lanham Act, Declaratory Judgment under State Statutory and Common Law, and Cancellation of Plaintiff SDVI's Trademark and Rectification of the Principal Register. (Dkt. No. 73.) The claims in the counterclaim are not subject to the instant motion for summary judgment.

[11cv2996-GPC(KSC)]

promote the use of digital imagery.  (Id. ¶ 3.)  Traditionally, veterinary radiologists would "make the rounds" by visiting veterinary offices, clinics and hospitals to examine images and provide diagnoses and consultations, and would receive x-ray images by messenger, overnight delivery, or regular mail.  (Id.)  As a result, the radiologist would provide his diagnosis one or two days after the x-rays had been taken.  (Id.)  In early 2004, Wallack contemplated the development of a software program that would serve as a "platform" where veterinary radiologists could store images, analyze and manipulate the images, and provide their consultations online.  (Id. ¶¶ 6, 7.) In 2004, SDVI hired Stephen Walters to assist in programming and coding the computer platform/website.  (Id. ¶ 9.)  Wallack and Walters worked together for months to develop the software platform.  (Id.)  They agreed that Walters would eventually become 20% owner in any future company.  (Id.)  Walters also retained ownership of the portions of the source code/programmed information he developed related to the website.  (Id.)  In early 2005, Wallack named the software DVMInsight and established a domain name and website called DVMInsight.com.  (Id. ¶ 10.)  On April 20, 2005, Wallack filed a trademark application for DVMINSIGHT on behalf of SDVI for "Veterinary services, namely providing teleradiology interpretation services and consultation in the field of veterinary medicine via a global computer network" on an intent-to-use basis.  (Dkt. No. 124-2, Concordance of UMF, No. 20.)  The DVMINSIGHT service mark ("Trademark") was assigned U.S. Registration No. 3,276,808 in early 2007.  (Dkt. No. 133-2, Wallack Decl. ¶ 10.)

Walters and Wallack worked closely together in 2004 and 2005.  (Id. ¶ 12.)  In July 2005, Wallack created and incorporated Veterinary Imaging Center of San Diego ("VICSD") which launched in December 2005.  (Id. ¶ 13.)  VICSD replaced SDVI for some, but not all of Wallack's work.  (Id.)  Wallack conducted conventional veterinary radiology and tele-radiology under VICSD.  (Id.)  When performing tele-radiology, Wallack used the name DVMInsight.  (Id.)  As a related company, SDVI allowed VICSD to use the Trademark.  (Id.)  At the end of November 2005, Dr. Matthew

Wright joined Wallack to work at VICSD to work on tele-radiology and to work on the DVMInsight platform.  (Id. ¶ 14.)  In 2005 and 2006, Wright became the manager and resident radiologist at VICSD, and Wallack spent his time "making the rounds" to veterinary hospitals on behalf of VICSD.  (Id.)  Wright and Wallack became close colleagues and they interacted with Walters in order to complete the development of the software platform.  (Id. ¶ 15.)

In September 2006, Wallack, Wright and Walters incorporated DVMInsight, Inc. ("DVMI") in California.  (Dkt. No. 124-2, Concordance of UMF, No. 2.)  At the time of its incorporation, "DVMI was a company with a three-fold purpose: (1) the development of a software platform ("DVMI platform") that could be utilized by veterinarians for teleradiology purposes; (2) the operation of a website at which clients and providers could use the afore-mentioned software, and (3) the generation of teleradiology work for Wallack and Wright."  (Id., No. 3.)  At the time of DVMI's incorporation, Wallack and Wright each owned 40% of DVMI's outstanding stock, and Walters, a computer programmer responsible for the development of the DVMI platform, owned the remaining 20%.  (Id., No. 4.)

After DVMI was incorporated in September 2006, DVMI furnished teleradiology services via the DVMInsight.com website and conducted its business under the name DVMInsight, Inc. until 2011 when its assets were acquired by Idexx RL.  (Id., No. 7.)

On December 31, 2009, Wallack's interest in DVMI was bought out by Walters and Wright pursuant to a Stock Repurchase Agreement ("SRA").  (Dkt. No. 124-2, Concordance of UMF, No. 5.)  The Trademark was not subject to the SRA.  (Dkt. No. 133-1, Ps' NOL, Ex. H.)  Then, in September 2011,[3] IDEXX acquired the assets of DVMI pursuant to an Asset Purchase Agreement ("APA").  (Dkt. No. 124-2, Concordance of UMF, No. 6.)  The Trademark was listed as an asset of DVMI in the

---

[3]The Concordance of Undisputed Material Facts incorrectly states that IDEXX acquired the assets of DVMI on September 9, 2009.  (Dkt. No. 124-2, Concordance of UMF, No. 6.)

1  APA.  (Dkt. No. 133-11, Ps' NOL, Ex. G at 33.)

2        After execution of the Stock Repurchase Agreement ("SRA") in December 2009,

3  DVMI continued using the DVMINSIGHT trademark name and domain name.

4  Between execution of the SRA in December 2009 and the execution of the APA in

5  September 2011, SDVI did not question, control or object to DVMI's continued use

6  of the DVMINSIGHT trademark, name or domain name, nor did SDVI seek payment

7  for such use.  (Dkt. No. 124-2, Concordance of UMF, No. 19.)

8                                   **Discussion**

9  **A.     Legal Standard on Motion for Summary Judgment**

10       Federal Rule of Civil Procedure 56 empowers the Court to enter summary

11  judgment on factually unsupported claims or defenses, and thereby "secure the just,

12  speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477

13  U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings,

14  depositions, answers to interrogatories, and admissions on file, together with the

15  affidavits, if any, show that there is no genuine issue as to any material fact and that the

16  moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact

17  is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc.,

18  477 U.S. 242, 248 (1986).

19       The moving party bears the initial burden of demonstrating the absence of any

20  genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can

21  satisfy this burden by demonstrating that the nonmoving party failed to make a

22  showing sufficient to establish an element of his or her claim on which that party will

23  bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the

24  initial burden, summary judgment must be denied and the court need not consider the

25  nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60

26  (1970).

