1  Cynthia A. Freeland, State Bar No. 180276
   **Schor & Freeland, LLP**
2  600 B Street, Suite 2200
   San Diego, CA  92101
3  Telephone:  +1 619 906 2400
   Facsimile:+1 619 906 2401
4  Email:  Cindy@schorfreeland.com

5  Attorneys for Matthew Wright and Stephen
   Walters

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10 | SETH WALLACK and SAN DIEGO | Case No.  3:11-CV-02996-GPC(KSC) |
   | VETERINARY IMAGING, INC., | |
11 | | **MEMORANDUM IN SUPPORT OF** |
   | Plaintiffs, | **MATTHEW WRIGHT'S AND** |
12 | | **STEPHEN WALTERS' MOTION** |
   | v. | **FOR ATTORNEYS' FEES AS** |
13 | | **SANCTIONS PURSUANT TO THE** |
   | IDEXX LABORATORIES, INC.; | **COURT'S INHERENT** |
14 | IDEXX REFERENCE | **AUTHORITY AND/OR 28 U.S.C. §** |
   | LABORATORIES, INC.; MATTHEW | **1927** |
15 | WRIGHT; AND STEPHEN WALTERS | |
   | | |
16 | Defendants. | **DATE:      June 3, 2016** |
   | | **TIME:      1:30 p.m.** |
17 | | **CTRM:     4D** |
   | | **JUDGE:   Hon. Gonzalo P. Curiel** |
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................ 2

      A.    The Parties' History Together .................................................... 2

      B.    The Litigation History ............................................................... 8

      C.    The Attorney's Fees and Costs Incurred by Individual Defendants ........................... 11

III.  THE COURT SHOULD EXERCISE ITS INHERENT AUTHORITY AND SANCTION WALLACK AND HIS COUNSEL ............................... 11

IV.   PLAINTIFFS' COUNSEL SHOULD BE ORDERED TO PAY THE INDIVIDUAL DEFENDANTS' ATTORNEYS' FEES PURSUANT TO 28 U.S.C. § 1927 ...................................................... 14

V.    CONCLUSION ................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

Alyeska Pipeline Service Co. v. Wilderness Society
  421 U.S. 240, 258-59, 95 S.Ct. 1612 (1975) ............................ 11

B.K.B. v. Maui Police Department
  276 F.3d 1091 (9th Cir. 2002) ................................................ 14

Chambers v. NASCO, Inc.
  501 U.S. 32, 46, 111 S.Ct. 2123 (1991) ................................ 11

Dreiling v. Peugeot Motors of America, Inc.
  768 F.2d 1159, 1165 (10th Cir. 1985) ................................... 14

Haeger v. The Goodyear Tire & Rubber Company
  793 F.3d 1122, 1131 (9th Cir. 2015) ..................................... 11

Hutto v. Finney
  437 U.S. 678, 689 fn. 14, 98 S.Ct. 2565 (1978) .................... 12

In re Keegan Management Co., Securities Litig.
  78 F.3d 431, 436 (9th Cir. 1996) .......................................... 15

MGIC Indem. Corp. v. Moore
  952 F.2d 1120, 1121-22 (9th Cir. 1991) ............................... 15

Reichmann v. Neumann
  553 F.Supp.2d 307, 319 (S.D.N.Y. 2008) ........................ 11, 12

Riley v. City of Philadelphia
  136 F.R.D. 571, 573 (E.D. Cal. 1991) .................................. 15

Schlaifer Nance & Co., Inc. v. Estate of Warhol
  194 F.3d 323, 338 (2d Cir. 1999) ......................................... 12

Shackelford v. Courtesy Ford, Inc.
  96 F.Supp.2d 1140, 1144 (D.Colo. 2000) ............................. 14

Steinert v. Winn Group, Inc.
  440 F.3d 1214, 1221 (10th Cir. 2006) ................................... 14

Thomas v. Girardi
  611 F.3d 1027, 1061 (9th Cir. 2010) ..................................... 14

## STATUTES

28 United State Code Section 1927 ................................... 13, 14

Federal Rules of Civil Procedure Rule 11 .............................. 15

Federal Rules of Civil Procedure Rule 11(b)(3) ...................... 15

ii

# I.

## INTRODUCTION

In 2009, Seth Wallack ("Wallack") asked to have his ownership interest in DVMInsight, Inc. ("DVMI") repurchased.  Wallack and his counsel thereafter negotiated Wallack's buyout, and Wallack was paid all consideration owed to him pursuant to that buy-out, in exchange for which Wallack signed a release in December 2009.

Two years later, after Matthew Wright and Stephen Walters (collectively, the "Individual Defendants") had worked tirelessly to build DVMI's business and reaped the rewards of that hard work through the sale of DVMI's assets to IDEXX Laboratories, Inc. ("IDEXX"), Wallack and his lawyer, ignoring the release that they had helped negotiate and that Wallack had signed in 2009, sued the Individual Defendants for claims that never had any merit and, nonetheless, had been knowingly released two years earlier.

The Individual Defendants appreciate that a request for sanctions is not one that should be made lightly or without justification.  Unfortunately, the same appreciation was not afforded them when Wallack initiated this lawsuit over four years ago.  The Individual Defendants, not only by the hand of Wallack but also at the hand of his counsel, John Millar, needlessly were made to endure the stress, stigma, and expense of a frivolous lawsuit, a lawsuit that was brought for no other purpose than to extort from the Individual Defendants a portion of the sales proceeds that they enjoyed from IDEXX's 2011 purchase of DVMI's assets.  Indeed, the Individual Defendants' mantra since the inception of this case has been that Wallack, undeterred by a complete lack of evidence or lawyers who should have known better, wrongfully used the judicial process to assuage his own seller's remorse.