27       Once the moving party has satisfied this burden, the nonmoving party cannot rest

28  on the mere allegations or denials of his pleading, but must "go beyond the pleadings

1  and by her own affidavits, or by the 'depositions, answers to interrogatories, and
2  admissions on file' designate 'specific facts showing that there is a genuine issue for
3  trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient
4  showing of an element of its case, the moving party is entitled to judgment as a matter
5  of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier
6  of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"
7  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In
8  making this determination, the court must "view[] the evidence in the light most
9  favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir.
10 2001). The Court does not engage in credibility determinations, weighing of evidence,
11 or drawing of legitimate inferences from the facts; these functions are for the trier of
12 fact. Anderson, 477 U.S. at 255.

13 **B.     First Cause of Action - Trademark Infringement**

14       To demonstrate trademark infringement, a plaintiff must show that it is "(1) the
15 owner of a valid, protectable mark, and (2) that the alleged infringer is using a
16 confusingly similar mark." Herb Redd Enters., LLC v. Florida Entm't Mgmt., Inc., 736
17 F.3d 1239, 1247 (9th Cir. 2013) (citing Grocery Outlet, Inc. v. Albertson's, Inc., 497
18 F.3d 949, 951 (9th Cir. 2007)). Registration of a mark is prima facie evidence of the
19 owner's ownership of the mark and exclusive use of the mark in commerce. 15 U.S.C.
20 § 1057(b). Once a mark has been registered for five years, it can become
21 "incontestable. 15 U.S.C. §§ 1065, 1115(b).

22       Wallack created the DVMINSIGHT name in early 2004. (Dkt. No. 133-2,
23 Wallack Decl. ¶ 10.) SDVI filed a trademark application on April 20, 2005. (Dkt. No.
24 133-6, Ps' NOL, Ex. B.) The trademark, DVMINSIGHT, became registered in early
25 2007. (Dkt. No. 133-2, Wallack Decl. ¶ 10.)

26       Defendants do not dispute the elements of trademark infringement but raise the
27 affirmative defenses of abandonment, acquiescence, laches and estoppel. They argue
28 that SDVI abandoned the Trademark by allowing Idexx Defendants' predecessor in

interest, DVMI, to use the mark absent any cognizable or enforceable license. Second, even if SDVI had licensed the mark to DVMI, SDVI abandoned its trademark rights by engaging in naked licensing when it failed to exercise quality control over the Trademark when DVMI was incorporated in September 2006 and continued to fail to exercise quality control over the Trademark after Wallack sold his shares in DVMI to Wright and Walters in December 2009.

## C.     Affirmative Defense - Abandonment

A trademark owner may grant a license and be protected as long as the licensor exercises quality control of the goods and services sold under the Trademark by the licencee. Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 595-96 (9th Cir. 2002).

A mark is deemed to be "abandoned"

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> [or]

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127.   Language of abandonment under § 1127(2) reflects policy considerations underlying the naked licensing defense.  Exxon Corp., v. Oxxford Clothes, Inc., 109 F.3d 1070, 1079 (5th Cir. 1997); see also Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 764 (6th Cir. 2005).  Naked licensing is an "uncontrolled" license where the licensor "fails to exercise adequate quality control over the licensee." Barcamerica Int'l USA Trust , 289 F.3d at 596. Abandonment through naked licensing is "purely an 'involuntary' forfeiture of trademark rights" so no evidence of any subjective intent to abandon the mark is required.  Id.

1    Defendants clarify in their reply that they do not argue that SDVI discontinued

2    use of the trademark with no intent to resume, (Dkt. No. 124, Reply Br. at 5[4] n.2), but

3    argue that SDVI failed to exercise quality control and failed to police or object to open

4    claims of ownership of the mark pursuant to 15 U.S.C. § 1127(2).

5    Abandonment must be strictly proved, <u>Prudential Ins. Co. of America v.</u>

6    <u>Gibraltar Fin. Corp. of Calif.</u>, 694 F.2d 1150, 1156 (9th Cir. 1982), and is an issue of

7    fact. <u>Star-Kist Foods, Inc. v. P.J. Rhodes & Co.</u>, 769 F.2d 1393, 1396 (9th Cir. 1985)

8    ("abandonment "is a factual issue, well within the domain of the district court."). The

9    Ninth Circuit has not decided whether "strictly proved" means to prove by clear and

10   convincing evidence, but the burden of proof is high. <u>Edwin K. Williams & Co., Inc.</u>

11   <u>v. Edwin K. Williams & Co.-East,</u> 542 F.2d 1053, 1059 (9th Cir. 1976) (since naked

12   licensing may result in forfeiture of trade mark rights and since owner has no subjective

13   intent to abandon the mark, a high degree of proof is required); <u>FreecycleSunnyvale v.</u>

14   <u>Freecycle Network</u>, 626 F.3d 509, 514-515 (9th Cir. 2010) (proper burden of proof

15   need not be decided in this case because the result would be the same under the higher

16   standard of proof); <u>Grocery Outlet Inc. v. Albertson's Inc.</u>, 497 F.3d 949, 952-54 (9th

17   Cir. 2007) (concurring judges split on whether the test is "clear and convincing" or

18   "preponderance of the evidence."); <u>Cash Processing Servs. v. Ambient Entm't, Inc.,</u>

19   418 F. Supp. 2d 1227, 1231-1232 (D. Nev. 2006) ("Strictly proved" means that

20   abandonment must be proven by clear and convincing evidence. Summary judgment

21   of abandonment was denied.); <u>Electro Source, LLC v. Brandess-Kalt-Aetna Group,</u>

22   <u>Inc.,</u> 458 F.3d 931 (9th Cir. 2006) (court of appeals did not decide, but noted that a

23   district court had held that "strictly proved" means "clear and convincing evidence.").

24   **1.    Oral License**

25   Defendants first argue that SDVI abandoned its rights to the Trademark because

26

27

28
_____
[4]The pages cited are based on the CM/ECF pagination.

there was never a cognizable oral license agreement between SDVI and DVMI.[5] Plaintiffs argue that lack of an oral license agreement is not critical to the affirmative defense of abandonment but argue there is an issue of fact as to whether there was an oral license to use the Trademark when DVMI was incorporated.