While no order can redress the emotional ramifications of Dr. Wallack's and Mr. Millar's cavalier use of the judicial system, an order sanctioning Dr. Wallack and/or Mr. Millar in the amount of $92,530.00, plus the fees associated with bringing

1

this motion, is warranted to address the bad faith conduct that compelled the Individual Defendants to incur those fees in the first instance.

## II.

## STATEMENT OF FACTS

### A.   The Parties' History Together

In September 2006, Wallack, Wright, and Walters incorporated DVMI. (Deposition of Seth Wallack ("Wallack Depo.")[1] 69:5-70:11; 71:4-16.)  At the time of its incorporation, DVMI was a company with a three-fold purpose: (1) the development of a software platform ("DVM platform") that could be utilized by veterinarians for teleradiology purposes, (2) the operation of a website at which clients and providers could use the afore-mentioned software, and (3) the generation of teleradiology work for Wallack and Wright.  (*Id*.)  At the time of DVMI's incorporation, Wallack and Wright, both of whom are veterinarians, each owned 40% of DVMI's outstanding stock, and Walters, a computer programmer responsible for the development of the DVM platform, owned the remaining 20%.  (*Id*., 75:5-76:20.) Wallack, Wright, and Walters all were named officers and directors of DVMI.  (*Id.*)

Notwithstanding his titles, Wallack, from the inception of DVMI, viewed his role in DVMI as that of an investor who would play a minimal role in the operation and management of DVMI.  (*Id*., 28:20-30:12; 52:18-53:1; 69:5-71:16; 73:15-74:8; 88:2-11; 90:19-91:5.)  Wallack, *by his own choice*, saw his role as removed from the day-to-day operations of the Company, and he purposefully left Wright to run the Company so that Wallack could pursue his business interests in a separate company known as Veterinary Imaging Center of San Diego ("VICSD").  (*Id*.)  The only service that Wallack provided to DVMI was occasionally to read teleradiology cases as an independent contractor.  (*Id*., 69:5-70:18; 73:15-74:8.)

[1] True and correct copies of the pertinent excerpts from the Deposition of Seth Wallack are attached as Exhibit K to the Notice of Lodgment ("NOL"), which is lodged concurrently.

Because it was Wallack's intention that Wright run DVMI, there never was a discussion about whether there were limitations on Wright's management duties and/or whether there were certain decisions that could only be made with Wallack's input.  (*Id.*, 72:17-73:7; 73:15-74:8; 134:20-135:2; 145:12-147:16; 148:6-149:3.)  Unlike Wallack, Wright was employed by DVMI and actively was involved in the day-to-day operations/management of DVMI.  (*Id.*, 113:19-114:18; 316:5-14; Deposition of Stephen Walters ("Walters Depo.")[2], 145:7-18; Deposition of Matthew Wright ("Wright Depo.")[3], 73:22-74:3.)  From the inception of DVMI, Wright was responsible for, among other things, handling the financial aspects of DVMI.  (*Id.*)  Under Wright's leadership, DVMI grew steadily over the next several years.  (Wallack Depo., 72:17-73:7; 73:15-74:8; 99:6-18; 134:20-135:2; 145:12-147:16; 148:6-149:3.)  Wallack had no concerns about any business decisions through 2008.  (*Id.*)

In or around the Spring of 2009, IDEXX Laboratories, Inc. ("IDEXX") was searching for partners for its teleradiology/storage needs and issued a Request for Proposal (the "RFP") to companies, including DVMI, in an effort to fulfill that need.  (Wallack Depo., 85:10-88:11; Wright Depo., 110:15-111:5; 119:16-120:19; 144:6-146:4; 150:9-153:6; 154:1-156:5; Walters Depo., 92:1-99:4; 109:15-115:19.)  Wright made Wallack aware of the RFP, and the Individual Defendants worked to prepare a response on behalf of DVMI.  (*Id.*)  Wright provided Wallack with the response, kept Wallack apprised of the status of the response, and informed Wallack that in the summer of 2009, Wright would be traveling to Maine, where IDEXX was headquartered, to present the response and to explore any interest that IDEXX had in purchasing DVMI.  (Wallack Depo., 85:23-86:19; 91:23-92:1; 310:6-313:10.)  Wallack elected not to accompany Wright to Maine.  Wright did not stop Wallack

---

[2] True and correct copies of the pertinent excerpts from the Deposition of Stephen Walters are attached as Exhibit I to the NOL.
[3] True and correct copies of the pertinent excerpts from the Deposition of Matthew Wright are attached as Exhibit J to the NOL.

from accompanying Wright to the meeting in Maine; Wallack was simply focused on commitments outside of DVMI.  (*Id*.)

While Wright was in Maine, Fred Farber, an IDEXX representative at the time, inquired of Wright about the possibility of IDEXX purchasing DVMI and suggested that any purchase price would not be more than $1 million.  (Wright Depo., 125:18-126:14; 129:14-135:6; 144:6-146:4; 150:9-153:6; Wallack Depo., 89:12-90:4; 92:2-94:17; Walters Depo., 108:5-12; Deposition of Michael Christian ("Christian Depo.")[4], 48:1-25.)  Wright relayed his discussion with Mr. Farber, including the discussion about the potential purchase price, to both Wallack and Walters, and all of the DVMI owners agreed that the proffered potential purchase price was not acceptable.  (*Id*.)  Given this, no further sale discussions took place in 2009, and DVMI never consummated a deal with IDEXX as a result of the response to IDEXX's RFP.  (*Id*., and *see* Walters Depo., 114:20-115:19; Wright Depo., 155:8-156:5.)