"Licenses are contracts 'governed by ordinary principles of state contract law.'" Dep't of Parks & Recreation for State of California v. Bazzar del Mundo Inc., 448 F.3d 1118, 1130 (9th Cir. 2006). The elements for an oral license is the same as a written license. See Careau & Co. v. Security Pacific Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990) (breach of written and oral contract require the same elements). "The consent of the parties to a contract must be: 1. Free; 2. Mutual; and, 3. Communicated by each to the other." Cal. Civ. Code § 1565. "An essential element of any contract is 'consent.'" Weddington Prods., Inc. v. Flick, 60 Cal. App. 4th 793, 811 (1998) (citing Cal. Civ. Code § 1550). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." Cal. Civil Code § 1580. In order for a contract to be enforceable, the terms of the contract must be sufficiently certain. Weddington Prods., Inc., 60 Cal. App. 4th at 811.

Here, Wallack explained that when DVMI was first created, there was no clarity from the beginning on many issues and everything was "very loose." (Dkt. No. 103-10, D's NOL, Ex. H, Wallack Depo. at 246:5-19.) Plaintiff testified that there was never any "sit-down" discussion as to how the new corporation, DVMI, would operate. (Id. at 60:10-13.) He also testified that as to any agreement concerning the intellectual property to be used by DVMI, it was "very loose oral arrangements regarding all of these things that was very fluid based on the needs of the people." (Dkt. No. 103-7, Ds' NOL, Ex. H, Wallack Depo. at 62:18-23.) Plaintiff does not recall any discussions concerning licensing the mark, DVMINSIGHT, to DVMI. (Id. at 63:11-64:6.) He testified that "it was common – common knowledge." (Id. at 63:16-20.) When asked

---

[5]The parties do not dispute that there was no written license agreement regarding DVMI's use of the DVMINSIGHT trademark.

[11cv2996-GPC(KSC)]

whether there were any discussions on when he could terminate the license, he stated that never came up.  (Id. at 245:20-246:5.)

In opposition, Wallack states that in August 2005, prior to the incorporation of DVMI, Walters, Wright and he met to discuss finalizing their business relationship concerning the new tele-radiology website/platform venture. (Dkt. No. 133-2, Wallack Decl. ¶ 16.) Initial discussions involved Wright to buy 40% stock interest in SDVI and Walters would receive a 20% stock interest for his prior year efforts of programming and source coding the platform.  (Id. ¶ 16.)  To support his assertion, Plaintiff references the corporate minutes of SDVI in August 2006. (Dkt. No. 133-7, Ps' NOL, Ex. C.)  He states, "[t]hose minutes clearly reflect our mutual agreement that SDVI would retain ownership of the DVMInsight name and domain until such time that Wright agreed to pay money to buy his stock interest."  (Id. ¶ 16.)  The minutes of the August 2006 board meeting state, "Transfer of ownership of DVMInsight to DVMInsight.com.  This transfer requires Dr. Matt Wright to pay up front for shares in DVMInsight.com.  Stephen Walters will get options for the value of 0.01.  Transfer will not happen until the shares are paid for.  SDVI will retain rights to the name DVMInsight.com, DVMInsight . . . ."  (Dkt. No. 133-7, Ps' NOL, Ex. C at 1.)

After the meeting, Wright refused to contribute money to DVMI, and therefore, the Trademark remained an asset of SDVI.  (Dkt. No. 133-2, Wallack Decl. ¶ 16.) Instead, in early September 2006, Wright, Walters and Wallack agreed to incorporate a new company called DVMInsight, Inc. (Dkt. No. 133-2, Wallack Decl. ¶ 17; Dkt. No. 133-8, Ps' NOL, Ex. D.)   "DVMI's business would be to complete the development of the software, operate a website at which its clients and providers could use the software, and, to a lesser extent, generate tele-radiology work for Wallack and Wright at VICSD."  (Dkt. No. 133-2, Wallack Decl. ¶ 17.)  Wright and Wallack received 40% of DVMI's outstanding stock and Walters received 20%. (Id.)  All were named officers and directors of DVMI.  (Id.)  Wallack was President and Wright was Treasurer.  (Id.)  All three agreed that no personal business assets would be contributed

to DVMI.  (Id.)  For example, SDVI would not contribute the domain name or ownership of the Trademark once received from the USPTO, Walters would not contribute his intellectual property in the source coding and programming of the website, and Wright would not contribute Animal Insides[6] to DVMI.  (Id.)  He states that all knew that SDVI retained the ownership of the Trademark and had allowed/licensed DVMI to use as an "affiliated company" under 15 U.S.C. § 1055(a)(3).  (Id. ¶ 17.)  According to Wallack, DVMI had no assets; it was a shell company where everyone had a piece of but did not have to put money into.  (Dkt. No. 133-5, Ps' NOL, Ex. A, Wallack Depo. at 58:13-14.)

In reply, Defendants note that Wallack's statement about the August 2006 minutes is patently false.  First, Plaintiff does not provide the complete minutes of August 30, 2006 and Defendants include it as an exhibit to their reply.  (Dkt. No. 124-1, McGrath Decl., Ex. B at 17.)  Second, according to the handwritten minutes in August 2006 of an SDVI shareholder meeting written by Wallack, he is the only participant.  (Id.)  Voting passed with his single vote.  (Id. at 18.)

In contrast, at his deposition, Wallack stated that Walters and Wright did not attend the August 2006 SDVI board meeting.  (Dkt. No. 124-1, McGrath Decl., Ex. A, Wallack Depo. at 61:2-9.)  Wallack also later confirmed that he, as the sole shareholder of SDVI, was the only attendee at these board meetings including the one in August.  (Id. at 199-21:201:17.)

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009) (citation omitted).  Here, contrary to Wallack's declaration stating that Wright, Walters and Wallack had discussed licensing the Trademark at the August 2006 SDVI board meeting, his deposition testimony and the minutes themselves, state the contrary.  Accordingly, the August 2006 board minute

---

[6]Animal Insides, Inc. was an online commentary on veterinary radiology owned by Wright. (Dkt. No. 133-2, Wallack Decl. ¶ 15.)

1    does not constitute a genuine issue of material fact that Wright, Wallack and Walters
2    were engaged in oral communications concerning SDVI's ownership of the Trademark
3    and SDVI's licensing of the Trademark to DVMI.