In August 2009, Wallack, unsolicited, raised with Wright the possibility of DVMI repurchasing Wallack's shares.  (Wallack Depo., 163:25-165:25.)  In an email that Wallack sent to Dr. Wright on August 12, 2009 explaining his proposed buyout, Wallack wrote:

> I proposed the buyout of my stock since as you and Stephen grow the company it is only fair that you should reap the rewards for that growth.  Michael Christian mentioned to me that I should hold onto the 40% ownership and go along for the ride but if I am not doing the work I a) don't think that is fair and b) could be a train wreck when it is time for shareholder distributions.  Therefore my 40% for founding the company and bringing the pieces together holds a current value.  If you wish to propose a fair market value exit strategy for me I am open to the idea.

(*Id*.)  Later that same day, Wallack decided that he would hold on to his ownership interest and communicated to Wright that he was "fine staying in for the ride."  (*Id*.)  In response, Wright noted that he would be happy to explore buying Wallack out.

---

[4] True and correct copies of the pertinent excerpts from the Deposition of Michael Christian are attached as Exhibit L to the NOL.

(Wallack Depo., 167:8-168:11.)  At an August 2009 special meeting of DVMI's Board of Directors, Wallack confirmed that he did not desire to be bought out at that time.  (Wallack Depo., 145:8-152:5.)

Several months passed and, on December 7, 2009, Wallack corresponded with Michael Christian, DVMI's counsel, and relayed his decision to have DVMI repurchase his shares in the Company.  (Christian Depo., 9:16-10:20; 12:5-9; 37:8-16; 50:10-51:9; 63:3-8.)  In that email communication, Wallack wrote, in pertinent part, the following:

> I am forwarding an email I received today from Matt.  It is good to see the company is doing well however the context of the message concerns me with respect to fiduciary responsibilities and bonuses intended to drive the year end profits to a level that would require retention of earnings.  I don't want to get into a legal battle so rather than call for an accounting evaluation I think it is better of the other shareholders buy me out.  I am steadfast on this decision and believe that a complete company valuation is required to determine a fair market value.  I have not discussed this with Matt or Stephen and do not wish to.  Again, I hope to settle this matter quickly.

(*Id.*)  Mr. Christian, in response, advised Wallack that he represented DVMI and that he could not represent one shareholder's interests in opposition to the Company. (Christian Depo., 50:10-51:9.)

Thereafter, Wallack retained separate counsel, William Markham, to assist him in having his shares in DVMI repurchased and/or in having the matter of his ownership interest resolved.  (Wallack Depo., 180:2-182:15; 324:19-327:24; Deposition of William Markham ("Markham Depo.")[5], 8:14-25; 13:6-9; 13:19-14:12; 15:11-16:4.)  In an effort to assist in valuing DVMI, Wallack reached out to Mr. Farber to confirm the potential purchase number Mr. Farber had shared with Wright in mid-2009.  (Wallack Depo., 313:13-315:3.)  Mr. Farber confirmed that he and Wright had discussed a potential purchase of DVMI in mid-spring of 2009, that the potential

---

[5] True and correct copies of the pertinent excerpts from the Deposition of William Markham are attached as Exhibit M to the NOL.

price had been in the $1 to $1.1 million range, and that there were had been no

continued business discussions between DVMI and IDEXX.  (*Id*.)

At the time Wallack retained Attorney Markham, Wallack was considering

several options for pursuing the repurchase of his DVMI shares, which options

included resolving the matter through negotiations among the parties that would result

in a mutual release among the parties or initiating a lawsuit, among other things, to

have DVMI involuntarily dissolved.  (Wallack Depo., 180:2-182:15; 324:19-327:24;

Markham Depo., 58:11-24; 112:20-113:1.)  On December 18, 2009, Wallack, through

Mr. Markham, wrote to the Individual Defendants and Mr. Christian, noting, among

other things, the following:

> I write to give formal notice that the current management of
> DVMInsight, Inc. (the "Company") must manage and direct
> the Company in the manner most likely to preserve and
> increase the value of the Company.  There has been a
> complete breakdown in the relationship between one of the
> shareholders (my client, Seth Wallack) and the other two
> shareholders (Matt and Stephen).  These two shareholders
> (Matt and Stephen) collectively own 60% of the Company.
> They control the Company's board of directors.  They
> constitute the management of the Company.  If these
> controlling shareholders run down the Company's business
> or divert its assets, my client will hold them personally liable
> for the malfeasance.
> . . . .
>
> Matt and Stephen apparently wish to avoid a meaningful
> discussion of the matter.  In the meantime, they want to
> award themselves additional remuneration and bonuses and
> operate the company on their own, doing so under
> circumstances that are patently unreasonable and prejudicial
> to the excluded minority shareholder.  Among other things,
> Matt and Stephen purport to have removed a valuable asset
> from the Company (the software), saying that this asset
> never belonged to the Company but will belong to it if they
> sell the Company (I addressed this matter at length
> yesterday).  They have unilaterally restricted Seth's ability
> to monitor the Company's activities.  More generally, there
> is sufficient indication from surrounding circumstances to
> suggest that Matt and Stephen mean to transfer the value of
> this Company's business to other entities and avoid paying
> an honest purchase price to the excluded minority
> shareholder. . . .
> Seth is unwilling to allow the controlling
> shareholders/current management to operate the Company in

a manner that will cause prejudice to his interest in it.  He therefore gives notice of the following matters:

**1.  Unless we can work out a proper severance, Seth *will* bring suit in Superior Court on *January 5, 2010*, seeking a judicial accounting, an involuntary dissolution, and damages for breach of contract, mismanagement, breach of the fiduciary duty, and related wrongs.**

(Markham Depo., 112:20-113:1.)