4           In his declaration, Wallack further states that all three agreed that no personal
5    business assets would be contributed to DVMI and that all knew the SDVI retained
6    ownership of the Trademark and had licensed DVMI to use it.  (Dkt. No. 133-2,
7    Wallack Decl. ¶ 17.)   Summary conclusion that all three knew that SDVI granted
8    DVMI a license does not demonstrate consent by the parties and does not show that the
9    terms of the license were sufficiently certain.  See Weddington Prods., Inc., 60 Cal
10   App. 4th at 811.    Accordingly, the Court concludes that Plaintiffs have not
11   demonstrated a genuine issue of fact as to whether there was an oral license agreement
12   concerning the use of DVMINSIGHT by DVMI.  Even if there was not an oral license
13   agreement, Wallack contends that there was an implied license to use the Trademark.

14          **2.     Implied License - September 2006 through December 2009**

15          Plaintiffs assert there was an implied license to DVMI to use the Trademark
16   based on the close relationship between the parties and conduct through 2009 as a
17   "related company."  (Dkt. No. 133-2, Wallack Decl. ¶ 17.)  When DVMI's assets were
18   sold to Idexx RL, SDVI terminated the implied license by filing the instant case.
19   Idexx Defendants argue that SDVI abandoned the DVMINSIGHT trademark through
20   "naked licensing" by failing to engage in quality control over the Trademark.  They
21   argue that DVMI used the Trademark openly from its incorporation in September 2006
22   until September 2011, when it was acquired by Idexx.  Therefore, DVMI was able to
23   assign the rights to the Trademark to Idexx RL based on DVMI's abandonment of the
24   Trademark.

25          A licensor's trademark rights in an express licensing agreement can be destroyed
26   through naked licensing when the licensor fails to exert quality control over the
27   trademark.  See Barcamerica Int'l USA Trust, 289 F.3d at 595.  Even if there is no
28   express written license agreement, the Ninth Circuit has held that a trademark license

may be implied from the conduct of the parties.  <u>Dep't of Parks & Recreation for State of California</u>, 448 F.3d at 1129-30; <u>see also</u> <u>Doeblers' Pennsylvania Hybrids, Inc. v. Doebler</u>, 442 F.3d 812, 824 (3d Cir. 2006) (in the absence of an express written license agreement, a trademark license can be implied).  In order to determine whether there is an implied license, courts look to the parties' course of conduct.  <u>Dep't of Parks & Recreation for State of California</u>, 448 F.3d at 1129 (citing <u>McCoy v. Mitsuboshi Cutlery, Inc.</u>, 67 F.3d 917, 920, 922 (Fed. Cir. 1995)); <u>Villanova Univ. v. Villanova Alumni Educ. Fdn., Inc.</u>, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties.") (citations omitted). A license is implied if the licensor exercised a sufficient degree of control over the licensee's operations.  <u>Dep't of Parks & Recreation for State of California</u>, 448 F.3d at 1131.

Trademark owners have a duty to control the quality of their trademarks. <u>FreecycleSunnyvale v. Freecycle Network</u>, 626 F.3d 509, 515 (9th Cir. 2010) (citing McCarthy 18:48).  A trademark owner may grant a license and be protected as long as it maintains quality control of the goods and services sold under the trademark by the licensee is maintained.  <u>Barcamerica Int'l USA Trust</u>, 289 F.3d at 595 (affirming dismissal on summary judgment where plaintiff licensed mark for use on wine with no quality control provision in the license and plaintiff "played no meaningful role in holding the wine to a standard of quality - good, bad or otherwise.").  "Naked licensing" occurs when the licensor "fails to exercise adequate quality control over the licensee." <u>Id.</u> at 596.  If a licensor fails to exercise adequate quality control over the licensee, such a practice is "*inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor." <u>Id.</u> at 598 (quoting <u>First Interstate Bancorp v. Stenquist</u>, 16 U.S.P.Q. 2d 1704 (N.D. Cal. 1990)).

Where a licensor fails to exercise adequate quality control over the licensee, the court may find that trademark owner has abandoned the trademark in which case the

[11cv2996-GPC(KSC)]

owner would be estopped from asserting rights to the trademark.  Barcamerica Int'l USA Trust, 289 F.3d at 596; JIPC Mgm't, Inc. v. Incredible Pizza Co., Inc., No. CV08-4310 MMM(PLAx), 2009 WL 8591607, at *28 (C.D. Cal. July 14, 2009) (quoting Blue Magic Products, Inc. v. Blue Magic, Inc., No. Civ. S–001155WBSJFM, 2001 WL 34098657, *5 (E.D. Cal. Sept. 5, 2001) ("[C]ourts have found abandonment . . .when a trademark owner enters into a 'naked' license, which is a 'grant of permission to use [the trademark owner's] mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark.'")).  Because a showing of subjective intent to abandon the mark is not required, "the proponent of a naked license theory faces a stringent standard of proof."  Barcamerica Int'l USA Trust, 289 F.3d at 596.

"The purpose of the control requirement is the protection of the public. If a licensor does not maintain control of his licensees in their use of the license, the public may be damaged by products that, despite their trademark, do not have the normal quality of such goods." United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 140 (3d Cir. 1981) (citing Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir. 1976)).  The amount of control varies depending on the circumstances.  Id. (several year delay does not constitute loss of control sufficient to prove abandonment in conjunction with no evidence that licensee offered a lower quality of service); Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114, 125 (5th Cir. 1973) (three or four years lapse in exercise of control not enough to work abandonment).

The Ninth Circuit has presented a method to analyze the affirmative defense of naked licensing depending on the type of license.  First, the court looks at whether the license contains an express contractual right to inspect and supervise the licensee's operations.  FreecycleSunnyvale, 626 F.3d at 516 (citing  Barcamerica, 289 F.3d at 596).  Second, if there is no express contractual right to inspect, then courts look at whether the licensor demonstrated actual control over the trademark.  Id. at 516-17.

Third, if the licensor does not have actual control over the trademark, then courts ask whether the "licensor is familiar with and relies upon the licensee's own efforts to control quality . . . ." Id. at 518.

Here, it is undisputed that there was no express contractual license agreement; thus, there was no express contractual right to inspect and supervise.  Second, as to whether SDVI had actual control over the trademark, Defendants argue that SDVI exercised no quality control and failed to police or object to open claims of ownership of the mark by DMVI, on its Terms of Use webpage, for at least five years from November 2006 until the purchase of DVMI from Idexx Defendants in September 2011.  Plaintiffs oppose.