Negotiations through counsel thereafter ensued, with the parties having different views about the value of the Company and with Wallack threatening throughout the process to sue the Individual Defendants for various alleged misdeeds, including breach of fiduciary duty.  (Wallack Depo., 329:19-330:11; 331:11-21; 334:18-22; Markham Depo., 15:21-16:4; 17:6-18; 20:5-23:7; 107:3-109:10; 110:15-22; 127:25-129:13; 138:20-139:8; Christian Depo., 73:22-75:3; 76:10-77:21.)  The parties ultimately reached an agreement in the latter part of December 2009 whereby Wallack agreed to sell his DVMI shares for $274,500, and he negotiated a payment from the Individual Defendants of $30,000 in exchange for general, mutual releases. (*Id*.)

The repurchase of Wallack's DVMI shares, along with the releases, was memorialized in the Agreement executed by all parties on December 31, 2009. (Wallack Depo., 329:19-330:11; 3331:11-21; 334:14-22; Markham Depo., 128:1-131:5.)  The Agreement was prepared collaboratively by Wallack's counsel, on the one hand, and DVMI's counsel, on the other, with Wallack acknowledging his ability to (1) seek the advice of counsel and investment experts and (2) obtain from DVM any additional information he needed to assess the advisability of entering into the Agreement.  (*Id*.)  After signing the Agreement, Wallack received the full consideration contemplated by the Agreement.  (Wallack Depo., 329:19-331:21; 334:4-13; 334:23-335:1; Markham Depo., 143:9-144:10.)

In or around June 2011, IDEXX contacted Wright to explore the possibility of IDEXX buying DVMI.  (Wright Depo., 158:17-160:7; Walters Depo., 173:17-

7

174:16.)  In September 2011, twenty-one months after Wallack sold his shares in DVMI, IDEXX Reference Laboratories purchased the assets of DVMI and Animal Insides, a company separately owned by Wright, for $3.2 million.  (*Id.*)

**B.   The Litigation History**

On or about December 22, 2011, Wallack, along with San Diego Veterinary Imaging ("SDVI"), a company owned by Wallack, (collectively, "Plaintiffs") initiated this action by filing a complaint alleging claims against the Individual Defendants and IDEXX Laboratories, Inc. and IDEXX Reference Laboratories (collectively, "IDEXX") for 1) violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (2) violations of California Corporations Code §§ 25401, 25403, 25501 and 25504.1; (3) intentional misrepresentation (fraudulent concealment); and (4) breach of fiduciary duty.  (*See* Declaration of Cynthia A. Freeland ("Freeland Decl."), ¶ 2.)  The Plaintiffs, at that time, were represented by Markham, the same attorney who had represented Wallack in 2009 in connection with the negotiations that culminated in the execution of the Agreement.  Knowing that the claims were foreclosed by a release in the Agreement and with complete disregard for the evidence he knew to be contrary to the allegations, Mr. Markham drafted the pleading so as to allege fraud in an effort to void the release and did not disclose that Wallack had been represented by counsel (namely Markham) during the negotiation of the Agreement.

On February 24, 2012, the Individual Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6).  (*Id.*, ¶ 3.)  The Individual Defendants argued, among other things, that the mutual release language contained in the Agreement precluded Wallack from levying any claims against the Individual Defendants (the "Release Argument").  (*Id.*)  As evidenced by the Court's April 15, 2015 Order Granting Defendant Wright and Walter's Motion for Summary Judgment ("Summary Judgment Order"), had all the pertinent facts been pleaded at the inception of this lawsuit, the case would have been dismissed at the pleading stage

because ultimately the Summary Judgment Order was issued *because of* the Release Argument.  (*Id*.)

On October 4, 2012, while the Individual Defendants' Motion to Dismiss was pending, the Court granted William Markham's motion for substitution of counsel. As of that date, Plaintiffs were represented by John Millar, Esq. of Kennedy & Sousa, APC.  (Freeland Decl., ¶ 4.)

On April 11, 2013, this Court granted, in part, and denied, in part, the Individual Defendants' motion, at the time rejecting the Release Argument (the "Order").  (*Id.*, ¶ 5.)  Specifically, this Court granted the Individual Defendants' motion to dismiss the Section 10(b) and 10(b)-5 federal securities claim without prejudice, the sections 25401 and 25501 state securities fraud claims without prejudice, the sections 25504.1 and 25403 claims with prejudice, the breach of fiduciary duty claim for failure to disclose a 2009 agreement to sell DVMI's assets to IDEXX without prejudice, and denied the motion to dismiss the breach of fiduciary duty claim as it was based on Plaintiffs' allegations of an illegal non-solicitation clause and allegations of hostile working conditions.  (*Id*.)

By virtue of the Order, Plaintiffs were granted twenty-one days to file an amended complaint, which they did on May 6, 2013.  (*Id*.)  In the First Amended Complaint, Plaintiffs, through their new counsel, asserted nearly identical allegations to those contained in the original pleading, again deliberately concealing facts that would have disposed of this case.  (*Id*.)