When the dvminsight.com website was first developed, Walters created a "Terms of Use" page accessible to all users of the website.  (Dkt. No.103-5, Walters Decl. ¶ 3.)  In early 2006 the "Terms of Use" page bore the heading "San Diego Veterinary Imaging, Inc.'s Terms of Use, Web Site Disclaimers and Legal Notices."  (Dkt. No. 103-5, Walters Decl. ¶ 3; Dkt. No. 103-10, Ds' NOL, Ex. L, Butler Decl., Ex. 1 at 85.)  The "Terms of Use" page stated that "DVMInsight is a service mark of San Diego Veterinary Imaging, Inc."  (Dkt. No. 103-10, Ds' NOL, Ex. L, Butler Decl., Ex. 1 at 85.)

After DVMI was incorporated in September 2006, in November 2006, Walters revised the webpage to "DVMInsight's Inc.'s Terms of Use, Web Site Disclaimers and Legal Notices."  (Dkt. No. 103-5, Walters Decl. ¶ 4; Dkt. No. 103-10, Ds' NOL, Ex. L, Butler Decl., Ex. 2 at 88.)  This notice stated, "DVMInsight is a service mark of DVMInsight.com.[7]  (Dkt. No. 103-10, Ds' NOL, Ex. L, Butler Decl., Ex. 2 at 89.)  The "Terms of Use" page remained the same until September 2011, when Idexx acquired DVMI's assets.  (Dkt. No. 103-5, Walters Decl. ¶ 5; Dkt. No. 103-10, Ds' NOL, Ex. L, Butler Decl., Ex. 3 at 91 (dated June 2010).)  In a declaration, Walters states that after the incorporation of DVMI, he revised the Terms of Use to acknowledge DVMI's

---

[7]It is undisputed that DVMinsight.com was owned by SDVI in 2006.

ownership interest in the Trademark.  (Dkt. No. 103-5, Walters Decl. ¶ 4.)  However, he "inadvertently" identified the "Company" as DVMInsight.com as the owner of the service mark instead of DVMInsight, Inc. because he viewed both as the same.  (Id.)

In opposition, Wallack testified that he never knew about the changes on the Terms of Use page made by Wright until after 2011 or 2012.  (Dkt. No. 103-10, Ds' NOL, Ex. H, Wallack Depo. at 272:12-22; 274:11-18.)  However, even if he did know, Wallack argues that the Terms of Use demonstrate that SDVI owned the service mark because DVMInsight.com was owned by SDVI in November 2006.

The Court notes that while Walters' designation of DVMInsight.com as the owner of the Trademark may have been inadvertent, the Court concludes, in viewing the fact in the light most favorable to SDVI, and the high burden of proof to demonstrate abandonment, there is a genuine issue of material fact as to whether SDVI knew about the Terms of Use page.  In addition, the Court questions whether failing to object to the Terms of Use was a failure to exercise quality control over the quality of the service mark.  See, e.g., Nat'l Grange of the Order of Patrons of Husbandry v. California State Grange, –F. Supp. 3d –, 2015 WL 4369901, at *7 (E.D. Cal. July 14, 2015) (whether the Brooklyn Grange has referred to its license from plaintiff on its website has no apparent connection to whether plaintiff has imposed so few restrictions on the use of its mark that "Grange" has "ceased to function as a symbol of quality and controlled source.")

In opposition, Plaintiff also argues that as a "related company" it had control over the mark based on the close working relationship.  In his declaration, Wallack states that he had constant input, control and oversight over the DVMInsight.com website from 2006 through mid-2009.  (Dkt. No. 133-2, Wallack Decl. ¶ 17.)[8]  In

---

[8]Wallack states that all the times leading up to the stock repurchase agreement, he attended corporate board meetings and maintained as active as possible in exercising control over DVMI business operations including quality control of the contends of the website/platform and cites to Exhibit A to NOL, Wallack Deposition, pp. 107:5-8; 146:2-6; 168:18-24.  However, the Court notes that the citation to his deposition is not contained in the opposition as Ex. A of Plaintiffs' NOL and cannot be used to oppose

1   addition, SDVI and DVMI had offices in the same building which promoted the close

2   working relationship.  (Id.)

3        "'[R]elated company' means any person whose use of a mark is controlled by the

4   owner of the mark with respect to the nature and quality of the goods or services on or

5   in connection with which the mark is used."  15 U.S.C. § 1127.

> 6   Where a registered mark or a mark sought to be registered is or may be
> 7   used legitimately by related companies, such use shall inure to the
>     benefit of the registrant or applicant for registration, and such use shall
> 8   not affect the validity of such mark or of its registration, provided such
>     mark is not used in such manner as to deceive the public. If first use of
> 9   a mark by a person is controlled by the registrant or applicant for
>     registration of the mark with respect to the nature and quality of the
> 10  goods or services, such first use shall inure to the benefit of the
>     registrant or applicant, as the case may be.

11

12  15 U.S.C. § 1055.  The test of a "related company" is the same as that used to

13  determine whether adequate quality control is exercised over a trademark licensee"

14  McCarthy 18:51.  In order to demonstrate related companies doctrine, there must be a

15  showing of a substantial relationship between the parties.  Secular Organizations for

16  Sobriety, 213 F.3d at 1131.  The statute does not require formal corporate control but

17  only control over the "use of a mark."  Estate of Coll-Monge v. Inner Peace Movement,

18  524 F.3d 1341, 1348 (D.C. Cir. 2008) (citing Turner v. HMH Pub. Co., 380 F.2d 224,

19  229 (5th Cir. 1967) (plaintiff as licensor "introduced ample evidence to show that [it]

20  fully controlled and dictated the nature and quality of the goods and services used in

21  connection with the trade and service marks by the several [independently owned]

22  licensees"); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition

23  § 18:51 (4th ed. 2005) (term "related" "is not limited to control of a company in

24  general" but "simply refers to control over the 'nature and quality of the goods and

25  services in connection with which the mark is used.'")).

26        Defendants incorrectly argue that there needs to be formal type of relationship

27  such as parent-subsidiary relationship or a partnership or a familial relationship in order

28  _____

Defendants' motion for summary judgment.

to be a "related company" under 15 U.S.C. § 1055.  As noted above, the focus is not on corporate formality but on the quality control over the nature of the quality of the service.