On May 7, 2013, the Individual Defendants' counsel sent a letter to Kevin Kennedy and John Millar outlining why Plaintiffs' continued pursuit of the claims against the Individual Defendants was frivolous and would expose Dr. Wallack as well as Kennedy & Souza, APC and counsel to the Individual Defendants' attorneys' fees.  (*Id.*, ¶ 6.)  The Individual Defendants received no response to the May 7, 2013 letter, necessitating that they file a motion to dismiss the First Amended Complaint

9

pursuant to FRCP 12(b)(6).  (*Id.*, ¶¶ 6-7.)  On September 12, 2013, this Court granted, in part, and denied, in part, Defendants' motion ("Order 2").  (*Id.*)

In Order 2, this Court granted, *with prejudice*, the Individual Defendants' Motion to Dismiss the Section 10b and Rule 10(b)-5 securities fraud claim, the California Corporations Code sections 25401 and 25501 state securities fraud claim, and the intentional misrepresentation/fraudulent concealment claims.  (*Id.*)  In ruling on the fraud-based claims, this Court held the following:

> [t]he First Amended Complaint alleges that Defendants fraudulently concealed and intentionally misrepresented facts concerning the sale of Plaintiff's stock to them.  (ECF No. 34, FAC ¶ 112.)  Plaintiff's intentional misrepresentation/fraudulent concealment must allege a false statement or omission of fact.  Underlying this cause of action are the same alleged misleading facts alleged in the federal and state securities fraud causes of action.  ***Since Plaintiff has not sufficiently pled a false statement under Rule 9(b) in the federal and state securities fraud causes of action, this claim also fails.  Plaintiff has been given two opportunities and has failed to allege a cause of action for intentional misrepresentation/fraudulent concealment. Therefore, the Court concludes that any further amendments would be futile.  The Court GRANTS all Defendants' motion to dismiss the intentional misrepresentation/fraudulent concealment cause of action with prejudice***.

(*Id.*  (Emphasis added).)  This Court also granted, without prejudice, the Individual Defendants' motion to dismiss the civil conspiracy claim, giving the Plaintiffs fourteen days leave to amend, which Plaintiffs did on September 26, 2013.  (*Id.*) While no independent fraud claim was asserted in the Second Amended Complaint, the pleading continued to assert, as a basis for the breach of fiduciary duty claim, that the Individual Defendants had engaged in fraudulent conduct.  Another motion to dismiss disposed of the civil conspiracy theory, leaving only the breach of fiduciary duty claim against the Individual Defendants.  (*Id.*, ¶ 7.)

On February 4, 2015, counsel for the Individual Defendants once again wrote to Plaintiffs' counsel about the Individual Defendants' commitment to seeking sanctions

10

upon the conclusion of the matter.  (*Id.*, ¶ 9.)  Plaintiffs did not respond to that correspondence.

On February 12, 2015, the Individual Defendants filed a motion for summary judgment.  (*Id.*, ¶ 17.)  In opposition to that motion, Plaintiffs asserted the same allegations contained in the Second Amended Complaint.  (*Id.*)  On April 15, 2015, this Court granted the motion for summary judgment.  (*Id.*, ¶ 18.)  Because the claims against IDEXX remained pending, judgment could not be entered in the Individual Defendants' favor until the issues between IDEXX and the Plaintiffs were resolved.  (*Id.*, ¶ 19.)

**C.    The Attorney's Fees and Costs Incurred by Individual Defendants**

In this case, Schor & Freeland (the "Firm") has represented the Individual Defendants since January 2012.  The Firm, among other things, prepared three motions to dismiss and an answer, attended two Early Neutral Evaluation conferences, propounded and responded to discovery, reviewed hundreds of pages of documents, took, defended and/or attended eight (8) depositions, prepared a motion for summary judgment and prepared a reply to the opposition to the summary judgment motion. The Individual Defendants' counsel spent 307.6 hours on this case through April 17, 2015, which hours were rendered necessary by the conduct of Wallack and Mr. Millar. (*Id.*, ¶¶ 2-19.)  As a result, the Individual Defendants, between January 2012 and April 17, 2015, incurred $92,520 in attorneys' fees defending themselves against the frivolous claims, exclusive of the fees incurred to bring this motion.  (*Id.*, ¶ 19.) These are fees that should never have been borne by the Individual Defendants and, as a result, the Individual Defendants respectfully request that they be reimbursed these fees and costs through sanctions imposed on Wallack and/or his counsel, Mr. Millar.

## III.

## THE COURT SHOULD EXERCISE ITS INHERENT AUTHORITY AND SANCTION WALLACK AND HIS COUNSEL

This Court has the inherent authority to fashion appropriate sanctions, such as

11

the assessment of attorneys' fees, when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." (*Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123 (1991) quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-59, 95 S.Ct. 1612 (1975); *Reichmann v. Neumann*, 553 F.Supp.2d 307, 319 (S.D.N.Y. 2008).)  This inherent power is not limited by overlapping statutes or rules.  As the United States Supreme Court explained "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." (*Haeger v. The Goodyear Tire & Rubber Company*, 793 F.3d 1122, 1131 (9th Cir. 2015) quoting Chambers, 501 U.S. at 49.)

As the *Chambers* court explained:

> A court may assess attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." [Citations omitted.]  In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, . . ., as it may when a party "shows bad faith in delaying or disrupting the litigation or by hampering enforcement of a court order. [Citation omitted.]  The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."

(*Hutto v. Finney*, 437 U.S. 678, 689 fn. 14, 98 S.Ct. 2565 (1978).)  While direct evidence of bad faith may be rare, "[b]ad faith can be inferred when the actions taken are so completely without merit as to require the conclusion that they must have been taken with some improper purpose." (*Reichmann v. Neumann*, 553 F.Supp.2d at 321 quoting *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 338 (2d Cir. 1999).)  In this case, this Court, while not expressly making a finding of bad faith, concluded that the undisputed evidence, which was known to Wallack before this case was filed, was that Wallack had released the Individual Defendants in 2009 from the

12

1    very claims that he brought in this case, a fact upon which the Court relied in issuing

2    the Summary Judgment Order.