Here, starting in 2004, Wallack and Walters initially worked together for the development of the software platform of DVMinsight.com, and then in 2005 Wright joined the venture until their fall out in December 2009.  SDVI had filed an application to register the Trademark in April 2005 prior to the formation of DVMI.  The new venture required close collaboration and trust and all three became close colleagues.  They all had constant input, control and oversight over the DVMInsight.com website.  Based on this relationship, all three became owners and officers when DVMI was incorporated in September 2006.  SDVI and DVMI were also in the same building from 2006 through mid-2009.  Idexx Defendants do not raise or dispute the close working relationship between Wallack, and Wright and Walters during this time period.  The Court concludes that Plaintiff has raised an issue of material fact as to whether SDVI, through Wallack, maintained actual control over the Trademark from 2006 through 2009.

Lastly, Wallack argues he also relied on the many years of close relationship with the DVMI owners' and their efforts to not abuse the use of the trademark .  (Dkt. No. 133-2, Wallack Decl. ¶ 22.)  "Courts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's *own* efforts to control quality."  Barcamerica, 289 F.3d at 596 (quoting Morgan Creek Prods., Inc. v. Capital Cities/ABC, Inc., 22 U.S.P.Q.2d 1881, 1884, 1991 WL 352619 (C.D. Cal. 1991) (citing Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017-18 (9th Cir. 1985)); Hokto Kinoko Co. v. Concord Farms, Inc., 738 F.3d 1085, 1098 (9th Cir. 2013) ("Even absent formal quality control provisions, a trademark owner does not abandon its trademark where "the particular circumstances of the licensing arrangement" suggest that the public will not be deceived" such as "where the licensor is familiar with and relies upon the licensee's own efforts to control quality.").

[11cv2996-GPC(KSC)]

In order for a licensor to rely on the licensee's quality control efforts, the Ninth Circuit requires that the licensor and licensee be involved in a "close working relationship" to establish adequate quality control in the absence of a formal agreement. FreecycleSunnyvale, 626 F.3d at 518; Barcamerica Int'l USA Trust, 289 F. 3d at 597 (same) (citing Taco Cabana Int'l Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991) (licensor and licensee enjoyed close working relationship for eight years); Transgo, 768 F.2d at 1017-18 (finding that the licensor was entitled to rely on the licensee's own quality control where licensor was familiar with ability and integrity of licensee); Edwin K. Williams & Co., Inc., 542 F.2d at 1059 (licensor's knowledge of licensee's competency, in conjunction with highly personalized nature of the licensed service, provided sufficient protection against public deception to preserve integrity of licensed name); Taffy Original Designs, Inc. v. Taffy's Inc., 161 U.S.P.Q. 707, 713 (N.D. Ill. 1966) (licensor and licensee were sisters in business together for seventeen years, licensee's business was a continuation of the licensor's and licensee's prior business, licensor visited licensee's store from time to time and was satisfied with the quality of the merchandise offered)). "The purpose of the quality-control requirement is to prevent public deception that would ensue from variant quality standards under the same mark." Taco Cabana Int'l Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991). "Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities." Id.

In Taco Cabana, the Fifth Circuit also considered whether there was any evidence to indicate any decline in the level of quality. Id. at 1122 (no evidence to indicate any decline in the level of quality or any other evidence that the licensing arrangement diminished any proprietary rights in the trade dress); see also Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co., 330 F.2d 667, 670 (7th Cir.

[11cv2996-GPC(KSC)]

1964) (noting that since there were no complaints about the quality of the goods, reliance on the licensee's control did not result in a naked license).

In this case, Wallack and Walters, starting in 2004, worked closely to develop a new tele-radiology website/platform that became DVMInsight.com. Wright joined them in November 2005 to work on both tele-radiology and the DVMInsight platform. In 2005 and 2006, Wright became the manager and resident radiologist at VICSD. DVMInsight, Inc. was incorporated in September 2006 where all three were named officers and directors of DVMI. All three had a close working relationship and were intimately involved in the creation of the software platform for about four year until the relationship soured in 2009. Therefore, Plaintiff could reasonably rely on the licensee's own efforts at quality control. In addition, Defendants have not provided any evidence that the quality of the service of DVMI has deteriorated or that any veterinary radiologists complained about the service.

Thus, the Court concludes that SDVI has raised a genuine issue of material fact whether there was an implied license granted to DVMI by SDVI from 2006 through December 2009.

### 3.    Implied License - January 2010-September 2011

Furthermore, Defendants argue that Wallack's departure from DVMI in 2009 after a deterioration of their relationship renders the Trademark abandoned based on naked licensing since there was no longer a "close working relationship." Wallack contends he exercised quality control over the Trademark by using the website hundreds of times from 2010 to 2014 and relied on the close relationship of SDVI and DVMI, and DVMI's expertise to not use the Trademark in such a way to confuse the public or lessen the importance of its intended use.[9] Further, Wallack asserts that

---

[9]Plaintiffs also provide facts as to Wallack's intent concerning use of the Trademark once the three year non-solicitation clause in the SRA expired. However, a licensor's intent is irrelevant to determining whether there was a naked license. See Barcamerica Int'l USA Trust, 289 F.3d at 596.

[11cv2996-GPC(KSC)]

throughout 2010 and 2011, SDVI and Wallack continued to monitor the ethos[10] of the Trademark and continued to use the DVMI platform through SDVI/VICSD, and reviewed Wright's monthly DVMInsight Insider Newsletters sent to Wallack via email. (Dkt. No. 133-2, Wallack Decl. ¶ 22.)  Once he learned that Idexx, a conglomerate corporation, purchased DVMI, Wallack filed suit three months later in December 2011 because the sale was contrary to the ethos of DVMINSIGHT.  (Dkt. No. 133-2, Wallack Decl. ¶ 22.)

After the SRA in December 2009, DVMI continued using the Trademark, name and domain name.  (Dkt. No. 124-2, Concordance of SUF, No. 19.)  Between December 2009 and September 2011, when the APA was executed, SDVI did not question, control or object to DVMI's continued use of the Trademark, name or domain name or seek payment for such use.  (Id.)

The Court concludes that Plaintiffs have raised a genuine issue of material fact as to whether an implied license existed after the relationship between Wallack, and Wright and Walters deteriorated and the SPA was executed in December 2009.