3          More specifically, in granting judgment in favor of the Individual Defendants,

4    this Court noted the following:

> Based on the evidence, it is clear that by December 2009 the relationship between Plaintiff and Wright/Walters had deteriorated.  Plaintiff was motivated to sell his shares in the company.  In order to avoid prolonged litigation, he was willing to accept a significant discount on the valuation in order to get something reasonable and to sever his ties with Wright and Walters.  (Dkt. No. 95-6, Freeland Decl., Ex. C, Markham Depo at 69:9-12.)  Plaintiff contacted Farber at Idexx concerning Idexx' offer in April/May 2009 and Markham conducted his own valuation of the company. (Id., Markham Depo. at 111:21-25.)  *Plaintiff was fully aware of the issues he alleged concerning Defendants' breach of their fiduciary duty; however, he acknowledged that he wanted to avoid litigation and voluntarily gave up his rights as to these claims when he signed and agreed to the mutual release.  Plaintiff made a choice to settle his claims rather than pursue litigation.*  He also acknowledged that he would be receiving less than what he believed DVM was worth.  On December 27, 2009, Markham wrote to Christian, Wright and Walters to accept a settlement offer.  (Dkt. No. 87-23, Ds' NOL., Ex. L at 35 - 36.)  In that email, he discussed his disagreement with the valuation procedures and cited to caselaw and disputing opposing counsel's supporting article.  (Id. at 36.)  In the end, Markham wrote, "[t]hese points, however, no longer matter, as Seth accepts Matt's offer, which he understands to be the following . . ." (Id. at 36.)
>
> Moreover, Plaintiff admits that he read the Agreement, did not have any concerns about the mutual release, and had an opportunity to speak to his lawyer about the Agreement before signing it.  (Dkt. No. 87-18, Ds' NOL, Ex. I, Wallack Depo. at 329:19-331:21; 334:4-13; Dkt. No. 87-22, Ex. L, Markahm [sic] Depo. at 143:9-144:5.)  After reading the Agreement, Plaintiff understood the terms and signed it on December 31, 2009 and received all the consideration provided under the Agreement.  (Id.)
>
> … Since the mutual release bars Plaintiff from asserting claims for breach of fiduciary duty, the Court GRANTS Defendants Wright and Walters' motion for summary judgment on the cause of action for breach of fiduciary duty.

(Summary Judgment Order, p. 22, l. 5 – p.23, l. 6 (emphasis added).)  From this, the

13

logical inference to be drawn is that the action was so completely without merit from its inception as to require the conclusion that it had to have been initiated and pursued with an improper purpose. As a result, Wallack and his counsel should be sanctioned in the amount of $92,520.00, which amount constitutes the entirety of the fees and costs incurred by the Individual Defendants through the entry of judgment, plus the $7500 in fees incurred in preparing and pursuing this motion.

## IV.

## PLAINTIFFS' COUNSEL SHOULD BE ORDERED TO PAY THE INDIVIDUAL DEFENDANTS' ATTORNEYS' FEES PURSUANT TO 28 U.S.C. § 1927

Even if this Court is disinclined to exercise its inherent power to sanction Wallack, Mr. Millar, Wallack's attorney, absolutely should have known better than to continue pursuit of claims that never should have found their way into a pleading, and he should have refrained from engaging in conduct that multiplied not only the proceedings but the cost exposure to the Individual Defendants. (*See* 28 U.S.C. § 1927.) Mr. Millar's conscious decision to disregard his obligations necessarily exposes him to sanctions under section 1927.

Specifically, section 1927 provides, in pertinent part:

> [a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Under section 1927, a court may assess attorneys' fees against an attorney if (1) the actions of the attorney multiply the proceedings, and (2) the attorneys' actions are vexatious and unreasonable. (*See Shackelford v. Courtesy Ford, Inc*., 96 F.Supp.2d 1140, 1144 (D.Colo. 2000) citing *Dreiling v. Peugeot Motors of America, Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985).) As the *Shackelford* court explained:

> [a]ctions are considered vexatious and unreasonable if the attorney acts in bad faith, *id.*, or if the attorney's conduct constitutes reckless disregard for the duty owed by counsel to the court. [Citations omitted.] "Vexatious" conduct

14

1
2
3
4
5
6
7

> includes briefing which obfuscates the legal issues and complicates the defendant's and the court's task of sorting them out. [Citations omitted.]  Section 1927 sanctions may be imposed where counsel persists in a position or in prosecution of a claim after it becomes clear that the position or claim is unfounded. [Citations omitted.]
>
> Reckless conduct differs significantly from mere negligence. Thus, inadvertence, incompetence, or unskillfulness do not warrant sanctions under § 1927. [Citations omitted.] Rather, the attorney's conduct must rise to the level of a 'serious and studied disregard for the orderly processes of justice." . . .

8
9
10

(*Shackelford v. Courtesy Ford, Inc.*, 96 F.Supp.2d at 1144; *B.K.B. v. Maui Police Department*, 276 F.3d 1091 (9th Cir. 2002).)

11
12
13
14
15
16
17
18
19
20
21

As courts have concluded, sanctions under section 1927 are appropriate "when an attorney is cavalier or bent on misleading the court; intentionally acts without plausible basis; [or] when the entire course of the proceedings was unwarranted." (*Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1221 (10th Cir. 2006).)  Toward that end, a finding that an attorney recklessly raised a frivolous argument which resulted in the multiplication of proceedings is sufficient to warrant sanctions under section 1927. (*See Thomas v. Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010) citing *B.K.B v. Maui Police Department*, 276 F.3d 1091, 1107 (9th Cir. 2002).)  "[I]n the contexts of § 1927, frivolousness should be understood as referring to legal or factual contentions so weak as to constitute objective evidence of improper purpose."  (*In re Girardi*, 611 F.3d at 1062.)