Defendants cite to Original Rex LLC v. Beautiful Brands Int'l LLC, 792 F. Supp. 2d 1242, 1258 (N.D. Oklahoma 2011) for the proposition that a naked license can arise if the licensor exits the business and ceases any control over the licensee.  Therefore, Defendants assert that when Wallack gave up his shares in DVMI in 2009, he ceased any control over DVMI and a naked license ensued.  However, the facts in Original Rex, LLC are distinguishable because the licensor died and the trademark and business was "passed completely out of the hands of his company" to another corporate entity. Id. at 1258.  In this case, Wallack sold his shares to his partners, who worked closely with him for four to five years, and DVMI continued its operations with Walters and Wright, two of the original owners.

The Court finds the case of Fusco Group, Inc. v. Loss Consultants Int'l, Inc., 462

---

[10]Wallack described the ethos of DVMINSIGHT as "empowering the independent veterinary radiologist, who is a small business professional."  (Dkt. No. 133-2, Wallack Decl. ¶ 22.)

F. Supp. 2d 321 (N.D.N.Y. 2006) helpful.  In <u>Fusco Group</u>, the plaintiffs and defendant worked together collaboratively from 1997 to 2005 and promoted themselves as one organization under the same trademark.  <u>Id.</u> at 325.  Defendant asserted that plaintiffs were granted an oral, nonexclusive license to use the mark in connection with plaintiffs' respective businesses while plaintiffs contended that defendant simply allowed the mark to be used by them in their respective markets and exercised no control over their use of the mark.  <u>Id.</u>  Disagreement arose in 2005, which resulted in litigation.  In determining whether there was an abandonment based on lack of control, the district court noted that relying on the integrity of the licensee is a basis to show the control requirement where there is a history of trouble-free service.  <u>Id.</u> at 331.  In ruling on a motion for preliminary injunction, the court held that plaintiffs failed to demonstrate that defendant abandoned the mark because the"familial relationship of the parties, the prior working relationship between Plaintiffs and Defendant prior to the creation of Plaintiffs' businesses, and the trouble-free collaborative effort between Plaintiffs and Defendants from 1997 to 2005 all provided defendant a basis to rely on Plaintiffs."   <u>Id.</u> at 331.  Despite the falling out between plaintiffs and defendant, the court looked at the history of the relationship and period of trouble-free working relationship.

Similarly, in this case, while the relationship between Wallack, and Wright and Walters deteriorated in the latter half of 2009, all three had a close and collaborative relationship when they were developing the DVMInsight platform from 2004 through 2009.  Therefore, this period of trouble-free period in their relationship can be a basis on which a licensor can rely on the licensee's integrity to fulfill the control requirement.  <u>See</u> <u>id.</u>

In sum, in viewing the evidence in light most favorable to Plaintiffs, and the high burden of proof to demonstrate abandonment, the Court concludes that Plaintiffs have demonstrated a genuine issue of material fact whether SDVI abandoned the DVMINSIGHT Trademark based on naked licensing.

**D.     Affirmative Defense - Acquiescence**

Defendants argue that SDVI acquiesced to DVMI's use of the mark, and thereby acquiesced to use by DVMI's successor in interest, the Idexx Defendants.  Plaintiffs oppose.

Acquiescence "limits a party's right to bring suit following an affirmative act by word or deed by the party that conveys implied consent to another." Seller Agency Council v. Kennedy Ctr. for Real Estate Educ., Inc., 621 F.3d 981, 988 (9th Cir. 2010). It is analogous to an implied license to use the mark. Coach House Rest., Inc. v. Coach and Six Rests., Inc., 934 F.2d 1551, 1563 (11th Cir. 1991).  "While abandonment results in a loss of rights as against the whole world, laches or acquiescence is a personal defense which merely results in a loss of rights as against one defendant." Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1046 (4th Cir. 1984) (citing 2 J.T. McCarthy, Trademarks and Unfair Competition 31:15 at 587 (2d ed. 1984)).  Acquiescence may be inferred from the trademark owner's affirmative conduct toward the defendant such as whether he was aware defendants were using the trademark and whether he was also involved in selling ingredients to defendant for use in its product. Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, 165 F.2d 693 (4th Cir. 1947).

The trial court has discretion to determine the applicability of the equitable doctrine of acquiescence. Seller Agency Council, 621 F.3d at 986.  "The elements of a prima facie case for acquiescence are as follows: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." Id. at 989.  The "active representation" need not be a "specific endorsement" or formal agreement, but an "implied acquiescence may be inferred from a clear encouragement of the use of the allegedly infringing mark, as when, for example, the plaintiff substantially contributes to the marketing of the allegedly infringing products." SunAmerica Corp. v. Sun Life Assurance Co. of

Canada, 77 F.3d 1325, 1348 (11th Cir. 1996).  In Coach House Restaurant, while there was no formal agreement, there was evidence that the petitioner allowed the registrant to use the mark as long as the registrant maintained the quality of the restaurant.  934 F.2d at 1563.  In the case, registrant used the logo for at least 20 years and accumulated extensive good will associated with the mark and relied on the lack of objection from the petitioner.  Id. at 1564.  The underlying court found that the registrant would suffer undue prejudice if it were forced to cease the mark.  Id.

Here, Defendants allege that SDVI admits that it encouraged DVMI's use of the mark following its incorporation starting in September 2006 while Wallack was involved with DVMI.  (Dkt. No. 50, SAC ¶ 31.)  Moreover, SDVI concedes that it abstained from objecting to DVMI's continued use of the Trademark after Wallack sold his shares in DVMI.  (Id. ¶ 50.)  Lastly, Defendants summarily claim that the "inexcusable delay created undue prejudice to both DVMI and Idexx Defendants who relied upon the absence of any enforcement action in purchasing the rights to use and sell services bearing the DVMINSIGHT name and trademark."  (Dkt. No. 103-1, Ds' Memo of P&A at 28.)  In response, Plaintiff asserts that the defense of acquiescence requires an intense factual inquiry and Defendants have failed to cite to any factual assertion that SDVI actively represented that it would not assert a right or claim against DVMI.   However, active representation is not required for acquiescence but acquiescence can be implied.  See SunAmerica Corp., 77 F.3d at 1348.

As discussed above, the Court concluded that there is a genuine issue of material fact as to whether there was an implied license granted to DVMI to use the Trademark.  Second, besides conclusory statements, Defendants have failed to provide any factual evidence of undue prejudice to them.  Accordingly, the Court DENIES Defendants' motion for summary judgment based on acquiescence.