22
23
24
25
26
27

While the imposition of sanctions under section 1927 requires a finding of bad faith, knowing or reckless conduct satisfies the requirement.  (*In re Keegan Management Co., Securities Litig.*, 78 F.3d 431, 436 (9th Cir. 1996); *MGIC Indem. Corp. v. Moore*, 952 F.2d 1120, 1121-22 (9th Cir. 1991).)  In this case, Mr. Millar acted in bad faith as he knew or should have known that the legal and factual contentions, that he, himself, *repeatedly* included in pleadings and oppositions

28

presented to this Court, were not only weak, they were wholly lacking in merit, a conclusion ultimately reached by this Court.

By executing pleadings in this matter, Mr. Millar represented, among other things, that the allegations set forth in the pleadings had evidentiary support or, if specifically so identified, would "likely have evidentiary support after a reasonable opportunity for further investigation or discovery." (Fed. R. Civ. P. 11(b)(3).) Mr. Millar received the file in this case from Markham, the attorney who had been involved in negotiating the Agreement in 2009 and from whom Mr. Millar should have gathered all the pertinent facts. In assuming representation of the Plaintiffs, Mr. Millar was obligated to conduct a modicum of research into the facts and law. (*See* Fed. R. Civ. P., Rule 11; *Riley v. City of Philadelphia*, 136 F.R.D. 571, 573 (E.D. Cal. 1991).) Had Mr. Millar fulfilled his obligation (and indeed simply explored the facts with Markham), he would have known that the bases of any alleged claims had been validly released with the execution of the Agreement in 2009.[6]

Notwithstanding this, Mr. Millar, in preparing and submitting the First Amended Complaint, the Second Amended Complaint, and the Opposition to the Motion for Summary Judgment, advanced allegations that, regardless of their veracity, were inactionable in light of the releases contained in the Agreement. More specifically, in each of the documents submitted to this Court by Mr. Millar, he asserted the Individual Defendants engaged in the following conduct that warranted voiding the release in the Agreement:

(a)     Withholding/Misrepresenting DVMI's true financial condition during 2009 from Wallack;

(b)     Taking control/seizing the books and account of DVMI;

(c)     Moving the DVMI business operations to Wright's home, with little or

---

[6] Even if, for some inexplicable reason, Mr. Millar did not get the background facts from Mr. Markham or from his own client, a conclusion that would defy logic and run afoul of Mr. Millar's Rule 11 obligations, Mr. Millar was on notice of all of these facts, at the very latest by May 7, 2013, when he received the letter from the Individual Defendants' counsel demanding dismissal of the case.

16

no notice;

(d)     Holding at least one secret meeting with the company accountant, including discussing that much of the 2009 profits (which Wright had in August told Wallack there would likely be none), would be distributed in the form of back paid salary to Wright and Walters, and bonuses to Walters, Wright and other DVMI employees, to the exclusion of Wallack;

(e)     Eliminating Wallack's Administrator access to the DVMI website;

(f)     Seizing and transferring ownership of the DVMinsight.com domain name to themselves from Wallack's company (SDVI) by having Walters surreptitiously use his prior SDVI access to the GoDaddy.com account to contact GoDaddy.com and have the domain name switched to another account and web host, with no access to Wallack or SDVI;

(g)     Attempting in bad faith, as part of the Stock Repurchase Agreement, to "steal" SDVI's registered ownership of the DVMINSIGHT Trademark, with the intent of selling that Trademark to IDEXX without obtaining the necessary written assignment under federal law (namely 15 USC 1055(a)(3));

(h)     Refusing to allow a fair business valuation of DVMI to establish a purchase price for Wallack's shares of stock; and

(i)     Knowingly retaining DVMI's corporate counsel, Michael Christian, as their personal counsel to represent them in the Stock Repurchase Transaction, including having Christian advocate to not have a business valuation and otherwise dissuade Wallack from receiving the benefits of a fair, reasonable, good faith and honest negotiation he deserved with those who owed him fiduciary duties (but who were fraudulently and clandestinely negotiating a Stock Repurchase so they could reap the rewards of future employment and millions of dollars from an asset purchase – to the tortous exclusion of Wallack from reaping those benefits.)

(j)     Subjecting Wallack to a coordinated effort to make his relationships with co-owners and is (sic) working environment with them and staff hostile ones; and

17

1  (k)     Threatening to misdirect DVMI's revenues/assets to their own personal

2  companies if Wallack insisted on remaining a shareholder of the company.

3  (Summary Judgment Order, pp. 11, l. 9- 12, l. 13.)  As this Court noted, however,  in

4  the Summary Judgment Order:

5  > [a]t his deposition, Markham confirmed that in December
> 2009, he sent an email threatening to bring a lawsuit in state
6  > court. . . .***Markham's email and testimony reveal that
> Plaintiff knew about alleged acts or omissions a, b, d, e, f,***
7  > ***h, and k prior to signing the mutual release.  Therefore,***
> ***these cannot be a basis to for [sic] void the mutual release***.

8

9  (Summary Judgment Order, p. 18, ll.12-13; 27-28 (emphasis added).)  The Court also

10 found, which facts Mr. Millar also should have known and which he most certainly

11 did know after the production of documents in this case and the depositions of

12 Wallack and Markham, that:

13  1)     with respect to the act/omission identified as (c), an August 2009 email

14 sent by Wallack not only confirmed he was aware of the business decision but

15 condoned it.  (*Id.*, p. 19, ll. 16-22.)