### E.    Affirmative Defense - Laches

The Ninth Circuit has stated that acquiescence and laches are very similar.  Seller Agency Council, Inc., 621 F.3d at 988.  "Laches is an equitable time limitation on a

party's right to bring suit resting on the maxim that one who seeks the help of a court of equity must not sleep on his rights." Id. (quoting Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002) (citations and internal quotations marks omitted)).  "[A]cquiescence implies active consent, while laches implies a merely passive consent."  Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 462 (4th Cir. 1996).

Laches requires a showing that "(1) [the] delay in filing suit was unreasonable, and (2) [that party] would suffer prejudice caused by the delay if the suit were to continue."  Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002).  A party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit.  Id.  The limitations period for laches starts "from the time the plaintiff knew or should have known about its potential cause of action."  Tillamook Cntry. Smoker, Inc. v. Tillamook Cnty. Creamery Assoc., 465 F.3d 1102 (9th Cir. 2006).

Here, Defendants argue that there is a presumption of laches since SDVI waited past the statute of limitations period to assert its rights.  They assert it had notice in November 2006 when the adverse statements of ownership was on the DVMInsight.com website.  Whether the statute of limitations is three year or four years, the complaint filed in this case on December 20, 2011 indicates a presumption of laches.  However, there is an issue of material fact as to whether SDVI had notice of the ownership on the "Terms of Use" webpage in November 2006.

As to the second factor, Idexx Defendants have not presented any facts of prejudice to support their laches claim.  They assert conclusory statements that Idexx relied on SDVI's inaction and acquired the rights to the dvminsight.com domain name and engaged business development since acquiring DVMI.  (Dkt. No. 103-1 at 29.) However, no facts as to undue prejudice are alleged.  See Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1045 (C.D. Cal. 2011) (denying motion for summary judgment as there was no factual support of prejudice for claim of laches).

[11cv2996-GPC(KSC)]

1    Accordingly, the Court DENIES Defendants' motion for summary judgment

2  based on laches.

3  **F.    Affirmative Defense - Estoppel**

4    Defendants argue that SDVI's claim is also barred by estoppel based on its

5  conduct despite SDVI's intent.  They cite to <u>Saverslak v. Davis-Cleaver Produce Co.</u>,

6  606 F.2d 208, 213-14 (7th Cir. 1979).  Estoppel does not focus on the obligor's intent

7  but looks at the effects of his conduct on the obligee.  <u>Id.</u> at 213.  "An estoppel . . .

8  arises only when a party's conduct misleads another to believe that a right will not be

9  enforced and causes him to act to his detriment in reliance upon this belief."  <u>Id.</u>  "Even

10  if the obligor has not waived a known right, he may be estopped from enforcing it."

11  <u>Id.</u>  The Ninth Circuit has stated that a determination on estoppel is a question of fact.

12  <u>U.S. ex rel. Westinghouse Elec. v. James Stewart Co.</u>, 336 F.2d 777, 779 (9th Cir.

13  1964) (citation omitted).

14    Defendants maintain that DVMI and its successor in interest, the Idexx

15  Defendants relied on SDVI's inaction and silence in the face of DVMI's use and open

16  claims of ownership for over five years.  However, as discussed with the other

17  affirmative defenses, there is an issue of material fact as to whether SDVI was aware

18  of DVMI's open claim of ownership of the Trademark on its website.  Accordingly, the

19  Court DENIES Defendants' motion for summary judgment on the affirmative defense

20  of estoppel.

21  **G.    Fourth Cause of Action - Declaratory Relief**

22    Because the Court denies Defendants' motion for summary judgment on the

23  trademark infringement cause of action, the Court also DENIES Defendants' motion

24  for summary judgment on the related claim for declaratory relief.

25  **H.    Request for Judicial Notice**

26    Defendants filed a request for judicial notice of publically filed documents in this

27  case as well as the endorsed articles of incorporation of DVMI and declaration from

28  Christopher Butler concerning Internet Archive web pages.  (Dkt. No. 103-3.)

1  Plaintiffs did not file an opposition.

2  Under Federal Rule of Civil Procedure ("Rule") 201, "[t]he court may judicially

3  notice a fact that is subject to reasonable dispute because it (1) is generally known

4  within the court's territorial jurisdiction; or (2) can be accurately and readily

5  determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

6  Civ. P. 201(b). The court may take judicial notice of "court filings and other matters

7  of public record." Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.

8  6 (9th Cir. 2006). Articles of incorporation are also subject to judicial notice. See

9  eBay Inc. v. Digital Point Solutions, Inc., 608 F. Supp. 2d 1156, 1164 n.6 (N.D.Cal.

10 2009) (judicially noticing articles of incorporation). Lastly, courts have also taken

11 judicial notice of the contents of internet archives. In re Methyl Tertiary Butyl Ether

12 (MTBE) Products Liab. Litig., MDL No. 1358 (SAS), 2013 WL 6869410, at *4 n. 65

13 (S.D.N.Y. Dec. 30, 2013) (taking judicial notice of existence of reports as of a date

14 certain based on Internet Archive); Martins v. 3PD, Inc., Civil Action No.

15 11-11313-DPW, 2013 WL 1320454, at *16 n.8 (D. Mass. Mar. 28, 2013) (taking

16 judicial notice of various historical versions of website available on the Internet

17 Archive as facts readily determinable by resort to a source whose accuracy cannot

18 reasonably be questioned). Since Defendants' documents are subject to judicial notice,

19 and no opposition having been filed, the Court GRANTS Defendants' request for

20 judicial notice.

21 **I.    Evidentiary Objections**

22 Defendants filed evidentiary objections to Plaintiff's declaration. (Dkt. No. 124-

23 3.) The Court notes their objections. To the extent that the evidence is proper under

24 the Federal Rules of Evidence, the Court considered the evidence. To the extent that

25 the evidence is not proper, the Court did not consider it.

26 / / / /

27 / / / /

28 / / / /

1

**Conclusion**

2       Based on the above the Court DENIES Idexx Defendants' motion for summary

3  judgment.

4       IT IS SO ORDERED.

5

6  DATED:  October 13, 2015

7

8                          HON. GONZALO P. CURIEL
                             United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28