16  2)     IDEXX's attempt to register the DVMI trademark years after Wallack

17 signed the Agreement is irrelevant to Wallack's claim that the Individual Defendants

18 breached a fiduciary duty to him in 2009.  (*Id.*, pp. 19, l. 23- 21, l. 8.)

19  3)     Wallack's assertion that the Individual Defendants retained DVMI's

20 corporate counsel to dissuade Wallack from receiving the benefits of a fair and

21 reasonable negotiation was nothing more than speculation (*Id.*, p. 21, ll. 9-24); and

22  4)     Wallack's allegation that the Individual Defendants subjected him to a

23 coordinated effort to create a hostile working environment "is essentially an

24 amalgamation of items a-j which have been shown to be meritless individually and are

25 no more meritorious combined."  (*Id.*, p. 21, l. 25-p. 22, l.1.)

26  Notwithstanding the evidence that was available to Mr. Millar before he

27 became counsel of record, Mr. Millar carefully drafted the First ***and*** Second Amended

28 Complaints so as to conveniently neglect to plead that (1) Wallack was represented by

18

counsel in connection with the 2009 negotiations that led up to the Agreement, (2) all of the bases upon which Wallack based his breach of fiduciary duty claim in this litigation were known to Wallack before he executed the Agreement (a fact confirmed by Markham in his deposition in this matter), (3) Wallack threatened in 2009 to initiate a lawsuit for, among other things, breach of fiduciary duty if an agreement could not be reached regarding the repurchase of his shares, and (4) Markham participated in the drafting of various provisions of the Agreement, which Wallack then voluntarily signed.  The inescapable conclusion is that Mr. Millar purposefully and on several occasions presented allegations to this Court that he knew to be false and/or he purposefully did not plead facts that, if they had been presented with the initial pleading, would have foreclosed years of needless litigation.  This course of conduct by Mr. Millar constitutes a 'serious and studied disregard for the orderly processes of justice."

Undeterred by the indisputable evidence, Mr. Millar unnecessarily and unreasonably multiplied the proceedings by (1) filing an opposition to the motion to dismiss the First Amended Complaint predicated on theories and factual assertions he knew or should have known were not supported by the evidence as known to Wallack since the inception of this matter, (2) filing a Second Amended Complaint predicated upon the same theories and factual assertions he knew or should have known were not supported by the evidence as known to Wallack since the inception of this matter, thus necessitating another motion to dismiss, (3) filing an opposition to the motion to dismiss the Second Amended Complaint, (4) forcing the Individual Defendants to engage in the discovery process only to confirm that Wallack was fully aware of the consequences of signing the Agreement and its accompanying release, (4) failing to dismiss the breach of fiduciary duty claim after Wallack's and Markham's depositions, in which Wallack and Markham conceded that Wallack had been aware of all of the alleged bases for the breach of fiduciary duty claim before he knowingly (and with the guidance of counsel) signed the Agreement, which failure necessitated

19

the filing of a motion for summary judgment, and (6) opposing the Individual

Defendants' motion for summary judgment on the same theories and factual assertions

he knew or should have known were not supported by the evidence as known to

Wallack since the inception of this matter, thus requiring a reply by the Individual

Defendants.

A lawyer, armed with the knowledge that the evidence cannot possibly support

the legal theory advanced, acts in bad faith when he nonetheless persists in his pursuit

of that legal theory.  As such, all of Mr. Millar's actions, at the very latest, post

May 7, 2013, multiplied the proceedings unreasonably and vexatiously so as to

needlessly increase the costs and fees incurred by the Individual Defendants in

defending themselves, fees and costs that Mr. Millar should now bear.  To the extent

that the Court is inclined to award sanctions under section 1927, as opposed to its

inherent authority, Mr. Millar should be sanctioned in the amount of $71,820, the

amount of fees that the Individual Defendants incurred defending themselves against

Plaintiffs' frivolous claims after May 7, 2013, plus the $7500 in fees that the

Individual Defendants incurred to pursue this motion.

## V.

## CONCLUSION

This lawsuit never should have been filed, not just because a mutual release

among the parties precluded the claims the Wallack levied against the Individual

Defendants but because Wallack never had anything more than speculation to support

his theory that the Individual Defendants breached a fiduciary duty to him.  Had Mr.

Millar done even a modicum of due diligence, he would have known that the

Plaintiffs' case against the Individual Defendants was frivolous from its inception.

Had Mr. Millar used the May 7, 2013 letter as an opportunity to delve into the facts of

the case, an exercise in which he should have engaged prior to accepting the case, he

would have known then that continued pursuit of the Plaintiffs' claims against the

Individual Defendants would expose him to the costs and attorneys' fees incurred by

20

the Individual Defendants.  Now, the Individual Defendants respectfully request that Wallack and Mr. Millar be sanctioned in the amount $92,530.00, which reflects the fees incurred by the Individual Defendants in the defense of this matter, plus an additional $7500 incurred in pursuing this motion.  Alternatively, Mr. Millar should be sanctioned in the amount of $71,820, the amount that the Individual Defendants incurred after May 7, 2013 defending themselves against Plaintiffs' frivolous claims, plus $7500 the Individual Defendants incurred in pursuing this motion.

Dated: April 1, 2016                    SCHOR & FREELAND, LLP

                                        By:    /s/ Cynthia A. Freeland
                                           Cynthia A. Freeland

                                           Attorneys for Matthew Wright and
                                           Stephen Walters